FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 MAR 16  PM 2: 39

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

    and

THE STATE OF MARYLAND

    and

*Ex Rel.* Michael GOEBEL
1121 Resden Run
Salisbury, MD 21804

    and

*Ex Rel.* WILLIAM COLEMAN
414 Somerset Avenue
Salisbury, MD 21801

              Plaintiffs,

    v.

SELECT REHABILITATION, INC.
2600 Compass Road
Glenview, Illinois 60026

    *Serve: Resident Agent:*
        James M. Halpin
        208 South Lasalle Street
        Chicago, Illinois 60604

    and

ANCHORAGE SNF, LLC
**d/b/a ANCHORAGE HEALTHCARE
CENTER**
105 Time Square
Salisbury, Maryland 21801

Case No. _____

**FILED UNDER SEAL**
Pursuant to 31 U.S.C. §3730
(False Claims Act)

**DO NOT** ENTER IN PACER
**DO NOT** PLACE IN PRESS BOX

JMJG 17CV0722

1

        *Serve: Resident Agent:*                :
               Stephanie Butterfield           :
               C/O Corporation Trust Incorporated :
               351 W Camden Street              :
               Baltimore, Maryland 21201        :

    and                                         :
                                                :
                                                :
**COMMUNICARE HEALTH SERVICES, INC.** :
4700 Ashwood Drive                              :
Blue Ash, Ohio 45241                            :
                                                :
        *Serve: Resident Agent:*                :
               Ira C. Kaplan                    :
               200 Public Square 2300 BP Tower  :
               Cleveland, Ohio 44114            :
                                                :
    and                                         :
                                                :
**WHITE OAK HEALTHCARE, LLC, d/b/a**            :
**WHITE OAK SENIOR CARE**                       :
921 East Fort Avenue Suite 240                  :
Baltimore, Maryland 21230                       :
                                                :
        *Serve: Resident Agent:*                :
               Stephanie Butterfield           :
               C/O Corporation Trust Incorporated :
               351 West Camden Street           :
               Baltimore, Maryland 21201        :
                                                :
                                                :
               Defendants.                      :

2

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.        COME NOW, Plaintiffs and *qui tam* Relators MICHAEL GOEBEL and WILLIAM COLEMAN ("Relators" or "Plaintiffs-Relators"), by and through undersigned counsel, and file this False Claims Act ("FCA") Complaint and Jury Demand, on behalf of themselves and the United States of America and the State of Maryland, against Defendants SELECT REHABILITATION, INC. ("Select" or "Defendant"), ANCHORAGE SNF, LLC ("Anchorage" or "Defendant"), COMMUNICARE HEALTHCARE SERVICES, INC. ("CommuniCare" or "Defendant"), and WHITE OAK HEALTHCARE, LLC ("White Oak" or "Defendant") (collectively referred to as "Defendants") for money damages and civil penalties arising out of the Defendants' violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.* and Md. Code Ann., Health-Gen § 2-601 *et seq.*, related to knowingly submitting false or fraudulent claims and therefore causing improper reimbursement payments from Medicare and Medicaid.

## NATURE OF THE CASE

2.        This is an action for money damages, including treble damages and civil penalties, under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 and the Medicare Act, 42 U.S.C. §§ 1395, *et seq.*

3.        This is also brought under the state False Claims Act of the State of Maryland, Md. Code Ann., Health-Gen § 2-601 *et seq.*

4.        Defendant Select is a nationwide therapy service provider that employs licensed and certified physical, occupational, and speech therapy professionals to provide healthcare

services for patients in need of post-acute rehabilitation treatment, including speech, occupational, and physical therapy, and long-term extensive nursing care. It is a vast, private entity that contracts with skilled nursing facilities ("SNFs"), continuing care retirement communities, adult residential facilities, independent living facilities, and home health agencies, to staff the facilities and engages in operating and managing the facilities' healthcare systems to provide therapy services to Medicare patients. Select currently contracts with medical facilities in about 32 states. Relators work at the Maryland location, which is in Select's Mid-Atlantic Region, also comprised of Delaware, Pennsylvania, and Virginia.

5.     Defendant Anchorage is a private SNF registered with the State of Maryland. Located in Salisbury, Anchorage specializes in both short-term and long-term rehabilitation and senior healthcare services, delivering both nursing and therapy care to its patients. Select contracts with Anchorage to staff its therapists at the Anchorage facility. It is one of the branches at which the Relators mainly work. Anchorage is owned and operated by Defendant CommuniCare.

6.     Defendant CommuniCare is a national provider of post-acute care. The company manages and operates approximately 51 facilities, including skilled nursing rehabilitation facilities, long-term facilities, assisted living communities, independent rehabilitation facilities, and long-term acute care hospitals, in five different states including Maryland. CommuniCare owns and operates Anchorage, providing general nursing care to the facility. For the purposes of enabling therapy services, Anchorage is permitted to contract with outside provider companies like Select. In essence, CommuniCare loans the Anchorage facility to Select and in turn, Anchorage contracts with Select to staff its facility with therapists provided by Select. Select's corporate office works closely with CommuniCare's corporate office to operate and manage

4

Anchorage on the therapy side of the business, including setting therapy minutes, monitoring therapists, assigning services to Medicare patients, managing productivity levels, and enforcing corporate directives. CommuniCare acquired Anchorage in January 2016

7.      Prior to CommuniCare's acquisition of Anchorage in January 2016, Anchorage was formerly owned and operated by Defendant White Oak, which managed Anchorage similarly to how CommuniCare manages Anchorage now. White Oak also loaned its facility to Select and Anchorage contracted with Select to staff its facility with Select's employees. White Oak is a mid-sized healthcare and senior services company registered in the State of Maryland. It is a private entity that operates and manages SNFs and other long-term residential-based facilities that provide rehabilitation services under Medicare. Select's corporate office worked closely with White Oak's corporate office to operate and manage Anchorage on the therapy side of the business. Relators also bring claims against White Oak for all the relevant fraud that occurred prior to the date of CommuniCare's acquisition of Anchorage. White Oak acquired Anchorage in June 2007.

8.      Relators are also staffed at the Harrison House of Snow Hill ("Snow Hill"). Like Anchorage, Snow Hill is also a SNF that provides skilled nursing and rehabilitation services to the Eastern Shore of Maryland, Delaware, and Pennsylvania. The facility is owned and operated by Harrison Senior Living.  Harrison Senior Living is a private company that offers a wide range of healthcare programs, personnel, and accommodations for its patients who reside in its facilities, including Snow Hill. Established in 1967, the company opened Snow Hill in Maryland in 1977. Not a party to this case, Snow Hill also contracts with Select to staff its facility with Select-employed therapists. Select has been staffing Snow Hill since June 2015. Select is responsible for the fraud committed at Snow Hill, within the scope of its management and

5

operations. Upon information and belief, unlike CommuniCare (and White Oak), Snow Hill is unaware of and not willingly participating in the fraud described herein.

      9.      Plaintiffs-Relators bring this *qui tam* action against Defendants, based on their personal knowledge of intentionally false and fraudulent practices performed or caused by the Defendants and/or their agents and employees related to the following main categories of fraud:

     (a) submission and/or causing the submission of false claims of services that have been intentionally up-coded;

     (b) fraudulent and improper billing and payment coding corresponding to specific services that are unreasonable or not medically necessary, that patients cannot tolerate or benefit from, or that are not actually provided;

     (c) fraudulent manipulation ("classic ramping") of therapy minutes during assessment reference periods to maximize payment;

     (d) falsification of patient Minimum Data Set 3.0 ("MDS 3.0") assessment reports and fabrication of medical records, including patient evaluations, plan of treatment forms, and therapy progress reports;

     (e) ignoring patient tolerance levels and functionality assessments to knowingly and intentionally classify nearly all patients into the Ultra High Resource Utilization Group (RUG) level;

     (f) performing unreasonable and medically unnecessary procedures and treatment and therapies, risking, causing, and elevating patient harm; and

     (g) sustaining a fraudulent course of conduct, using methods of avoiding detection, to obtain improper and unlawful government reimbursement, which is not paid back or refunded.

      10.     One location in which the fraud occurs is at Anchorage. Anchorage, one of CommuniCare's facilities, is currently under contract with Select to provide therapy services to its Medicare patients. In doing so, Select's corporate office conspires with CommuniCare's corporate office (and previously with White Oak's corporate office), to violate the federal and Maryland state FCA through such frauds. CommuniCare joins in the fraud by receiving a portion of the billed services that Select fraudulently bills. Upon information and belief, CommuniCare

knowingly permits, participates and benefits from the fraud. It is in constant communication with Select and either encourages or, with deliberate indifference to the truth, turns a blind eye to Select's fraudulent activity. Anchorage also plays a key role in contributing to the fraud by carrying out the corporate directives that directly lead to patient harm and government fraud. This combined effort directly causes the fraudulent acts that intentionally divest the government of funds, maximizing Medicare and Medicaid reimbursement for the personal, financial benefit of all the Defendants involved. Not only does Select's corporate hierarchy jeopardize patient health, welfare, and safety, but the company knowingly and intentionally encourages, facilitates, requires, actively pressures, and financially benefits from the fraud, at the tremendous expense of the U.S. Treasury and the State of Maryland.

11.    Corporate directives concerning therapy service are normally handed down by Select, through the chain of command, in the form of both written and verbal instructions. Select actively encourages and pressures therapists, for example at Anchorage and Snow Hill, to maximize Select's contract therapy revenues and to meet the company's targeted quota of the frequency and duration of therapy services provided to each Medicare or Medicaid patient. CommuniCare is aware of Select's corporate directives but proceeds to let Select manage the therapy services at Anchorage and Snow Hill fraudulently, because CommuniCare benefits therefrom, also receiving a portion of the contract therapy revenues. At all times relevant, White Oak also knew of the fraud, permitted it and benefitted therefrom by receiving a portion of the revenues.

12.    In summary, first, Select routinely provides skilled care for patients based on illegitimate, medically irrelevant, falsified, and non-CMS compliant standards. Select wrongfully provides skilled care to Medicare patients at its facilities even if those patients do not meet the

7

eligibility assessment standards to receive skilled care benefits and thus, are not truly qualified for Medicare reimbursed treatment.

13.    One critical way in which it facilitates fraud is by allowing off-site Select administrators, sitting in their office without any opportunity to examine patients, to make decisions directly related to the medical care of patients, including setting targeted therapy minutes for the facility and assigning levels of therapy to patients, in disregard of CMS regulations. These administrators are under enormous corporate pressure to secure and report high RUG levels for each patient any way they can and regardless of medical necessity. Upon information and belief, these administrators are personally financially incentivized with bonuses based on the level of therapy services provided to each patient, which incentivizes and encourages much of the fraud at issue here. As a result, treatment decisions are not made in the best interests and individualized medical needs of each patient.

14.    For example, CMS provides explicit and unambiguous coverage determination requirements for Medicare patients who need SNF care. Among other requirements and limitations, Medicare expressly states that SNF benefits will not be covered for a patient who has used all 100 days of coverage in the designated benefit period and/or for a patient who no longer needs inpatient skilled care on a daily basis. In other words, if the skilled care is no longer reasonable and necessary for the patient's condition, Medicare no longer covers SNF care for the patient, and thus, Medicare will not make any reimbursement payments.

15.    CMS also expressly states that if the patient clearly refuses daily skilled care, the patient will lose his or her SNF benefits. In other words, if the patient is unable to tolerate skilled care and completely refuses therapy, treatment should discontinue immediately and Medicare will not cover SNF benefits for the patient.

8

16.    However, these eligibility standards are ignored by Select administrators.

17.    Instead, Select administrators knowingly and intentionally interfere with treatment decisions, to improperly assign medically unreasonable and unnecessary therapy to patients, paying no attention to the patient's refusal to participate in therapy or status indications of the patient's intolerance to therapy, so that the company can still bill Medicare.

18.    In doing so, Select administrators supervising Anchorage and Snow Hill rely heavily on therapy assistants to maintain their fraudulent scheme, although therapy assistants are usually neither clinically licensed to assess patients nor provide actual patient therapy. Even though Select administrators and the identified therapy assistants do not assess patients, do not see patients, do not have exposure to the patient's status and their relevant medical needs, they continue to automatically set high therapy minutes for patients without appropriate medical justification.

19.    Furthermore, Select administrators also routinely disregard doctor's orders and override recommendations and suggestions of licensed, treating therapists at Anchorage and Snow Hill, including the Relators, who, unlike the Select administrators, work with patients on a daily basis and are able and authorized to make clinical decisions. Select's fraudulent activities, based entirely on dollar figures, result in an ever decreasing level of quality and care provided to its Medicare patients

20.    Second, Select knowingly falsifies medical records and patient assessment forms submitted to its fiscal intermediary and to CMS, in order to up-code RUG levels (Resource Utilization Group) and improperly increase therapy. Therapy progress reports, patient evaluations, and plan of treatment forms, all documenting patient symptoms, functioning and

needs, do not accurately and truthfully reflect honest clinical assessments made by therapists who actually work with the patients on a daily basis.

21.     Instead, the fraud is purely associated with the financial motives of the Defendants, in efforts to obtain overpayments from Medicare and Medicaid and avoid potential cancellation of SNF benefits for patients. As a result, skilled care services and its related types and lengths of treatment and therapy are falsely and recklessly increased to allow for treatment and/or a greater level of treatment without the required clinical symptoms and medical necessity.

22.     In practice, Select assigns its patients to the highest therapy reimbursement level possible and engages in up-coding case mix data results, RUG rates, based on the Minimum Data Set 3.0 ("MDS 3.0") assessments submitted to the Government. As an example, Select's corporate office automatically assigns RUG rates at Ultra-High - the highest level of therapy minutes that can be provided to each patient, which converts to a classification system that allows for a higher rate of Medicare payment - to over 95% of its Anchorage patients, regardless of medical need or a patient's ability to tolerate or benefit. The abnormally high number of Ultra-High levels assigned to patients at Anchorage is not only statistically impossible, given the demographics of the facility's location and the makeup of the facility and staffing, but is clinically inappropriate.

23.     The fraud also negatively impacts patients who actually need Medicare coverage for other medical purposes, preventing them from receiving benefits to which they are entitled and deserve. For example, Select routinely forces therapy services on and up-codes treatment rates for patients who may no longer need skilled care. Patients are often exhausted of benefits in that fraudulent process and are later denied at other medical facilities when they truly need health care services. Even if the patients need hospice, need to be admitted to a hospital, or need to be

10

treated at another facility for services covered through Medicare Part B, these patients are informed that since they have used up all their 100 days of coverage in the benefit period (on medically unnecessary SNF care) they are not qualified for any more coverage benefits.

24. Thus, the fraud puts patients at real risk of harm and of not getting medically necessary coverage when they need it.

25. Third, Select also engages in strategic methods to continue its fraudulent practices undetected. Select administrators deliberately keep tabs on when each patient is entering a new assessment cycle, intentionally working around the assessment reference date ("ARD") to assign treatment minutes. Select ramps, or manipulates, therapy minutes in an attempt to submit to the Government without raising any red flags that could be associated with maintaining the highest level through the entire treatment period. It is a critical component in Select's scheme to avoid fraud detection.

26. Furthermore, in order to avoid government inquiry and detection, Select specifically instructs therapists at Anchorage and Snow Hill to schedule the therapy minutes in non-overlapping increments. This allows the patients to be maintained at a certain high RUG level for at least the five-day assessment reference period, so that in turn, Select will gain excessive revenue from the contract therapy. "Classic ramping" at Select, which is typically performed against doctor's orders or therapist recommendation, imposes serious medical setbacks for too many patients at both Anchorage and Snow Hill and risks patient harm.

27. Finally, fraud is also committed through a documented set of broad corporate policies and procedures, consisting of internal and external factors that impact the daily operations of Anchorage and Snow Hill. Select's corporate office instructs and strictly monitors its employees to follow corporate policies, exercised through both written and verbal directives.

By personally setting the daily RUG levels for Anchorage and Snow Hill, the off-site Select administrators micromanage the manner in which and the minutes for which therapists provide treatment for each patient. CommuniCare typically allows Select to run Anchorage in this manner, because CommuniCare is guaranteed a share of the contract therapy revenue. At all times relevant, White Oak's attitude towards Select's fraud resembled CommuniCare's actions pertaining to operating the therapy service system at Anchorage.

28.     Clinicians, including the Relators, at Anchorage and Snow Hill are closely supervised and monitored by off-site Select administrators to ensure that the facilities are closely following the company's goals of maximizing its contract therapy revenue, directly profiting from the government through various fraud and with disregard to whether patients are legitimately eligible for skilled care benefits.

29.     Through the fraudulent practices that have occurred and that still continue to spread throughout the facilities, Select compels Anchorage and Snow Hill to bill the government for patients who are not eligible for skilled care benefits and for high intense therapy that is not reasonable or medically necessary, that patients expressly refuse and are unable to tolerate and/or benefit from. As a result, Select receives a large surplus of payments from Medicare and Medicaid, for which it is not entitled, should not keep, and should return but does not. Select's corporate office is in charge of the billing system for the therapy services provided at Anchorage and Snow Hill. Upon information and belief, CommuniCare knows about, permits and conspires in Select's process in fraudulently billing the government for therapy services provided to Medicare patients at its facilities. Upon information and belief, CommuniCare also earns a percentage of the profit that Select collects from the fraudulently submitted reimbursements, paid for by the government.

30.     All of the Defendants violate the federal and Maryland state FCA because they knowingly submit and/or cause the submission of false claims to the government, perpetrating fraudulent acts in order to receive or aid in the receipt of payments for services purportedly provided to patients insured by Medicare and Medicaid. Defendants' billing invoices to the United States Government are based on false information in connection with improper eligibility determinations of skilled care patients, fabrication of medical records and assessments to intentionally up-code RUG levels, "classic ramping," and performance of therapy that is neither reasonable nor medically necessary, dangerously increasing patient risk and harm.

31.     Thus, Defendants' fraudulent conduct impose a critical financial impact on Medicare, Medicaid, and the government. The Federal Treasury and the State of Maryland have been damaged in a substantial amount that is yet to be determined, but estimated at millions of dollars, and continues to be wrongfully depleted.

32.     The fraud continues to occur at the time of the filing of this Complaint. Relators report this fraud to expose the unlawful actions in order to protect the patients they serve from medical risk and danger, but to also provide safeguard mechanisms for unaware Medicare and Medicaid patients that could be treated by Select and its related entities in the future.

## PARTIES

33.     The United States, through the Department of Health and Human Services ("HHS") and HHS's Centers for Medicare and Medicaid Services ("CMS"), is the real party-plaintiff in interest in this action. HHS's headquarters are located at 200 Independence Avenue S.W., Washington, D.C., 20201. CMS's main office is located at 7500 Security Boulevard, Baltimore, MD 21244.

34. The State of Maryland is also a real party-plaintiff in interest in this action. Maryland runs its state's Medicaid program (also known as the Medical Assistance program), through its Department of Health and Mental Hygiene.

35. Plaintiff-Relator Michael Goebel is a resident of the State of Maryland. He lives in Salisbury, Maryland. He is a licensed Certified Occupational Therapy Assistant ("COTA"), with 12 years of veteran expertise in geriatric and sub-acute rehabilitation care. Relator joined Select in September 2010. He currently works at Snow Hill. He previously served as the Program Manager at Anchorage for five years, providing health care services in his capacity as well as evaluating patient functional outcomes, maintaining patient RUG levels, scheduling patient caseloads, managing therapists and assistants, and attending interdisciplinary meetings to ensure safe and timely discharge of patients. Relator has personal knowledge of the fraud described herein. Prior to joining Select, Relator was employed in other rehabilitation service facilities in the Maryland region, including Sundance Rehabilitation Center in Pocomoke City, Genesis Healthcare in Salisbury, and Deers Head Hospital Center, also in Salisbury.

36. Plaintiff-Relator Bill Coleman is also a resident of the State of Maryland. He also lives in Salisbury, Maryland. He is a licensed Physical Therapist ("PT") with 19 years of experience in physical therapy service. Relator joined Select in July 2015 as a full-time contract employee. He served as Program Manager at Snow Hill, performing and documenting therapy exams, evaluating data to diagnose patients prior to intervention, and monitoring patient treatment at various stages to adjust treatment levels accordingly. He also worked at Anchorage and John B. Parsons ("JB Parsons"). (JB Parsons is a personal care and assisted living facility owned and operated by Harrison Senior Living). Relator officially resigned from Select on September 9, 2016. He continues working as a PT, but for another, non-Select, facility.

14

37.     Defendant Select is a large national therapy service provider. Incorporated in

1998, Neal Deutsch is its co-founder and CEO and Anna Guardina-Wolfe is its co-founder and

President. Select is a private entity with a principal place of business at 2600 Compass Road

Glenview, Illinois 60026, and regional offices throughout the United States. Select employs a

variety of licensed medical professionals and offers an array of contract rehabilitation services

within the post-acute care field, including physical, occupational, and speech language therapy.

Select contracts with facilities within 32 states across the U.S., staffing the branches with

therapists and also engages in the managing duties in order to provide contract therapy to its

Medicare patients. Anchorage and Snow Hill are both located in Maryland which is considered

Select's Mid-Atlantic Region, also comprised of Delaware, Pennsylvania, and Virginia. Select's

corporate office consists of about 50 employees. Select is reported to average revenue totaling

from about $1 million to $5 million per branch. Anchorage consists of about 300 employees. In

2016 (between January and September), Anchorage alone made about $2 million in billings.

Approximately 97.7% of that revenue is connected to Medicare reimbursement payments. Snow

Hill, which is a smaller SNF than Anchorage, totaled about $800,000 in billings, between

January and October of 2016. Approximately 99% of that revenue is connected to Medicare

reimbursement payments. Snow Hill has about 100 employees. At all times relevant, Select

employed Relators.

38.     Defendant Anchorage is a private SNF registered with the State of Maryland.

Established in 2002 and located in 105 Time Square Salisbury, Maryland 21801, Anchorage is

larger than the average nursing home in Maryland, with 126 beds. It specializes in providing

both short-term and long-term rehabilitation and senior healthcare services for its patients.

CommuniCare holds ownership of Anchorage, providing nursing care to its patients. Anchorage

contracts with an outside therapy provider company like Select to staff its facility with Select-employees to provide therapy services to its Medicare patients.

39.     Defendant CommuniCare is a national provider of post-acute care. Established in 1984, Stephen L. Rosedale is its founder and CEO. CommuniCare is a family-owned company with a principal place of business at 4700 Ashwood Drive Blue Ash, Ohio 45241. CommuniCare currently manages and operates 50 medical facilities, including skilled nursing rehabilitation facilities, long-term facilities, assisted living communities, independent rehabilitation facilities and long-term acute care hospitals, in five different states, Ohio, Maryland, Pennsylvania, West Virginia, and Missouri. This includes Anchorage located in Maryland. In January 2016, after acquiring Anchorage from White Oak, CommuniCare became the second-largest provider of SNFs in the Maryland area, with 15 total facilities and nearly 2,000 beds. CommuniCare directly hires physicians and nurses to provide long-term nursing care for its patients but allows its facilities to employ therapists from outside provider companies in providing physical and occupational therapy for its patients. As a result, through Select's contractual relationship with Anchorage, Select can operate and manage Anchorage. Thus, CommuniCare is also responsible for conspiring with Select to commit fraud at Anchorage, by establishment of corporate directives.

40.     Defendant White Oak is a mid-sized healthcare and senior services company registered in the State of Maryland. Incorporated in 2006, White Oak is a private entity with a principal place of business at 954 Ridgebrook Road Sparks Glencoe, Maryland 21152. White Oak owns and operates 11 SNFs, six of which are located in the Maryland area. White Oak owned and operated Anchorage from June 6, 2007 to January 2016, until CommuniCare acquired Anchorage in January 2016.

16

## FCA SUBJECT MATTER JURISDICTION & VENUE

41.     This Court has jurisdiction over the subject matter jurisdiction of this action pursuant to 28 U.S.C §1331 and 31 U.S.C §3732. 31 U.S.C §3732 specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C §§3729 and 3730.

42.     Prior to any "public disclosure" (as defined by the FCA) and prior to filing this action, Relators voluntarily disclosed to the United States Attorney's Office for the District of Maryland on August 25, 2016 the information on which the allegations or transactions in this complaint are based.

43.     Through Relator Goebel's current employment and Relator Coleman's former employment at Select, both Relators are an "original source" of the information on which these allegations are based, within the meaning of the FCA.

44.     This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C §§1391(b) and 31 U.S.C §3732(a), because those sections authorize nationwide service of process and because the Defendants have at least minimum contacts with the United States. Moreover, the Defendants can be found in and transact business in Maryland in addition to employing Maryland residents.

45.     Venue lies in the District of Maryland under 28 U.S.C §1391(b) and 31 U.S.C §3732(a) as the place where many of the claims arise.

46.     The Government would not have known about this fraud, its details, and its breadth and scope, without the personal knowledge provided by the Relators.

## BACKGROUND

### *False Claims Act*

47.     The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or Fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a False record or statement material to a false or fraudulent claim;

(a)(1)(C) conspires to defraud the Government by getting a false or Fraudulent claim allowed or paid; or

…

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for any civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

48. For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

49. The FCA defines a "claim to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 U.S.C. § 3729(b)(2).

18

50.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C § 2461 (notes), and 64 Fed. Ref. 47099, 47103 (1999), the FCA civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### *Medicare Program*

51.     Medicare is the federal health insurance program that was created in 1965 when Title XVII of the Social Security Act was adopted. 42 U.S.C. §§ 1395, *et seq*. Medicare covers people of age 65 and older, regardless of their income or medical history, providing for the payment of hospital services, medical services, and durable medical equipment. Patients who receive benefits under Medicare are commonly referred to as "beneficiaries." Medicare is administered by HHS through CMS and the program extends to about 46 million Americans.

52.     Medicare is divided into four major components, the first two of which are relevant to this action. Part A pays for skilled nursing facility stays, inpatient hospital stays, hospice care, and home health visits. Part B covers physician visits, outpatient services, preventive services, and home health visits. Part C, the Medicare Advantage Program, allows beneficiaries to enroll in a private health organization, such as a health maintenance organization (HMO), and receive all Medicare-covered benefits. Part D is the voluntary, subsidized outpatient prescription drug benefit.

53.     Medicare Part A and B covers many of the services provided by skilled nursing facilities ("SNFs"), including those provided by the Defendants.  By virtue of their participation in the Medicare programs, Defendants agreed to be bound by the conditions imposed on it by Federal and State laws, including not to make any knowing or reckless false statements in their claims for payment from Medicare.

19

54.     Reimbursement for Medicare claims are managed through CMS, which contracts with private insurance companies that operate as Part A/Part B Medicare Administrative Contractors (MACs), to process reimbursement claims.

55.     MACs issue written Local Coverage Determinations ("LCDs"), in which all Medicare providers under their purview must comply. LCDs refer to "a determination by a fiscal intermediary or a carrier under Part A or Part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary – or carrier-wide basis under such parts …" *See* Section 1869(f)(2)(B) of the Social Security Act.

56.     In short, the MAC accepts, reviews, and pays reimbursement claims under Medicare Part A, including skilled care, and most claims under Part B, from providers that furnish Part A services. Examples of payment under Part B include a patient, who is a SNF inpatient, in which the SNF is responsible for furnishing all services within the scope of the skilled care benefit. *See* Medicare Benefit Policy Manual, Chapter 1 – General Billing Requirements.

57.     In addition, the Administrative Simplification Compliance Act ("ASCA") requires that claims be submitted to Medicare electronically unless certain exceptions are met. All service providers and suppliers, including SNFs, are required to self-assess whether they meet certain permitted exceptions to this electronic billing requirement. In some cases however, providers are required to submit a written request to their Medicare contractor to receive permission to submit some or all of their claims on paper.

58.     To be eligible to file a claim for payment with Medicare, SNFs are required to establish an Electronic Data Interchange ("EDI") agreement with Medicare – either by submitting the CMS Form 855 or an Internet-based application via the Provider Enrollment,

Chain and Ownership System. *See* Medicare Claims Processing Manual, Chapter 24 – General

EDI and EDI Support Requirements, Electronic Claims, and Mandatory Electronic Filing of

Medicare Claims.

59.    The agreement includes a "Certification Statement" section listing the

requirements that a provider must meet and maintain in order to bill Medicare. By signing the

"Certification Statement," the SNF agrees to adhere to the following requirements:

1.    I agree to notify the Medicare contractor of any future changes to the information contained in this application in accordance with the time frames established in 42 C.F.R. §424.516(e). I understand that any change in the business structure of this provider may require the submission of a new application.

2.    I have read and understand the Penalties for Falsifying Information [...] I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare [...] may be punished by criminal, civil or administrative penalties, including but not limited to the denial or revocation of Medicare billing privileges, and/or imposition of fines, civil damages, and/or imprisonment.

3.    I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

[...]

6.    *I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.* (Emphasis added).

*See* CMS Form 855A.

60.    The "Certification Statement" is executed by an "authorized official" on behalf of

the provider. An "authorized official" refers to an appointed official to whom the organization

21

grants legal authority to enroll it in the Medicare program. The certifications in the agreement, which are mandatory for Medicare enrollment, expressly create a continuing duty to comply with the conditions of participation in and payment by the Medicare program. *See* CMS Form 855A.

61.     The most basic requirement for reimbursement eligibility under Medicare is that it will only pay for services that are "reasonable and necessary for the diagnosis or treatment of illness of injury." Medical providers are not allowed to bill the Government for any expenses incurred for medically unnecessary services or procedures. 42 U.S.C. § 1395y(a)(l)(A).

62.     The medical necessity requirement applies not only to the fact of treatment, but also to the level of treatment provided to the patient. Medicare will not pay for more expensive services if only less expensive services are medically necessary.

63.     SNFs seeking reimbursement under Medicare must also meet certain obligations. These obligations include the following duties to:

> (a) Not make false statements or misrepresentations of material facts concerning requests for payment under Medicare. 42 U.S.C. § 1320a-7b(a)(1) & (2); 1320a-7; 1320a-7a;
>
> (b) Provide economical medical services, and then, only where medically necessary. 42 U.S.C. § 1320c-5(a)(1);
>
> (c) Provide evidence that the service given is medically necessary. 42 U.S.C. §1320c-5(a)(3);
>
> (d) Assure that such services are not substantially in excess of the needs of such patients. 42 U.S.C. § 1320a-7(b)(6) & (8);
>
> (e) Not submit or cause to be submitted bills or requests for payment substantially in excess of the physician's usual charges for the same treatment or services. 42 U.S.C. § 1320a-7(b)(6)(A);
>
> (f) Certify when presenting a claim that the service provided is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B); and

22

(g) Not as a matter of billing policy waive co-payment amounts in violation of the federal anti-kickback and self-referral statutes. 42 U.S.C. § 1320a-7a(a)(5); 42 U.S.C. § 1320a-7a(i)(6).

### *Medicaid Program*

64.     Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program. Thus, under XIX of the Social Security Act, 42 U.S.C. § 1396 *et.seq.* Federal money is distributed to the states, which in turn provide certain medical services to the poor and other eligible groups.

65.     Federal Medicaid regulations require each state to designate a single state agency responsive for the Medicaid program. In Maryland, the program is administered by the Department of Health and Mental Hygiene.

66.     The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary"). After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" (FPP), which gets recalculated each fiscal year.

67.     Maryland requires all Medicaid providers to agree to the following among other items:

> That all claims submitted under his, her or its provider number shall be for medically necessary services that were actually provided as described in the claim. The Provider acknowledges that the submission of false or fraudulent claims could result in criminal prosecution and civil and administrative sanctions.

(Maryland Medical Assistance Program – Provider Agreement).

23

*__National and Local Coverage Determinations__*

68.     Prior to completion of an initial EDI Enrollment Agreement and issuance of an

initial EDI number and password by the contractor, provider must obtain a National Provider

Identifier ("NPI") number. Once the SNF obtains a Medicare provider number, it then submits its

claims to the MACs that process the claims for submission to CMS. At all times relevant to this

Complaint, upon information and belief, Select submits its Medicare claims for Anchorage and

Snow Hill to Novitas Solutions, Inc. ("Novitas Solutions").

69.     Novitas Solutions processes Part A and Part B claims for institutional providers,

physicians, practitioners, and suppliers in the State of Maryland. Most SNFs, including

Anchorage and Snow Hill, submit claims to MACs. *See* Who Are The MACS – CMS.

70.     Compliant to CMS standards, Novitas Solutions issued a LCD covering Services

and Procedures in Nursing Facilities (#L34863).

71.     The LCD requires that an initial and a periodic comprehensive assessment be

conducted for each patient, in order to institute a comprehensive care plan that meets the

patient's medical needs.

> The care plan must be developed and revised by an inter-disciplinary team that
> includes at least the attending physician and a registered nurse with responsibility
> for the resident. The components of the care plan are then documented on the
> physician's order sheet, which is signed by the physician and the nurse. The
> physician's order sheet is used to list the medications, diet, activities and hygienic
> needs of a resident of a SNF or NF. However, it has also been used to list various
> provider specialties which may render services and procedures for the resident,
> and various screening services which may be routinely performed on the resident.
> Provider specialties have often included audiology, optometry, podiatry,
> psychology, psychiatry, physical therapy and occupational therapy. Routine
> screening services have often included laboratory tests, electrocardiograms and
> portable chest x-rays. These so-called "p.r.n." or "standing" orders for care by
> other provider specialties and provision of routine screening services have
> resulted in considerable over utilization, and so are being addressed by this policy.

(#L34863).

24

72.     Furthermore, Novitas Solutions will not cover any service or procedure that is performed on a patient of a SNF, unless:

- The patient's attending physician evaluates the patient in person or evaluates the signs and symptoms of the patient described via telephone by the SNF and authorizes the order for the service or procedures; and/or
- A named physician, whose attendance is requested only by the patient or the patient's interested family member or for the referral of the patient to another provider specialty.

73.     All services must be reasonable and medically necessary and that the beneficiary actually needs skilled care.

In order to be covered under Medicare, **a service shall be reasonable and necessary**. When appropriate, contractors shall describe the circumstances under which the proposed LCD for the service is considered reasonable and necessary under Section 1862(a)(1)(A). Contractors shall consider a service to be reasonable and necessary if the contractor determines that the service is:

- Safe and effective;
- Not experimental or investigational; and
- Appropriate, including the duration and frequency that is considered appropriate for the service, in terms of whether it is:
  - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member.
  - o Furnished in a setting appropriate to the patient's medical needs and condition.
  - o **Ordered** and furnished by **qualified personnel**.
  - o One that meets, but does not exceed, the patient's medical needs.
  - o At least as beneficial as an existing and available medically appropriate alternative.

*See* Medicare Program Integrity Manual, Chapter 13 – Local Coverage Determinations (emphasis supplied); *See also* #L34863.

74.     CMS requires this LCD to be generally consistent with National Coverage Determinations, although they can be more specific, and allows it to supplement existing Medicare applicable National Coverage Determinations.

75.     In sum, to ensure that correct claims are submitted, Medicare requires that the patient needs a service that must be ordered by a doctor and must be performed by a licensed clinician, that the patient needs services on a daily basis, that the daily services can only be provided on an inpatient basis in a SNF, that are ordered by qualified personnel, and that the services and treatment are reasonable and necessary and are also consistent with the nature and severity of the patient's medical condition, the patient's particular medical needs, and are reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Chapter 8 – Coverage of Extended Care (SNF) Services Under Hospital Insurance.

### *Skilled Nursing Facilities Coverage Under Medicare*

#### *Overview*

76.     Anchorage and Snow Hill provide skilled nursing care to mostly Medicare Part A and Part B patients. Part A of the Medicare Program authorizes payment for institutional care, including SNFs. Part B of the Medicare program authorizes payment for outpatient services, physician visits, home health visits, and preventive services. In addition to other limitations on coverage, Medicare covers only those services that are "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A).

77.     Skilled nursing care or skilled therapy care provides an opportunity for patients either to improve their condition or maintain their current condition but prevent or delay the patient from getting worse. SNF care is health care given when the patient needs skilled nursing or therapy staff to manage, observe, and evaluate the patient's care.

78.     The purpose of skilled care is to help the patient function more independently and assist with taking care of their health needs. The skilled nursing and therapy staff includes,

physical and occupational therapists, registered nurses, and licensed practical and vocational

nurses. *See* CMS Booklet, Medicare Coverage of Skilled Nursing Facility Care.

79.     Medicare will cover SNF care only if the patient meets the following

requirements:

- Patient has available days left in the benefit period;

- Patient has a qualifying hospital stay, which refers to an inpatient hospital stay of three consecutive days or more, starting with the day the hospital admits the patient as an inpatient, but not including the day the hospital beneficiary leaves the hospital;

- Doctor ordered inpatient services for SNF care, including physical therapy and occupational therapy;

- **Patient requires skilled care on a daily basis** and the services must be ones that can only be provided in a SNF on an inpatient basis;

  - The daily basis requirement is met when the patient needs and receives therapy service on at least five days a week. If therapy services are provided less than five days a week, the daily requirement would not be met.

- Patient needs skilled services for:

  - An ongoing treatment that was also treated during the qualified three-day inpatient hospital stay,

  - A new condition that started while the patient was getting SNF care for the ongoing condition.

- **Skilled services must be reasonable and necessary for the diagnosis or treatment of the condition**; and

- The patient receives skilled services in a Medicare-certified SNF.

*See* Medicare Coverage of Skilled Nursing Facility Care – CMS Booklet. (Emphasis supplied).

80.     Medicare keeps track of how many days of SNF benefits the patient uses and how

many are left after use. The "benefit period" begins on the day the patient starts receiving

inpatient hospital or SNF care.

81.     The patient can get up to 100 days of SNF coverage per benefit period. Once the 100 days are over, the current benefit period must end before the patient can renew its SNF benefits.

82.     There is no limit to the number of benefit periods that a patient can have. But, once a benefit period ends, the patient must obtain another three-day qualifying hospital stay and meet the eligibility standards pursuant to CMS requirements in order to receive another 100 days of SNF benefits.

### Skilled Care and Skilled Physical Therapy

83.     Individualized SNF care for a patient, which includes both skilled nursing care and skilled therapy care, is determined by daily assessments in the form of a care plan. Stated differently, SNF care is based on a patient's doctor's orders and daily assessments of the patient's condition from those qualified clinicians on-site.

84.     CMS requires periodic daily assessments, which document a patient's condition, medical history, speech, decision-making ability, physical limitations, and activities of daily living. The SNF uses the plan to manage the patient's care, as well as determine appropriate reimbursement to the SNF.

85.     As such, the first recorded assessment must be conducted within the first eight days of the SNF stay, sometimes referred to as the "five-day assessment," during the five-day assessment period. The first five days indicate the assessment reference date window, which are the defined days when the SNF must set the assessment reference date. Medicare adds a few extra days, totaling the first eight days of the SNF stay (days 6-8), referred to as grace days, which is the date range when the SNF can set the assessment reference date without penalty. Grace days apply only for scheduled assessments. Therefore, the assessment window includes

the assessment reference date window plus grace days. Medicare also requires the SNF to record assessments on days 14, 30, 60, and 90 of the patient's covered stay to account for significant changes in the patient's condition.

86.    In addition, CMS also provides guidelines concerning skilled physical therapy services to patients, which includes skilled physical therapy, occupational therapy, and speech/language pathology therapy. Assuming all other requirements for coverage under the SNF benefit are met, skilled therapy services are covered when an individualized assessment of the patient's clinical condition shows that the patient needs the qualified services of a licensed therapist. Skilled physical therapy, in particular, must also meet all of the following conditions, in order to be covered by Medicare:

- Services must be directly and specifically related to an active written treatment plan that is based upon an initial evaluation performed by a physical therapist after admission to the SNF and prior to the start of physical therapy services;

- Condition of the patient must be of a nature that requires the skills of a physical therapist;

- Services must be provided with the expectation, based on the assessment made by the physician of the patient's restoration potential, that the condition of the patient will improve materially in a reasonable and generally predictable period of time; or, the services must be necessary for the establishment of a safe and effective maintenance program; or, the services must require the skills of a therapist for the performance of a safe and effective maintenance program;

- Services must be considered under accepted standards of medical practice to be specific and effective treatment for the patient's condition; and

- **Services must be reasonable and necessary for the treatment of the patient's condition**, which includes the requirement that the **amount, frequency, and duration of the services must be reasonable.**

*See* Medicare Benefit Policy Manual, Chapter 8 – Coverage of Extended Care (SNF) Services Under Hospital Insurance (emphasis supplied).

### *Breaks in Skilled Care*

87.     The patient's benefit period ends if the patient has not actually been in the SNF or a hospital for at least 60 days in a row, or if the patient did not receive skilled care for at least 60 days in a row, even though the patient may still remain admitted to the SNF. Sometimes, a patient admitted to a SNF for skilled care could be discharged from the SNF before their benefit period ends. This break in SNF care affects Medicare coverage in various ways.

88.     If a patient's break in SNF care lasts for *less than 30 days,* the patient is not required to have a new three-day inpatient hospital stay to qualify for coverage of additional SNF care. The current benefit period continues. Thus, the maximum coverage available would be the number of unused SNF benefit days remaining in the current benefit period.

89.     If a patient's break in SNF care lasts *at least 30 days but less than 60*, Medicare will not cover additional SNF care unless the patient has a new three-day qualifying inpatient hospital stay, among other requirements. The new hospital stay does not need to be for the same condition that the patient was treated for during the patient's previous stay. Since the break is still less than 60 days in a row, the current benefit period continues. Thus, the maximum coverage available would be the number of unused SNF benefit days remaining in the current benefit period.

90.     If a patient's break in SNF care lasts *at least 60 days*, Medicare will not cover additional SNF care unless the patient has a new three-day qualifying inpatient hospital stay, among other requirements. The new hospital stay does not need to be for the same condition that the patient was treated for during the patient's previous stay. Since the break in SNF care lasted for at least 60 days in a row, the current benefit period ends and renews the SNF benefits. Thus,

maximum coverage available would be up to 100 days of SNF benefit in the patient's new

benefit period. *See* Medicare Coverage of Skilled Nursing Facility Care – CMS Booklet.

### *Current Payment Methodology - SNF PPS*

91.     SNF claims submitted to the government and regulated at the Federal level,

require SNFs to adhere to the policies established by Medicare. *See* Medicare Program Integrity

Manual, Chapter 6 – Medicare Contractor Medical Review Guidelines for Specific Services, Sec.

6.1

92.     Medicare pays SNFs through its Prospective Payment System ("PPS"), which

refer to *per diem* rates based on the patient's condition as determined by the Resource Utilization

Group ("RUG") level classification. This classification is categorized by the use of a medical

assessment tool, called the Minimum Data Set 3.0 ("MDS 3.0") report, and is required to be

performed periodically for purposes of Medicare payment. *Id.*

93.     Each MDS report represents the patient's clinical status based on the patient's

Assessment Reference Date ("ARD"), which is the established look-back period for the covered

days associated with the MDS reports. In other words, the ARD is defined as the specific end

point of look-back periods in the MDS assessment process. It allows for those who complete the

MDS to refer to the same period of time when reporting the condition of the patient. For SNF

PPS assessments, this date also determines payment. Medicare reimbursement claims are based

on the most recent clinical assessment, for all covered days associated with the MDS report. *Id.*

94.     Under SNF PPS, covered SNF services typically include post-hospital SNF

services for which benefits are provided under Part A and all other relevant items and services

under Part B. Pursuant to CMS regulations, all Medicare contractors are required to review

Medicare SNF PPS bills and accurately and honestly determine whether the SNF services are

reasonable and necessary, delivered in the appropriate setting, and coded correctly, based on appropriate documentation. *Id.*

95.     Patients admitted directly to a SNF after a qualifying hospital stay are considered to meet the level of care requirements defined in CMS, including the ARD for the 5-day assessment, when correctly assigned to one of the RUG levels. CMS states that when the initial Medicare required 5-day assessment results in a beneficiary being correctly assigned to one of the RUG levels, this effectively creates a presumption of coverage for the period from the first day of the Medicare covered services up to, and including, the ARD for that assessment. *Id.* at Sec. 6.1.1

96.     The existing administrative presumption of coverage allows Medicare contractors to review the bill and supporting medical information to confirm the accuracy of the RUG level. This involves determining that the furnished services and intensity of those services, as defined by the billed RUG level, were reasonable and necessary for the patient. *Id.*

97.     To correctly determine whether the patient was assigned to the appropriate RUG level, Medicare contractors are required to verify that the billed RUG level accurately and correctly reflects the MDS reports and other medical records including physician, nursing, and therapy documentation, and the patient's billing history, provided by the provider company. *Id.*

98.     In sum, an accurate Medicare reimbursement payment determination requires that:

- the SNF submits a MDS report;

- the SNF complies with the assessment schedule;

- the patient meets the level of care requirement; and

- services are reasonable and necessary. (In making a reasonable and necessary determination, it must be determined whether the services indicated on the

MDS were actually rendered and were reasonable and necessary for the patient's condition as reflected by medical record documentation).

*Id.* at Sec. 6.1.4.

### *Resident Assessment Instrument (RAI)*

99.     In order for CMS to accurately administer Medicare reimbursement claims, SNFs are required to submit patient assessments using the Minimum Data Set ("MDS"), which is a part of the Resident Assessment Instrument ("RAI"). The RAI offers guidance for the SNF on gathering patient information, including its strengths and needs, which must be addressed in an individualized care plan. It also helps the SNF evaluate patient goal achievement and revising care plans accordingly by enabling the SNF to track and monitor changes in the patient's functionalities and symptoms. *See* CMS – Long-Term Care Facility Resident Assessment Instrument 3.0 User's Manual (October 2015).

100.    The RAI consists of three components, which includes the MDS report, the Care Area Assessment ("CAA") process, and the RAI Utilization Guidelines. The MDS report is a core set of screening, clinical, and functional status elements, which forms the foundation of a comprehensive assessment for skilled care patients certified to participate in Medicare. Accordingly, the CAA Process is designed to interpret the information documented on the MDS. Once a care area is triggered through this process, the SNF uses evidence-based clinical resources to conduct an assessment of the potential problem and determine whether or not to devise a plan of care for the patient. The CAA Process helps the clinician focus on key issues identified during the assessment process so that decisions as to whether and how to intervene can be explored with the patient. The RAI Utilization Guidelines provide instructions for when and how to use the RAI. *Id.*

101.    It is critical that the SNF utilizes all three components of the RAI to recognize the patient's functional status, strengths, weaknesses, and preferences. The entire RAI process is a holistic method to conduct adequate and accurate assessment of each patient. *Id.*

102.    Federal regulations require that the RAI process is conducted accurately, by a registered health professional, who signs and certifies the completion of the assessment. In addition, the assessment process must include direct observation, as well as communication with the patient and direct care staff on all shifts. Most SNFs perform an evaluation shortly after the patient arrives at the facility. *Id.*

### Minimum Data Set

103.    SNFs must assess the clinical condition of patients by completing the MDS assessment for each Medicare patient receiving Part A skilled care for reimbursement under the SNF PPS.

104.    The information collected through the MDS assessment includes significant data with regards to the patient's medical condition and expected needs. Among other uses, Medicare requires SNFs to complete the MDS to qualify for reimbursement under SNF PPS. It is used as a data collection tool to classify the Medicare patients into RUG levels, which in turn, corresponds to the level of patient care that Medicare covers. *Id.*

105.    The MDS assessment is supposed to serve as a comprehensive and accurate assessment that identifies the patient's continuing need for skilled care, in order to meet his or her medical, nursing, rehabilitative, social, and discharge planning needs. *Id.*

### Assessment Reference Date

106.    CMS also requires the SNF to set the Assessment Reference Date on the MDS Item Set or in the facility software within the required timeframe of the assessment type being

completed. The ARD refers to the last day of the observation (or look back) period that the assessment covers for the patient. The look back period is important in the assessment process because it is the time period over which the patient's condition is documented by the MDS assessment. For example, the ARD for the Medicare-required five-day scheduled assessment must be set on days one through eight. *Id.*

107.    CMS requires that patients be assessed promptly upon admission (but no later than day 14). Accordingly, the ARD must be set no later than day 14, counting the date of admission as day one. In other words, the first day of Medicare Part A coverage for the current stay is considered day one for PPS assessment scheduling purposes. Typically, the first day of Medicare Part A coverage is the date of admission or reentry. Timeliness of the PPS assessment is defined by selecting an ARD within the prescribed ARD window. *Id.*

108.    While it is important for the SNF to conduct timely and prompt patient assessments, CMS allows a number of grace days for each Medicare assessment, in certain situations when an assessment had to be delayed. The grace period allows for more clinical flexibility for the patient's medical conditions, in setting ARDs. The Medicare-required five-day ARD can be extended with one to three grace days. *Id.*

109.    The Medicare-required standard assessment schedule includes 5-day, 14-day, 30-day, 60-day, and 90-day scheduled assessments, each with a predetermined time period for setting the ARD for that assessment. It is critical that the SNF completes the assessments according to the following schedule to assure compliance with the SNF PPS requirements:

35

| Medicare MDS Scheduled Assessment Type | Reason for Assessment (A0310B code) | Assessment Reference Date | Assessment Reference Date Grace Days+ | Applicable Standard Medicare Payment Days^ |
|---|---|---|---|---|
| 5-day | 01 | Days 1-5 | 6-8 | 1 through 14 |
| 14-day | 02 | Days 13-14 | 15-18 | 15 through 30 |
| 30-day | 03 | Days 27-29 | 30-33 | 31 through 60 |
| 60-day | 04 | Days 57-59 | 60-63 | 61 through 90 |
| 90-day | 05 | Days 87-89 | 90-93 | 91 through 100 |

*See* CMS - Long-Term Care Facility Resident Assessment Instrument 3.0 User's Manual (October 2015).

### *Resource Utilization Group (RUG) Levels*

110.    CMS uses the information provided in the MDS to determine the case-mix adjustment for each patient that is then used to calculate a *per-diem* payment under the SNF PPS. Each patient is categorized into one of 66 different case-mix adjustment classifications referred to as Resource Utilization Group ("RUG") categories, each of which has an associated payment amount for a benefit period of skilled care.

111.    RUG levels are divided into the following rehabilitation categories:

- Ultra-High (a minimum of 720 minutes per week of therapy on at least five distinct days)
- Very-High (a minimum of 500 minutes per week of therapy on at least five distinct days)
- High (a minimum of 325 minutes per week of therapy on at least five distinct days)
- Medium (a minimum of 150 minutes per week of therapy on at least five distinct days)
- Low (a minimum of 45 minutes per week of therapy on at least five distinct days)

112.    The RUG levels convert to a *per-diem* payment.

113.    For example, a 2013 chart shows the average payment rates for each level of therapy, directly referencing the therapy RUG levels to indicate for instance, an Ultra-High or a

36

Very-High. Of note, this 2013 chart is illustrative of the therapy level terms that are also used in the patient examples used as representative examples herein:

**Medicare Payment Rates per Day per RUG in FY 2013**

| RUG Category | RUG | Therapy Level | ADL Score | Payment Rate per Day* |
|---|---|---|---|---|
| **Therapy RUGs** | | | | |
| Rehabilitation Plus Extensive Services | RUX | Ultra high | 11 to 16** | $751 |
| | RUL | Ultra high | 2 to 10 | $734 |
| | RVX | Very high | 11 to 16** | $668 |
| | RVL | Very high | 2 to 10 | $593 |
| | RHX | High | 11 to 16** | $605 |
| | RHL | High | 2 to 10 | $540 |
| | RMX | Medium | 11 to 16** | $555 |
| | RML | Medium | 2 to 10 | $509 |
| | RLX | Low | 2 to 16 | $488 |
| Rehabilitation | RUC | Ultra high | 11 to 16** | $569 |
| | RUB | Ultra high | 6 to 10 | $569 |
| | RUA | Ultra high | 0 to 5 | $476 |
| | RVC | Very high | 11 to 16** | $488 |
| | RVB | Very high | 6 to 10 | $423 |
| | RVA | Very high | 0 to 5 | $421 |
| | RHC | High | 11 to 16** | $425 |
| | RHB | High | 6 to 10 | $383 |
| | RHA | High | 0 to 5 | $337 |
| | RMC | Medium | 11 to 16** | $374 |
| | RMB | Medium | 6 to 10 | $351 |
| | RMA | Medium | 0 to 5 | $289 |
| | RLB | Low | 11 to 16** | $363 |
| | RLA | Low | 0 to 10 | $234 |

*See* HHS-OIG: The Medicare Payment System for Skilled Nursing Facilities Needs to be Reevaluated (September 2015).

114.    The following chart is from 2016, also showing the average payment rates for each level of therapy:

Table 4—RUG-IV Case-Mix Adjusted Federal Rates and Associated Index

| RUG-IV Category | Nursing index | Therapy index | Nursing component | Therapy component | Non-case-mix therapy comp | No con |
|---|---|---|---|---|---|---|
| RUX | 2.67 | 1.87 | $468.00 | $246.90 | | |
| RUL | 2.57 | 1.87 | 450.47 | 246.90 | | |
| RVX | 2.61 | 1.28 | 457.48 | 169.00 | | |
| RVL | 2.19 | 1.28 | 383.86 | 169.00 | | |
| RHX | 2.55 | 0.85 | 446.96 | 112.23 | | |
| RHL | 2.15 | 0.85 | 376.85 | 112.23 | | |
| RMX | 2.47 | 0.55 | 432.94 | 72.62 | | |
| RML | 2.19 | 0.55 | 383.86 | 72.62 | | |
| RLX | 2.26 | 0.28 | 396.13 | 36.97 | | |
| RUC | 1.56 | 1.87 | 273.44 | 246.90 | | |
| RUB | 1.56 | 1.87 | 273.44 | 246.90 | | |
| RUA | 0.99 | 1.87 | 173.53 | 246.90 | | |
| RVC | 1.51 | 1.28 | 264.67 | 169.00 | | |
| RVB | 1.11 | 1.28 | 194.56 | 169.00 | | |
| RVA | 1.10 | 1.28 | 192.81 | 169.00 | | |
| RHC | 1.45 | 0.85 | 254.16 | 112.23 | | |
| RHB | 1.19 | 0.85 | 208.58 | 112.23 | | |
| RHA | 0.91 | 0.85 | 159.50 | 112.23 | | |
| RMC | 1.36 | 0.55 | 238.38 | 72.62 | | |

See CMS Rule: Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2017, SNF Value-Based Purchasing Program, SNF Qualify Reporting Program, and SNF Payment Models Research (August 2016).

115.   More than one-third of the RUG levels are for patients who require physical or occupational therapy, like those admitted to Anchorage and Snow Hill. The more therapy the patient receives, the higher the level of Medicare reimbursements.

116.   A September 2015 Office of Inspector General report examining SNF billing patterns between 2001 and 2013, reported that the use of the Ultra-High level of rehabilitative

therapy reimbursement increased from 7% of patient days in 2002 to 54% of patient days in 2013. Furthermore, between 2011 and 2013, the average number of Ultra-Highs increased from 21% to 34% and the Very-Highs rose from 12% to 22%. Meanwhile the Lows dropped from 14% to 12%. *See* HHS-OIG: The Medicare Payment System for Skilled Nursing Facilities Needs to be Reevaluated (September 2015).

117. The increasing use of higher therapy levels, often without grounds for medical justification, paired with annual increases to base payment rates (based on the market-based index), is alarming because it directly results in rapid increases in average SNF payment margins.

118. Setting RUG levels in the SNF setting and assigning appropriate therapy minutes to each patient is a critical part of providing reasonable and medically necessary skilled care to its Medicare patients. The process should be carefully carried out in accordance with Medicare guidelines and in the best interests of its patients, taking care to lessen any chances of risk or harm.

119. National skilled care organizations including the American Physical Therapy Association and the American Occupational Therapy Association, have raised and continue to raise concerns about the increases in average SNF payment margins as a result of high RUG rates. The organizations highlight that the roles of therapists, nurses, and other involved licensed clinicians are critical in the SNF setting, as they are projected to make assessments and judgments in the best clinical interests of each Medicare patient. This is not being done at Select facilities.

## FACTS AND ALLEGATIONS

### *Select's Company Structure and Relationship to CommuniCare and White Oak and Relators' Employment at Select, Anchorage, and Snow Hill*

120.    Select is a national contract therapy provider that contracts with medical facilities and staffs them with physical therapists and occupational therapists. Comprised of various licensed and certified health care professionals, the company delivers post-acute rehabilitative services, including speech, occupation, and physical therapy, and long-term extensive nursing care to over 600 clinical facilities, including SNFs, within 33 states.

121.    According to papers filed by Select with the Office of the Illinois Secretary of State, Neil Deutsch is its co-founder and CEO. Anna Guardina-Wolfe is a co-founder and President of Select.

122.    Select employs full-time physical therapists ("PTs"), occupational therapists ("OTs"), and registered nurses ("RNs") to staff and provide skilled care to the facilities that contract with the company. Most skilled care clinicians employed at Select receive an hourly salary and schedule a certain number of patient disciplines per week. Generally, these clinicians see patients for an hour or so to provide set treatment minutes per day, evaluate ongoing medical issues, and/or provide instructions to patients on handling new medical problems. When a therapist is salaried, the level of care is not factored into the wage. Relator Goebel is a full-time employee at Select. Relator Coleman was also a full-time employee at Select, until he resigned on September 9, 2016.

123.    Select's corporate office consists of regional administrators and staff members, including Regional Managers and Program Managers, who are expected to follow and enforce corporate management orders, even under unlawful circumstances. As a part of its corporate strategy to perpetuate fraudulent practices, Select hires a series of individuals to fill positions to

40

manage and operate each of the branches. These are off-site administrators who never see patients. Yet, they are the ones setting RUG levels for Anchorage and Snow Hill and making clinical decisions on eligibility and on various skilled care for its patients.

124.    Anchorage is owned and operated by CommuniCare and thus, management decisions specifically concerning nursing care, including the billing process and patient treatment, are made entirely by CommuniCare. On the other hand, all management decisions for the facility regarding therapy treatment, including the billing process, setting RUG levels, and assigning patient treatment minutes, essentially come from Select, though with the knowledge, acquiescence and to the benefit of CommuniCare and White Oak.

125.    In fact, Select's corporate office is heavily involved in running the day-to-day operations of the facility, making clinical decisions pertaining to patients. Upon information and belief, CommuniCare is cognizant of Select's daily actions, all of which carry no justifiable clinical weight, but does not interfere with Select's operations because CommuniCare, as owner of Anchorage, also earns a profit from the contract therapy revenues that Select and Anchorage collects. White Oak expressed the same attitude when it was owner of Anchorage from 2006-2016. In fact, upon information and belief, Select communicates constantly with CommuniCare (and White Oak previously) concerning the management for the facility regarding therapy treatment. As such, both CommuniCare and White Oak are also responsible for the fraud, as they agreed to treat patients simply as sources of revenue, and financially benefitted from the fraudulent conduct

126.    Select's administrative hierarchy serves to operate and track the amount of both Medicare Part A and Part B patients that receive skilled care for each branch, unreasonably at the highest level possible to maximize Medicare reimbursement, regardless of patient need and

41

medical necessity. Upon information and belief, Select further compensates the administrators by rewarding bonuses.

127.    A representative example points to the Regional Managers at Select, who intentionally assign patients to the highest therapy reimbursement level possible, with their eyes fixed merely on financial incentives. The fraudulent activities that continue impose dangerous medical risks and harm to patients.

128.    Relators at Select are supervised under Bobby Schaffer, Northeast Regional Manager, who sets RUG levels and assigns treatment minutes at Anchorage, and Daniel Chesla, Northeast Regional Clinical Manager at Select, who sets RUG levels and assigns treatment minutes at Snow Hill. Both Mr. Chesla and Mr. Schaffer are off-site, licensed clinicians and as a part of Select's corporate management, are typically supposed to exclusively handle administrative matters. However, they set irrational daily percentages of RUG levels that clinicians are forced to meet and assign RUG levels to patients without appropriately evaluating patients, essentially controlling how each therapist handles each patient caseload.

129.    This creates huge risks for patients because both Mr. Chesla and Mr. Schaffer do not have knowledge of the patient's status and the day-to-day needs of each patient. In fact, when assigning RUG levels, these off-site administrators habitually override doctor's orders and treatment notes provided by therapists, ignoring on-site, documented patient needs. In addition, they also personally contact therapists directly via text message or phone calls to micromanage and control patient discipline schedules and to order the clinical staff to automatically assign the highest level of therapy to patients they never examined.

130.    Both Mr. Chesla and Mr. Schaffer report to Ed Luberski, Regional Vice President at Select. Upon information and belief, Mr. Luberski established the case management index

policy for Anchorage and Snow Hill. Mr. Chesla and Mr. Schaffer completely defer to Mr. Luberski, issuing orders closely aligned with Mr. Luberski's corporate directives to Relators, therapists, and nurses working at the facilities. For example, Mr. Schaffer sets the daily discipline schedule at Anchorage. Therapists cannot start working on any given day unless and until they receive the daily minutes from Mr. Schaffer. All three Select administrators are key figures at Select, carrying out corporate fraud directives.

131.    Select also hires therapy assistants, purposely putting them in charge at the facilities, often to act as puppets to maintain and perpetuate the fraudulent scheme. For instance, once Mr. Schaffer sets the therapy minutes, a therapy assistant like Bonnie McDaniel at Anchorage plays the role of a messenger between Mr. Schaffer and the Relators, to confirm and enforce the corporate-set therapy minutes. Someone like Ms. McDaniel is often put in charge because she is cheaper to hire than an actual therapist and less likely to buck the system and question the directives of corporate management. Unlike the Relators, therapy assistants like Ms. McDaniel rarely push back on management. She simply accepts the treatment minutes that are set off-site by Mr. Chesla and Mr. Schaffer and enforces those minutes on-site and without question.

132.    Turning the evaluation period and RUG-setting process on its head, Relators often hear the Regional Managers say that, "the next patient through the door *will* be an Ultra [(highest RUG level)]" before that patient is known and identified and before he or she is ever examined by anyone at the facility.

133.    To keep up with the fraud, Select's employment policy is to first hire more therapists and clinicians, and then build patient caseload to suit staffing, not the other way around as it should be based on actual demand. This is possible for Select because the company

43

predetermines every single patient, setting them at an Ultra-High or Very-High, no matter what the circumstances. This practice is, if not already at its worst, more and more damaging and more flagrant.

134.    Relators are two veteran health care practitioners. Relator Goebel is a current full-time employee at Select. Relator Coleman was also a full-time employee at Select until he resigned in September 2016.

135.    Before joining Select as an employee, each of the Relators accumulated almost 10 years of operations experience in the post-acute rehabilitation facility industry.

136.    Upon employment at Select, Relators were subject to preexisting corporate policies that violate Federal regulations, risking and causing serious patient harm.

### *Fraud at the Facilities Under Select Demand*

#### *Select Wrongfully Provides Skilled Care for Patients who do not Meet Eligibility Assessment Standards for Skilled Care Benefits*

137.    Select routinely and consistently systemizes improper SNF care for its patients at Anchorage and Snow Hill, based on illegitimate, medically irrelevant, and non-CMS compliant standards.

138.    In efforts to provide therapy to all Medicare referred patients despite there being no reasonable and medically necessary reason to treat, Select provides skilled care to patients who do not meet the eligibility qualifications of SNF benefits, and therefore, are not truly qualified for reimbursed treatment under the Medicare rules and coverage determinations.

139.    CMS standards with respect to coverage determinations for SNF benefits are expressly stated for provider companies like Select and the facilities it operates, including Anchorage and Snow Hill. Providing skilled care to patients in accordance with the standards is

critical to every patient's well-being to ensure they are receiving the right amount of individualized skilled care for their condition.

140.    The general patient admission policy at a typical SNF operating above board would be roughly as follows: when a physician refers a patient to a SNF or assigns skilled care, the SNF clinicians plan the patient's care accordingly. The doctor and the SNF clinicians work together to review relevant patient assessments and records to decide what services the patient needs and to determine how the patient's health goals will be met.

141.    CMS requires that patient assessments are recorded periodically and the documented assessments are used by the SNF to plan and manage the Start of Cares for each patient. The first recorded assessment must be within the first eight days of the SNF stay, known as the five-day assessment reference period. CMS also requires the SNF to routinely record assessments on days 14, 30, 60, and 90 of the covered stay and any other assessments that are necessary to account for significant changes in the condition (until the patient is discharged or has used all of the 100 days of SNF coverage in the benefit period, whichever comes first). The patient assessment includes the patient's current physical and mental condition, medical history, prescribed medications, and an evaluation of how well the patient is carrying out its daily living activities, including bathing, dressing, eating, getting in and out of bed, moving around, and using the bathroom, speech, as well as its decision-making ability and other physical limitations.

142.    SNF care benefits continue for the patient, if the patient still needs inpatient skilled care on a daily basis, if the patient has used less than 100 days of coverage in its benefit period, and the skilled services are reasonable and necessary for the patient's condition.

143.    However, Medicare coverage for SNF care benefits ends immediately if the patient has used up all of its 100 days of coverage in the benefit period, if the patient no longer

needs inpatient skills on a daily basis, and the skilled care is no longer reasonable and necessary for the patient's condition.

144.    Furthermore, CMS expressly states that if the patient distinctly refuses skilled care, the patient will lose SNF benefits. CMS further states that if the patient is unable to tolerate skilled care, treatment should discontinue immediately.

145.    This CMS language is unambiguous.

146.    But this eligibility assessment standard for skilled care is routinely ignored at Select. The disregard for what patients really need, leads not only to the automatic addition of therapy for 100% of its patients but every single patient is at an Ultra-High or a Very-High RUG level.

147.    For example, if there are 26 patient referrals at Anchorage, 20 of those patients are set at Ultra-High and 6 are set at Very-High. Nothing lower. This initial classification has nothing to do with the patient and his or her medical necessity. Instead, these RUG levels are simply set based exclusively on the company's business and productivity interests as well as reimbursement goals. In fact, setting RUG levels, which is considered a critical clinical component to treating skilled care patients, is made off-site and before patient evaluations are conducted. As a result, the patients at Anchorage and Snow Hill are subject to risk and harm, as they are forced to receive treatment they cannot tolerate or from which they cannot benefit.

148.    Select's fraudulent activities, based entirely on financial interests, results in an ever decreasing level of quality and care provided to its Medicare beneficiaries at Anchorage and Snow Hill. In fact, this year, Relators and at least one other clinician directly heard a Select Regional Manager state the following: Select's philosophy is to get as much money out patients right now, "before they go to heaven, home, or hospice."

46

149. As a result, excessive and over-certification of Medicare patients who do not meet the SNF care criteria are constantly being admitted to Select's facilities.

150. Financial figures obtained from a monthly "P & L Report" for Anchorage indicates the massive amounts of contract therapy revenue that Select accrued in the course of nine months in 2016. Select bills and Medicare pays for an estimated extra amount of $120,302 to $138,735 for PT, OT, and ST for the Anchorage facility alone. The following reports indicate the contract therapy revenue that Select profited as a result of Medicare Part A, Part B, and Medicaid payment from January 1, 2016 to September 30, 2016:

*Contract Therapy Revenue at Anchorage from 1/1/2016 – 1/31/2016: **$129,656.99***

### P & L Report

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 1/1/2016 - 1/31/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | | | | ($37.10) |
| Insurance | $1,455.30 | $1,435.70 | $63.70 | $2,954.70 |
| Medicaid | $5,633.04 | $3,733.80 | $901.60 | $10,268.44 |
| Medicare B (NovitasJL)(No MPPR) | $30,856.14 | $15,251.56 | $1,410.45 | $47,518.15 |
| Medicare Part A | $34,704.02 | $32,648.69 | $1,600.09 | $68,952.80 |
| Contract Therapy Revenue Subtotal | $72,648.50 | $53,069.75 | $3,975.84 | $129,656.99 |

*Contract Therapy Revenue at Anchorage from 2/1/2016 – 2/29/2016: $126,156.43*

## P & L Report

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 2/1/2016 - 2/29/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | $23.38 | $30.19 | | ($139.63) |
| HMO Skilled Other | $396.90 | $343.00 | | $739.90 |
| Insurance | $1,925.70 | $1,847.30 | $220.50 | $3,993.50 |
| Medicaid | $5,159.70 | $3,042.90 | $622.30 | $8,824.90 |
| Medicare B (NovitasJL)(No MPPR) | $24,228.85 | $12,855.61 | $2,148.40 | $39,232.86 |
| Medicare Part A | $37,439.15 | $35,252.09 | $813.67 | $73,504.90 |
| Contract Therapy Revenue Subtotal | $69,173.68 | $53,371.09 | $3,804.87 | $126,156.43 |

*Contract Therapy Revenue at Anchorage from 3/1/2016 – 3/31/2016: $136,007.25*

## P & L Report

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 3/1/2016 - 3/31/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | $461.47 | $446.34 | | $333.81 |
| HMO Rugged | $212.50 | $277.88 | $114.42 | $604.80 |
| Insurance | $5,948.60 | $6,073.06 | $426.30 | $12,447.96 |
| Managed Care Part B (MGB) | $1,229.42 | $1,503.97 | | $2,733.39 |
| Medicaid | $4,792.20 | $3,146.78 | $1,430.80 | $9,369.78 |
| Medicare B (NovitasJL)(No MPPR) | $29,865.59 | $25,639.50 | $241.62 | $55,746.71 |
| Medicare Part A | $26,592.00 | $26,500.64 | $810.86 | $53,903.50 |
| Workers Comp | $426.30 | $441.00 | | $867.30 |
| Contract Therapy Revenue Subtotal | $69,528.08 | $64,029.17 | $3,024.00 | $136,007.25 |

*Contract Therapy Revenue at Anchorage from 4/1/2016 – 4/30/2016: $138,735.11*

**P & L Report**

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 4/1/2016 - 4/30/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | ($110.10) | ($45.12) | $241.62 | ($619.20) |
| HMO Rugged | | $201.60 | | $201.60 |
| Insurance | $3,660.30 | $3,635.80 | | $7,296.10 |
| Managed Care Part B (MGB) | $2,107.86 | $2,532.72 | $1,029.01 | $5,669.58 |
| Medicaid | $7,154.00 | $8,707.30 | $735.00 | $16,596.30 |
| Medicare B (NovitasJL)(No MPPR) | $24,476.74 | $24,904.49 | $1,209.60 | $50,589.83 |
| Medicare Part A | $27,972.19 | $27,950.99 | $1,955.62 | $57,878.80 |
| Workers Comp | $588.00 | $534.10 | | $1,122.10 |
| **Contract Therapy Revenue Subtotal** | **$65,847.98** | **$68,421.88** | **$5,170.85** | **$138,735.11** |

*Contract Therapy Revenue at Anchorage from 5/1/2016 – 5/31/2016: $138,355.06*

**P & L Report**

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 5/1/2016 - 5/31/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | | | | ($483.00) |
| HMO Rugged | $21.00 | | | $21.00 |
| Insurance | $4,706.94 | $4,521.72 | | $9,228.66 |
| Managed Care Part B (MGB) | $345.72 | $343.64 | $242.12 | $931.48 |
| MD Medicaid | $5,635.98 | $6,696.34 | $441.00 | $12,773.32 |
| Medicare B (NovitasJL)(No MFPR) | $25,547.61 | $18,464.70 | $181.09 | $44,193.40 |
| Medicare Part A | $35,849.27 | $34,373.73 | $1,447.20 | $71,670.20 |
| **Contract Therapy Revenue Subtotal** | **$72,106.52** | **$64,400.13** | **$2,311.41** | **$138,335.06** |

*Contract Therapy Revenue at Anchorage from 6/1/2016 – 6/30/2016: $120,302.72*

**P & L Report**

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 6/1/2016 - 6/30/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | | | | ($128.80) |
| Insurance | $2,652.86 | $2,597.00 | | $5,249.86 |
| MD Medicaid | $4,543.28 | $3,284.96 | $499.80 | $8,328.04 |
| Medicare B (NovitasJL)(No MPPR) | $23,718.35 | $15,497.03 | $1,088.54 | $40,303.92 |
| Medicare Part A | $33,630.56 | $31,277.22 | $1,641.92 | $66,549.70 |
| **Contract Therapy Revenue Subtotal** | **$64,545.05** | **$52,656.21** | **$3,230.26** | **$120,302.72** |

*Contract Therapy Revenue at Anchorage from 7/1/2016 – 7/31/2016:* **$123,697.44**

### P & L Report

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 7/1/2016 - 7/31/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | $126.22 | $153.93 | | $329.15 |
| Insurance | $3,557.40 | $3,366.30 | | $6,923.70 |
| MD Medicaid | $2,675.40 | $3,433.92 | $499.80 | $6,609.12 |
| Medicare B (NovitasJL)(No MPPR) | $37,535.59 | $25,914.88 | $1,633.31 | $65,083.77 |
| Medicare Part A | $22,375.31 | $21,378.51 | $997.88 | $44,751.70 |
| Contract Therapy Revenue Subtotal | $66,269.91 | $54,247.54 | $3,130.99 | $123,697.44 |

*Contract Therapy Revenue at Anchorage from 8/1/2016 – 8/31/2016:* **$129,811.19**

### P & L Report

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 8/1/2016 - 8/31/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | | | | ($92.40) |
| Insurance | $1,368.08 | $1,308.30 | $58.80 | $2,735.18 |
| MD Medicaid | $5,308.66 | $3,942.54 | $58.80 | $9,310.00 |
| Medicare B (NovitasJL)(No MPPR) | $36,082.08 | $23,828.33 | $2,047.40 | $61,957.81 |
| Medicare Part A | $28,141.52 | $27,084.03 | $675.08 | $55,900.60 |
| Contract Therapy Revenue Subtotal | $70,900.34 | $56,163.20 | $2,840.08 | $129,811.19 |

*Contract Therapy Revenue at Anchorage from 9/1/2016 – 9/30/2016:* **$126,706.66**

### P & L Report

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 9/1/2016 - 9/30/2016
**Parameter(s):** Mileage Rate: 0; Overtime Calculation: 40HRS/WK

**Site of Service:** Anchorage Nursing & Rehab Center

| Contract Therapy Revenue | PT | OT | ST | Total |
|---|---|---|---|---|
| Prior Month Revenue Adjustments | $219.60 | $217.15 | | $436.75 |
| Insurance | $1,771.84 | $1,675.80 | $455.70 | $3,903.34 |
| Managed Care Part B (MGB) | $1,405.18 | $1,387.22 | | $2,792.40 |
| MD Medicaid | $2,940.98 | $1,749.30 | | $4,690.28 |
| Medicare B (NovitasJL)(No MPPR) | $33,010.00 | $24,176.02 | $2,254.37 | $59,440.39 |
| Medicare Part A | $27,716.79 | $27,052.74 | $673.96 | $55,443.50 |
| Contract Therapy Revenue Subtotal | $67,064.39 | $56,258.23 | $3,384.03 | $126,706.66 |

151.    Over the course of the nine months, at Anchorage alone, Select collected over $1 million in contract therapy revenue, in which Medicare paid for as a result of falsely submitted claims.

152.    Successful admissions of all referrals and automatically assigning high therapy levels to those patients, regardless of whether the patient will benefit from or tolerate treatment, not only yield high financial revenues for the company, but also for Select administrators, who are strongly motivated by personal incentives. Upon information and belief, Select administrators receive bonuses based on the level of therapy services provided to each patient.

153.    Furthermore, upon information and belief, CommuniCare and White Oak, as current and past owners of Anchorage respectively, also receive and used to receive portions of the profit Select earns. Therefore, CommuniCare is, and White Oak was, less inclined to interfere with Select's brazen activities.

154.    In summary, Mr. Schaffer and Mr. Chesla micromanage Anchorage and Snow Hill to carry out Select's policy and procedures, setting RUG levels and treatment minutes for patient therapy and initially assigning patients to the Ultra-High RUG level and keeping them there, even if the patient no longer needs inpatient skills on a daily basis and the skilled care is no longer reasonable and necessary for the patient's condition. As a result, Select submits false claims for patients who do not meet CMS eligibility assessment standards for skilled care benefits.

155.    Relators provide the following as representative patient examples to illustrate the fraud in which Medicare is unlawfully billed for patients that are assigned treatment minutes not reasonable and necessary for their condition as well as for therapy not rendered but still documented and for circumstances in which the patient clearly refuses skilled care and/or the

patient is unable to tolerate skilled care. Select demonstrates clear intent to commit fraud by forcing therapy upon these patients because compliant to CMS standards, patients are no longer subject to skilled care for therapy they refuse, unable to tolerate or impossible to benefit from.

**Patient R.H.[1]**

156.     By way of example, Medicare Part A patient R.H. (birth year 1947) began his Start of Care on or about January 20, 2016 at Anchorage. Primarily diagnosed with non-pressure chronic ulcer of heel and mid-foot and chronic obstructive pulmonary disease, the patient was assigned therapy focused on increasing muscle strength and functional mobility.

157.     During treatment however, the patient stated he was ready to go home and that he did not want to stay at Anchorage. He refused further therapy, complaining of pain. In fact, the patient's medical records entitled "Physical Therapy Treatment Encounter Notes" indicate that his functionality stayed about the same during treatment, showing no marked improvement, and that he had asked for therapy to be discontinued a number of times:

**Physical Therapy
Treatment Encounter Note(s)**

Provider:     Anchorage Nursing & Rehab Center                                        ████████

| Identification Information | | | | | | | |
|---|---|---|---|---|---|---|---|
| Patient: ████████ | | | | DOB: ████████ | | | |

| Date of Service: 3/24/2016 |
|---|
| Summary of Skill |

97530     97530: sup>sit sup, stand pivot bed>WC Min A. Pt tol sitting in WC approx 30 mins. sit<>stand min A, stand pivot WC>bed Max A. sit>sup sup.

Comments     Subjective/Objective: Pt tol tx poorly due to dec participation last few txs.

---

[1] To protect patient confidentiality, no patient names or full dates of birth are used herein.

| Date of Service: 3/23/2016 | |
|---|---|
| Summary of Skill | |
| 97530 | 97530: Educated pt on benefits of participating in tx/getting OOB. |
| Comments | Subjective/Objective: Pt refused tx states,"I just don't care anymore" |

| Date of Service: 3/22/2016 | |
|---|---|
| Summary of Skill | |
| 97530 | 97530: Educated pt several times on benefits of participation/getting OOB. |
| 97110 | 97110: Pt tol acifit x30 mins to inc strength to dec risk for fall. |
| Comments | Subjective/Objective: "Just leave me alone, I'm leaving on Friday" |

158.    Here, patient R.H. refuses physical therapy stating, "I just don't care anymore,"

and "Just leave me alone, I'm leaving Friday."

159.    Similarly, the patient's "Occupational Therapy Treatment Encounter Notes"

indicate that his functionality also stayed about the same during treatment, showing no marked

improvement, and that he had expressed his desire of being discharged number of times:

**Occupational Therapy**
**Treatment Encounter Note(s)**

Provider:    Anchorage Nursing & Rehab Center

| Date of Service: 1/29/2016 | |
|---|---|
| Summary of Skill | |
| 97530 | 97530: Pt and therapist participated in leisure activity needed for increased participation in desired leisure tasks. |
| 97110 | 97110: Pt completed UE exercises w/ 3 lbs dowel and against gravity to work on strength and endurance needed for completing morning ADL routine in a timely fashion. |
| Comments | Subjective/Objective: Pt stated "I want to go home" and pt stated that he feels like he is ready to go home. |

| Date of Service: 1/27/2016 | |
|---|---|
| Summary of Skill | |
| 97530 | 97530: Functional transfers: sit to stand x 1 w/ supervision to ensure safety. Pt ambulated w/ rollator up to 75 ft x 2 w/ supervision to work on ambulating to bathroom. Pt was educated in pt's rights of the facility and his options for possibility of going home. |
| 97110 | 97110: Pt completed bicep curls w/ 4 lbs dowel and fine motor activities w/ milk and straw needed for completing IADL tasks at home. |
| Comments | Subjective/Objective: Pt stated he wanted to go home and did not want to stay at the facility. The pt seemed to be in a better mood after speaking w/ the doctor. |

160.    Here, Patient R.H. refuses occupational therapy stating that he wants to go home and does not want to stay at the facility.

161.    CMS requires that if the patient refuses daily skilled care or therapy, the therapy must discontinue at the patient's request and thus, the patient loses Medicare SNF coverage and the SNF is unable to bill for the skilled care.

162.    Here, despite patient's refusals, Select up-coded the patient as an Ultra-High and Very-High during the entire time he was admitted, which was unreasonable and not medically necessary.

163.    For the majority of the therapy, even though the patient refused, he still received the outrageously high number of treatment minutes. In fact, the patient was billed for 105 treatment minutes of physical therapy and 100 treatment minutes of occupational therapy, which brought the patient to 3 ½ hours of treatment per day. Patient R.H's service log matrix for both PT and OT indicates as such:

## Service Log Matrix (PT)

Site Of Service: Anchorage Nursing & Rehab Center    Place Of Residence: Skilled Nursing Facility    Service Dates: 02/01/2016 - 02/29/2016

| Patient Name (Last, First) | | | MRN No. | | | HICN / Policy No. | | | Physician | | | | Med Dx Onset | | SOC | | SOC Visits | | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 93505 | | | 219464113a | | | Natesan, Usha | | | | 1/13/2016 | | 1/20/2016 | | 30 | | Active | |

| Primary Med. Dx & Onset: | L97.409 - 01/13/16 | Non-pressure chronic ulcer of unspecified heel and midfoot with unspecified severity. Additional Diagnosis [ I73.00, G99.0, I25.810, I25.10, J44.9, I10, E11.8 ] |
|---|---|---|
| Treatment Dx & Onset: | R26.2 - 01/20/16 | Difficulty in walking, not elsewhere classified. Additional Diagnosis [ M62.81 ] |

| Code | Svc. Description | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 97110 | Therapeutic exercises | 15 | 35 | 20 | 20 | 35 | | | | 50 | 70 | | 70 | | | 35 | 35 | 30 | 20 | | | | 40 | 25 | 35 | 30 | 30 | | | 25 | | | 520 |
| | Visit 1 | KA | KA | KA | KA | KA | | | | KA | KA | | KA | | | KA | KA | MK | KA | | | | KA | KA | KA | KA | KA | | | KA | | | |
| 97116 | Gait training therapy | 30 | | 15 | 15 | 20 | | | | 25 | 15 | 15 | 15 | | | 15 | 15 | 15 | 15 | 15 | | | 10 | | | 15 | 15 | | | 10 | | | 275 |
| | Visit 1 | KA | | KA | KA | KA | | | | KA | KA | KA | KA | | | KA | KA | MK | KA | KA | | | KA | | | KA | KA | | | KA | | | |
| 97530 | Therapeutic activities | 15 | 30 | 40 | 40 | 15 | | | | 15 | 30 | | 20 | | | | | | 10 | 30 | | | | 15 | 15 | 10 | 10 | | | 15 | | | 310 |
| | Visit 1 | KA | KA | KA | KA | KA | | | | KA | KA | | KA | | | | | | KA | KA | | | | KA | KA | KA | KA | | | KA | | | |
| | Total Minutes: Visit 1 | 60 | 65 | 75 | 75 | 70 | | | | 15 | 105 | 35 | 35 | 35 | | | 50 | 50 | 45 | 45 | 45 | | | 50 | 40 | 50 | 55 | 55 | | | 50 | | | 1105 |

| Therapist Co-Signature | LG | LG | LG | LG | LG | | | LG | LG | LG | LG | LG | | | LG | LG | LG | LG | LG | | | LG | LG | LG | LG | LG | | | LG | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PPS Day | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | | | |
| RUG Level | RL | RU | RU | RU | RL | RL | RL | RU | RU | RU | RL | RU | RU | RL | RU | RU | RU | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | | | |
| Evaluation Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-MDS Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Individual Treatment Minutes | 60 | 65 | 75 | 75 | 70 | | | 15 | 105 | 35 | 35 | 35 | | | 50 | 50 | 45 | 45 | 45 | | | 50 | 40 | 50 | 55 | 55 | | | 50 | | | 1105 |
| Concurrent Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Group Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Time Based Minutes | 60 | 65 | 75 | 75 | 70 | | | 15 | 105 | 35 | 35 | 35 | | | 50 | 50 | 45 | 45 | 45 | | | 50 | 40 | 50 | 55 | 55 | | | 50 | | | 1105 |
| Total Minutes | 60 | 65 | 75 | 75 | 70 | | | 15 | 105 | 35 | 35 | 35 | | | 50 | 50 | 45 | 45 | 45 | | | 50 | 40 | 50 | 55 | 55 | | | 50 | | | 1105 |
| RUG Minutes (7 Days) | 405 | 395 | 395 | 395 | 405 | | | 320 | 340 | 300 | 260 | 225 | | | 260 | 260 | 215 | 225 | 225 | | | 225 | 225 | 230 | 240 | 230 | | | 295 | | | |
| PPS Units | 4 | 4 | 5 | 5 | 5 | | | 1 | 7 | 2 | 2 | 2 | | | 3 | 3 | 3 | 3 | 3 | | | 3 | 3 | 3 | 4 | 4 | | | 3 | | | 72 |
| Visits | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | | | 1 | | | 21 |
| Payer Source | MCA | MCA | MCA | MCA | MCA | | | MCA | MCA | MCA | MCA | MCA | | | MCA | MCA | MCA | MCA | MCA | | | MCA | MCA | MCA | MCA | MCA | | | MCA | | | |

**Service Log Matrix (OT)**

| Site Of Service: | Anchorage Nursing & Rehab Center | | | Place Of Residence: | Skilled Nursing Facility | | Service Dates: | 02/01/2016 - 02/29/2016 |
|---|---|---|---|---|---|---|---|---|
| Patient Name (Last, First) | | MRN No. | HICN / Policy No. | Physician | Med Dx Onset | SOC | SOC Visits | Status |
| | | 93505 | 219464113a | Natesan, Usha | 6/8/2015 | 1/20/2016 | 29 | Active |
| Primary Med. Dx & Onset: | J44.9 - 06/08/15 | Chronic obstructive pulmonary disease, unspecified. Additional Diagnosis [ I73.00, F32.3, I48.91 ] | | | | | | |
| Treatment Dx & Onset: | M62.81 - 01/20/16 | Muscle weakness (generalized) | | | | | | |

| Code | Svc. Description | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 97110 | Therapeutic exercises | 30 | 50 | | | 10 | 40 | | 30 | 45 | 35 | | | | | 35 | 70 | 15 | | | | | 25 | 15 | 35 | | 50 | | | | | | 430 |
| | Vist 1 | MG | FN | | EL | EL | | | KX | BH | KX | | | | | KX | KX | KX | | | | | KX | KX | KX | | FN | | | | | | |
| 97112 | Neuromuscular reeducation | | | | | 15 | | | | | | | | | | | | 15 | | | | | | | | | | | | | | | 30 |
| | Vist 1 | | | | | EL | | | | | | | | | | | | KX | | | | | | | | | | | | | | | |
| 97530 | Therapeutic activities | 30 | | | 30 | 30 | 30 | | 25 | 40 | | 35 | 40 | | | 15 | 30 | | 30 | 30 | | | 30 | 35 | 15 | 15 | | | | | | | 420 |
| | Vist 1 | MG | | | EL | EL | ES | | KX | BH | | KX | KX | | | KX | KX | | KX | KX | | | KX | KX | KX | KX | | | | | | | |
| 97535 | Self care management training | | 15 | | | 15 | 40 | | 15 | 15 | | | | | | 15 | 15 | | | | | | | | 35 | | | | | 50 | | | 215 |
| | Vist 1 | | FN | | | EL | ES | | KX | BH | | | | | | KX | KX | | | | | | | | KX | | | | | KX | | | |
| | Total Minutes: Visit 1 | 60 | 65 | | 70 | 70 | 70 | | 70 | 100 | 35 | 35 | 40 | | | 50 | 60 | 45 | 45 | 30 | | | 50 | 50 | 50 | 50 | 50 | | | 50 | | | 1135 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Therapist Co-Signature | EL | | | EL | EL | EL | | EL | EL | EL | | | | | EL | EL | EL | EL | EL | | | EL | EL | EL | EL | | | | EL | | | |
| PPS Day | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | | | |
| RUG Level | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RV | RV | RV | RV | RV | RV | RV | RV | RV | | | | | | |
| Evaluation Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-MDS Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Individual Treatment Minutes | 60 | 65 | | 70 | 70 | 70 | | 70 | 100 | 35 | 35 | 40 | | | 50 | 50 | 45 | 45 | 30 | | | 50 | 50 | 50 | 50 | 50 | | | 50 | | | 1135 |
| Concurrent Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Group Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Time Based Minutes | 60 | 65 | | 70 | 70 | 70 | | 70 | 100 | 35 | 35 | 40 | | | 50 | 50 | 45 | 45 | 30 | | | 50 | 50 | 50 | 50 | 50 | | | 50 | | | 1135 |
| Total Minutes | 60 | 65 | | 70 | 70 | 70 | | 70 | 100 | 35 | 35 | 40 | | | 50 | 50 | 45 | 45 | 30 | | | 50 | 50 | 50 | 50 | 50 | | | 50 | | | 1135 |
| RUG Minutes (7 Days) | 290 | 325 | | 315 | 325 | 335 | | 345 | 330 | 415 | 380 | 350 | | | 260 | 210 | 220 | 230 | 220 | | | 220 | 270 | 725 | 230 | 250 | | | 250 | | | |
| PPS Units | 4 | 4 | | 5 | 5 | 5 | | 5 | 7 | 2 | 2 | 3 | | | 3 | 3 | 3 | 3 | 2 | | | 3 | 3 | 3 | 3 | 3 | | | 3 | | | 74 |
| Visits | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | | | 1 | | | 21 |
| Payer Source | MCA | MCA | | MCA | MCA | MCA | | MCA | MCA | MCA | MCA | MCA | | | MCA | MCA | MCA | MCA | MCA | | | MCA | MCA | MCA | MCA | MCA | | | MCA | | | |

("*RU*" refers to Ultra-High and "*RV*" refers to Very-High)

164.    According to the patient's medical records, there were occasions in which the therapy was discontinued for the day as a result of the patient's absolute refusal. Upon information and belief, Select nevertheless instructed the patient to be up-coded to the highest RUG level possible. The assigning therapist would then record and document various nursing functions to justify the RUG levels. For example, assisting the patient to the restroom or helping them walk down the hallway is considered a nursing function and thus, should be billed appropriately. In other words, while it is normal for therapists to carry out some nursing functions on occasion, none of this should be billed as a therapist function. However, Select instructs the therapist to do so, so that it looks like the patient participated in the therapy in some way.

165. Select made sure that patient R.H. was strictly placed at a high RUG level because it knew it could lose reimbursement payment if it decreased the patient's therapy minutes or stopped his skilled care or therapy altogether at his request. None of this was clinically appropriate.

166. Relator Goebel personally worked with Patient R.H. The patient could not have tolerated more than 60 minutes of therapy per day. He certainly could not benefit medically from the 3 ½ to 4 hours of treatment minutes. Typically, a SNF patient should start at a lower RUG level and later raised to a higher level if they do not get better and if they can benefit from more therapy; they should not start at the maximum level and stay there regardless of tolerance or medical necessity, as is consistently done by Select. Initially putting patient R.H. into the Ultra-High RUG category and making sure that he was maintained at the higher level of RUG rates despite his refusal, was not medically necessary or reasonable and was beyond his physical tolerance.

167. On or about September 2016, patient R.H. was discharged. Before he left the facility, Relator Goebel brought to attention the inappropriateness of the patient's RUG levels with Ms. McDaniel, the therapy assistant at Anchorage. She simply responded: "Mike, you know how it goes."

168. Patient R.H. died a month later on October 31, 2016. Select's greed to continue therapy, prevented him from receiving hospice, which was the actual appropriate level of care he really needed as he was clearly dying, as identified by the Relators.

*Patient C.F.*

169.    In another representative example, both Relators Goebel and Coleman worked

with Medicare Part A patient C.F. (birth year 1936) at Snow Hill beginning on or about April 23,

2016.

170.    The patient was diagnosed with a number of medical complications related to

chronic respiratory failure and was assigned treatment to improve functional mobility and to

increase muscle strength. Early in the treatment, the patient expressed that he could not tolerate

care and would like to leave the facility. Later, the patient began to more aggressively refuse

physical therapy, completing only 30 minutes of a scheduled 75-minute treatment. The patient's

therapy progress report for both PT and OT indicates as such:

**Physical Therapy**
**Treatment Encounter Note(s)**

Provider:    Harrison House of Snow Hill

| Identification Information | | | |
|---|---|---|---|
| Patient: | | | |
| MRN: | 1816 | DOB: | |

**Date of Service: 5/6/2016**

| Summary of Skill | |
|---|---|
| 97530 | 97530: Therapeutic Activities: ROM techniques to increase functional task performance, dynamic functional activities to increase strength, ROM, flexibility in a progressive manner and transfer training to increase functional task performance. Pt instructed in pursed lip breathing with O2 @ 3Lpm via NC. Pt instructed to elevated (B) LE to help control edema |
| Comments | Subjective/Objective: Pt became very difficulty and refused anymore PT today  Stating " I'm not doning anymore today. I'm not going to walkand I don't care what anyone says." Nrsg, MDS Coordinator, SW and Administrator aware of Pt's refusal to participate in Rehab. Administrator talked with Pt but don't know the out come. |

| Original Signature: | Electronically signed by William Coleman, PT | 5/6/2016 12:19:25 PM EDT |
|---|---|---|
| | | Date |

171.    In the patient's "Physical Therapy Treatment Encounter Notes," (above) the

patient expressly states, "I'm not doing anymore today. I'm not going to walk and I don't care

what anyone says."

**Occupational Therapy**
**Treatment Encounter Note(s)**

Provider:    Harrison House of Snow Hill                                                      ████████

| Identification Information | |
|---|---|
| Patient: | |
| MRN: | 1816 |

DOB:    ████████

## Date of Service: 5/6/2016

*Summary of Skill*

| | |
|---|---|
| 97535 | 97535: pt completed UB/LB wash dress. min A UB was, CGA UB dress, Min A LB wash/dress. |
| Comments | Subjective/Objective: pt only completed 30 mins of scheduled 75 minute treatment. pt politely refused further tx saying he "is leaving this facility to go to New York anyway" Nursing is aware pf pt reluctance to participate in therapy, Pt caregiver is employed by this facility and is aware.  pt has hx of poor participation in therapy at prior placement, a fact not lost upon anyone involved in Mr ████ treatment.  MDS coordinator aware, Administrator aware, and DON/ADON both aware. |

| | | |
|---|---|---|
| Original Signature: | Electronically signed by Michael Goebel, COTA | 5/6/2016 11:23:47 AM EDT |
| | | Date |
| Cosignature: | Electronically co-signed by Suzanne Beebee, OT | 5/9/2016 12:14:56 PM EDT |
| | | Date |
| Revision Signature: | Electronically signed by Michael Goebel, COTA | 5/6/2016 11:33:06 AM EDT |
| | | Date |

## Date of Service: 5/3/2016

*Summary of Skill*

| | |
|---|---|
| 97535 | 97535: pt completed ADL routine min A UB wash/dress, mod A LB wash dress. pt needed cuing for thoroughness. |
| 97530 | 97530: fx tf's CGA/SBA, pt completed sit > stand tf 5-6 x CGA/SBA with no LOB.  pt had several c/o sob during tx session and was encouraged to rest whenever he felt fatigued. |
| 97110 | 97110: sci-fit 15 mins |
| Comments | Subjective/Objective: pt unable to tolerate Ultra minutes on day-by-day basis.  Suggest ramp-down to very. if pt medical condition warrants, will increase mins at later date in spell of illness |

| | | |
|---|---|---|
| Original Signature: | Electronically signed by Michael Goebel, COTA | 5/3/2016 12:26:05 PM EDT |
| | | Date |
| Cosignature: | Electronically co-signed by Suzanne Beebee, OT | 5/5/2016 10:45:34 AM EDT |
| | | Date |
| Revision Signature: | Electronically signed by Michael Goebel, COTA | 5/3/2016 01:41:57 PM EDT |
| | | Date |

172.    The patient's "Occupational Therapy Treatment Encounter Notes" (above) form indicates that the patient clearly refused treatment more than once. In addition, Relator Coleman highlights in the medical notes on or about May 3, 2016, that the patient is unable to tolerate

Ultra-High therapy minutes on a daily basis and suggests that the patient be ramped down to a Very-High, promising to increase therapy minutes later if reasonable or medically necessary.

173.     Norman Fortt, the Program Manager at Snow Hill who has since resigned, also informed Mr. Chesla that the patient should not be at an Ultra-High RUG level. Completely disregarding on-site clinical judgment, Mr. Chesla assigned the patient to a Very High RUG level with 75 treatment minutes of physical therapy and 75 minutes of occupational therapy. Mr. Fortt pushed back by pointing out that the patient will eventually refuse treatment completely. He stated, "I know the patient. He won't do it." Mr. Chesla responded, "This has to happen [because of Medicare reimbursement]." Mr. Chesla knew that the patient was going home the next day. Relator Goebel saw Mr. Chesla ignoring Mr. Fortt's clinical judgment on four separate occasions regarding this patient.

174.     The Regional Managers, even though they did not obtain the on-site knowledge of the patient's status, were personally involved in and always had the final say as to which RUG levels each patient was assigned to, showing their desires to intentionally submit false claims to Medicare.

175.     Patient C.F. was finally discharged after refusing to participate with his Plan of Care but died at home within a week. In total, the patient had completed 75 minutes of PT and 75 minutes of OT per day. The therapy had been unreasonable and medically unnecessary and had done nothing to benefit his condition.

***Patient J.H.***

176.     Relator Goebel also worked with another representative example, Medicare Part A patient J.H., at Anchorage on or about March 19, 2016. The patient was diagnosed with a leg fracture and was assigned treatment for gaining muscle strength.

177.    Although there was no medical record indicating a need for extension, the patient received a prolonged extension to continue therapy she did not medically need – 2 ½ hours per day. Furthermore, she was never sent home even though she was capable of living independently. Her medical records indicate it is not reasonable or necessary for the patient, with only two scheduled disciplines to treat her medical condition, to remain as an Ultra-High for 60 days. Instead of discharging the patient when clinically appropriate, Select up-coded her RUG level to continue maximizing Medicare reimbursement for as long as it could.

178.    Below is the patient's service log matrices for both PT and OT, indicating the patient's Ultra-High level for the entire 100 days she was admitted to Anchorage:

### Service Log Matrix (PT)

| Site Of Service: Anchorage Nursing & Rehab Center | | | | | | | | | | | Place Of Residence: Skilled Nursing Facility | | | | | | | | | | Service Dates: 04/01/2016 - 04/30/2016 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Name (Last, First) | | | | | | MRN No. | | | HICN / Policy No. | | | Physician | | | | | | Med Dx Onset | | SOC | | | SOC Visits | | | | Status | | | | |
| | | | | | | 93106 | | | 375266525A | | | Shaik, Sameer | | | | | | 3/14/2016 | | 3/19/2016 | | | 31 | | | | Active | | | | |
| Primary Med. Dx & Onset: | | S82.435A - 03/14/16 | | | | Nondisplaced oblique fracture of shaft of left fibula, initial encounter for closed fracture. Additional Diagnosis { S82.434A, R29.6 } | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Treatment Dx & Onset: | | M62.81 - 03/19/16 | | | | Muscle weakness (generalized). Additional Diagnosis { M62.50, R26.2 } | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Code | Svc Description | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 97110 | Therapeutic exercises | 30 | | | 30 | 30 | 30 | 30 | 35 | | | 75 | 25 | 30 | 30 | | | | 40 | 25 | | 35 | 45 | | | 35 | 35 | 30 | 35 | 35 | | | 630 |
| | Visit 1 | CT2 | | | CV7 | VK | VK | VK | AR | | | AR | CW | AR | VK | CT2 | | | AR | AR | | AR | CT2 | | | CT2 | MK | MK | CT2 | CT2 | | | |
| 97112 | Neuromuscular reeducation | | | | | 30 | 30 | | | | | | | | 15 | | | | | | | | | | | 15 | | | | | | | 90 |
| | Visit 1 | | | | | VK | VK | | | | | | | | VK | | | | | | | | | | | MK | | | | | | | |
| 97116 | Gait training therapy | | | | | | | | | | | | | | | | | | | | 15 | 20 | | | | | | | | | | | 35 |
| | Visit 1 | | | | | | | | | | | | | | | | | | | | AR | AR | | | | | | | | | | | |
| 97530 | Therapeutic activities | 20 | | | 30 | | | 35 | 25 | | | 35 | 30 | 35 | 15 | 30 | | | 20 | 35 | 45 | 15 | 25 | | | 30 | 45 | 35 | 40 | 25 | | | 565 |
| | Visit 1 | CT2 | | | CW | | | VK | AR | | | AR | CW | AR | VK | CT2 | | | AR | AR | AR | AR | CT2 | | | CT2 | VK | MK | CT2 | CT2 | | | |
| 97760 | Orthotic management and training | 10 | | | | | | | | | | | | | | | | | | | | | | | | 10 | | | | 10 | | | 30 |
| | Visit 1 | CT2 | | | | | | | | | | | | | | | | | | | | | | | | CT2 | | | | CT2 | | | |
| | Total Minutes Visit 1 | 60 | | | 60 | 60 | 60 | 60 | 60 | | | 60 | 55 | 65 | 60 | 60 | | | 60 | 60 | 62 | 70 | 70 | | | 75 | 75 | 75 | 70 | 70 | | | 1345 |

| Therapist Co-Signature | LG | | LG | | | LG | | LG | LG | LG | | LG | | | LG | LG | LG | LG | LG | | LG | LG | LG | LG | LG | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PPS Day | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 |
| RUG Level | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU |

61

## Service Log Matrix (OT)

| Site Of Service: | Anchorage Nursing & Rehab Center | | | | | | | | | | | | | Place Of Residence: | | Skilled Nursing Facility | | | | | | | Service Dates: | | | | 04/01/2016 - 04/30/2016 | | | | | |

| Patient Name (Last, First) | | HRN No. | | HICH / Policy No. | | Physician | | Med Dx Onset | | SOC | | SOC Visits | | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 93106 | | 375286525A | | Shaik, Sameer | | 3/14/2016 | | 3/21/2016 | | 30 | | Active | |

Primary Med. Dx & Onset: S82.435A - 03/14/16 | Nondisplaced oblique fracture of shaft of left tibia, initial encounter for closed fracture. Additional Diagnosis [ S82.474A ]

Treatment Dx & Onset: M62.81 - 03/21/16 | Muscle weakness (generalized)

| Code | Svc. Description | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 97110 | Therapeutic exercises | 30 | | | 35 | 15 | 30 | | 35 | | | 30 | 35 | 30 | 25 | 30 | | | 30 | 15 | 20 | 25 | 35 | | | 35 | 20 | 30 | 25 | 35 | | | 555 |
| | Visit 1 | BM | | | KW | KW | KW | | BM | | | BM | BM | BM | BM | BM | | | BM | BM | BM | BM | BM | | | BM | BM | BM | BM | BM | | | |
| 97530 | Therapeutic activities | 30 | | | 75 | 45 | | | 30 | | | 30 | 30 | 30 | 35 | 30 | | | 30 | 45 | 20 | 30 | 35 | | | 40 | 25 | 45 | 20 | 35 | | | 615 |
| | Visit 1 | BM | | | KW | KW | | | BM | | | BM | BM | BM | BM | BM | | | BM | BM | BM | BM | BM | | | BM | BM | BM | BM | BM | | | |
| 97535 | Self care management training | | | | | | 30 | 60 | | | | | | | | | | | | | 20 | | | | | | | 30 | | 30 | | | 170 |
| | Visit 1 | | | | | | KW | KW | | | | | | | | | | | | | BM | | | | | | | BM | | BM | | | |
| | Total Minutes-Visit 1 | 60 | | | 60 | 60 | 60 | 60 | | | 60 | 60 | 60 | 60 | 60 | | | 60 | 60 | 60 | 60 | 70 | | | 75 | 75 | 75 | 75 | 70 | | | 1340 |

| Therapist Co-Signature | EL | | | EL | EL | EL | EL | EL | | | EL | EL | EL | EL | EL | | | EL | EL | EL | EL | SK | | | SK | EL | EL | EL | EL | | | |
| PPS Day | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | |
| RUG level | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | |

179.    While patient R.H. and patient C.F. are examples of patients getting assigned more minutes than they can physically tolerate, despite their refusals and inability to benefit, patient J.H. is an example of a patient getting assigned more minutes than she clearly needed, and failing to discharge her when it was medically appropriate.

180.    Despite the different ends of the spectrum, these examples demonstrate clear intent of the Defendants' scheme to bill Medicare for their patients for skilled care services that were not reasonable or medically necessary, non-compliant to CMS eligibility standards.

**Patient M.K.**

181.    In addition to patients R.H. and C.F., Medicare Part A patient M.K. (birth year 1924) at Snow Hill is another patient that passed away soon after discharge. Patient M.K. began her Start of Care on or about July 8, 2016, diagnosed with benign intracranial hypertension, which is a condition due to high pressure within the spaces that surround the brain. She was

placed as an Ultra-High the entire time she was at Snow Hill, even though treating therapists continuously noted in daily and weekly treatment progress notes that the patient is clearly inappropriate for 70 minutes of PT and 75 minutes of OT per day. As a result, she not only suffered a rapid functional decline but had to be referred to speech therapy for dysphagia, which is a condition that involves poor swallow reflex.

182.    The patient's service log matrices for both PT and OT show the outrageously high RUG levels assigned to her the entire time she was treated at Snow Hill:

## Service Log Matrix (PT)

Site of Service:  Harrison House of Snow Hill   Place Of Residence:   Skilled Nursing Facility   Service Dates:   08/01/2016 - 08/31/2016

| Patient Name (Last, First) | | MRN No. | HICN / Policy No. | Physician | | Med Dx Onset | SOC | SOC Visits | Status |
|---|---|---|---|---|---|---|---|---|---|
| | | 1834 | 723122351A | biaral, sanded | | 7/7/2016 | 7/8/2016 | 36 | Active |
| Primary Med. Dx & Onset: | G93.2 - 07/07/16 | Benign intracranial hypertension. Additional Diagnosis [ M14.3RD, F02.81 ] | | | | | | | |
| Treatment Dx & Onset: | M52.81 - 07/08/16 | Muscle weakness (generalized). Additional Diagnosis [ R26.9, R22.8 ] | | | | | | | |



(Service Log Matrix table with daily columns 1 through 31 and Total column, listing service codes 97110 Therapeutic exercises, 97112 Neuromuscular re-education, 97116 Gait training therapy, 97530 Therapeutic activities, with visit minutes, RUG levels (RU), evaluation minutes, treatment minutes, RUG minutes, payor source HCA, etc.)

Service Log Matrix (OT)

| Site Of Service: | Harrison House of Snow Hill | | | | | | | | | | | | | | Place Of Residence | | Skilled Nursing Facility | | | | | | Service Dates: | | | 08/01/2016 - 08/31/2016 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Name (Last, First) | | | | | | MRN No. | | | | HICN / Policy No. | | | | Physician | | | | | Med Dx Onset | | | SOC | | SOC Visits | | | Status | | | | |
| | | | | | | 1834 | | | | 220122351A | | | | Soral, Sorad | | | | | 7/2/2016 | | | 7/8/2016 | | 35 | | | Active | | | | |
| Primary Med. Dx & Onset: | F02.B1 - 07/02/16 | | | | Dementia in other diseases classified elsewhere with behavioral disturbance. Additional Diagnosis [ M1A.3800, G93.2 ] | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Treatment Dx & Onset: | M62.81 - 07/08/16 | | | | Muscle weakness (generalized). Additional Diagnosis [F02.81 ] | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Code | Svc. Description | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 97110 | Therapeutic exercises | | 30 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 30 |
| | Pct 1 | | MG | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 97530 | Therapeutic activities | | 45 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 45 |
| | Pct 1 | | MG | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 97535 | Self care management training | 75 | | 75 | 70 | 70 | | | 75 | 75 | 75 | 70 | 70 | | | 70 | 75 | 65 | 60 | 70 | | | 75 | 75 | 70 | 70 | 70 | | | | | | 1355 |
| | Pct 1 | CR | | CR | CR | CR | | | CR | CR | CR | CR | CR | | | CR | CR | CR | CR | CR | | | CR | CR | CR | CR | CR | | | | | | |
| | Total Minutes Visit 1 | 75 | 75 | 75 | 70 | 70 | | | 75 | 75 | 75 | 70 | 70 | | | 70 | 75 | 65 | 60 | 70 | | | 75 | 75 | 70 | 70 | 70 | | | | | | 1430 |

| Therapist Co-Signature | SB* | SB | SB | SB | SB | | | SB | SB | SB | SB | SB | | | SB | SB | SB | SB | SB | | | SB | SB | SB | SB | SB | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PPS Day | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | |
| RUG Level | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | RU | |
| Evaluation Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-MDS Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Individual Treatment Minutes | 75 | 75 | 75 | 70 | 70 | | | 75 | 75 | 75 | 70 | 70 | | | 70 | 75 | 65 | 60 | 70 | | | 75 | 75 | 70 | 70 | 70 | | | | | | 1430 |
| Concurrent Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Group Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Time Based Minutes | 75 | 75 | 75 | 70 | 70 | | | 75 | 75 | 75 | 70 | 70 | | | 70 | 75 | 65 | 60 | 70 | | | 75 | 75 | 70 | 70 | 70 | | | | | | 1430 |
| Total Minutes | 75 | 75 | 75 | 70 | 70 | | | 75 | 75 | 75 | 70 | 70 | | | 70 | 75 | 65 | 60 | 70 | | | 75 | 75 | 70 | 70 | 70 | | | | | | 1430 |
| RUG Minutes (7 Days) | 360 | 360 | 365 | 365 | 365 | | | 365 | 365 | 365 | 365 | | | | 360 | 360 | 360 | 345 | 340 | | | 340 | 345 | 350 | 360 | 360 | | | | | | |
| PPS Units | 5 | 5 | 5 | 5 | 5 | | | 5 | 5 | 5 | 5 | 5 | | | 5 | 5 | 4 | 4 | 5 | | | 5 | 5 | 5 | 5 | 5 | | | | | | 95 |
| Visits | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 1 | 1 | 1 | | | | | | 20 |
| Payer Source | MCA | MCA | MCA | MCA | MCA | | | MCA | MCA | MCA | MCA | MCA | | | MCA | MCA | MCA | MCA | MCA | | | MCA | MCA | MCA | MCA | MCA | | | | | | |

183. The *RU* indicates the Ultra-High RUG level. It is the highest level of RUG rate that could be assigned to each patient.

184. Patient M.K. was made hospice on or about September 19, 2016. She was at Ultra-High for 72 days and was only ramped down to Very-High, after hearing she was to be made hospice. She died the same day she was discharged.

185. Too many patients, either under the care of Select at Anchorage or Snow Hill, or within a short-term after what should have been an earlier discharge, are dying, many missing the level of care (*i.e.* hospice) they actually need. The patient samples illustrate Select's scheme to bill for SNF care benefits despite the patient's ineligibility for coverage. Even though the patient does not need inpatient skilled care on a daily basis, even though the skilled services are not reasonable and unnecessary for the patient, and even though the patient clearly refuses skilled care, unable to tolerate and/or benefit from the treatment, Select automatically assigns

64

therapy minutes and places patients at the highest RUG level, not based on patient necessity, but based solely on the financial desires of the provider company.

186.    As a part of its multi-faceted scheme to defraud the government, Select wrongfully assigns high RUG levels to all of the patients referred to its facility, despite there being no reasonable and medically necessary reason to treat, including those that do not want to be treated or those that cannot physically tolerate, and therefore, do not truly qualify for reimbursed treatment for skilled care.

### Select Falsifies MDS Reports Submitted to CMS to Up-Code RUG Levels and Improperly Increase Therapy

187.    Select engages in an intentional fraudulent scheme to falsify patient medical records and MDS Reports, forcing clinicians at Anchorage and Snow Hill to record inaccurate diagnoses of patients, all in efforts to improperly up-code RUG levels.

188.    CMS requires licensed clinicians to conduct a comprehensive assessment of the patient, in which the collected information is recorded on the MDS report.

189.    The purpose of this extensive MDS report is to capture an accurate diagnosis of the patient, including the identification of the patient's continuing need for skilled care, in order to meet his or her medical, nursing, rehabilitative, social, and discharge planning needs. The MDS report, as a part of the RAI, serves as an assessment tool required by Medicare to determine how much therapy the patient truly needs and what types of skilled care treatments are reasonable and necessary, therefore, determining the level of reimbursement.

190.    Like initial assessments that include the care plan, licensed therapists are tasked with conducting the MDS report, which is submitted to the Government. CMS ultimately examines the entire RAI to determine the monetary reimbursement payment that should be delivered to the provider. As such, CMS expects patients' medical needs to be thoroughly

satisfied at the MDS assessment level, requiring the collected data to closely reflect the patient's plan of care and assigned RUG level.

191.    The MDS report, which allows the therapist to assign the appropriate RUG level to the patient, is typically conducted as soon as the patient is admitted to the skilled care facility. The RUG level, which equates to the dollar amount reimbursed by Medicare, is derived from the MDS report.

192.    Furthermore, CMS also requires a periodically scheduled PPS Assessment according to the patient's length of stay in Medicare Part A care. Each assessment must accurately reflect the patient's status, be conducted or coordinated by a licensed clinician, including direct observation and constant communication with the patient and the direct care staff, and cover the observation (look back) period. The Observation Period is the time period when the patient's condition is captured by the MDS assessment. Thus, clinicians are not permitted to code anything on the MDS assessment that did not occur during the Observation Period.

193.    As such, RUG rates are supposed to be assigned after patient evaluations and are supposed to be tailored to a patient's individualized medical need.

194.    At Select, the opposite occurs.

195.    Turning the regulations on their head,  Select automatically sets RUG rates and Length of Stay (LOS) targets, *prior* to the MDS assessment and then, requires its therapists to document the patient's condition, the duration of therapy minutes, and disciplines according to the RUG rates predetermined by the corporate office

66

196.    Stated differently, Select wants each patient to stay at Anchorage and Snow Hill for as long as possible, with the highest RUG level that could be assigned. In fact, early patient discharges almost never occur at Select's facilities.

197.    Off-site Select administrators set the daily minutes for Medicare Part A and Part B patients, prior to patient assessments, then actively pressure clinicians to meet the target threshold. Accordingly, at Anchorage, RUG rates are assigned first, typically before a patient is ever evaluated. Instead "the next person through the door" is assigned to Ultra-High, for no justifiable medical reason whatsoever.

198.    Select sets and maintains its own RUG rate quotas. Select currently requires a RUG average of 70% for Ultra-High at Anchorage. And, Select requires a RUG average of 66.67% at Snow Hill.

199.    This is an abnormally high number of Ultra-High RUGs at Anchorage. It is highly unusual and unlawful. A 2015 HHS study examining Medicare's SNF payment system, found that on average, SNFs were providing exactly 720 minutes for 34% of Ultra-High therapy RUGs. This number is an increase from 21% from the year before. Select is requiring double the national average, focusing purely on revenue generation and clearly not on the clinical aspects of each patient.

200.    Relators noticed Select's excessive Medicare billing and up-coding at Anchorage and Snow Hill throughout the duration of their employment and reasonably believe and therefor aver that the company is misusing government funds by retaining employees in the corporate office who are not performing their administrative duties and responsibilities, but instead are directly involved in the clinical component of the facility, especially with how often and how much the therapists are providing treatment for each patient.

201.    At Select, clinicians are required to fill out a "Service Log Matrix" form for physical therapy and occupational therapy, documenting the disciplines, RUG levels, and therapy minutes provided to each patient. Unfortunately, these documents are not accurate reflections of the status of patients at Select. The corporate office issues fraudulent policies that directly prevents clinicians from submitting a true and honest MDS report, which incorporates information from the service log matrices. Clinicians also fill out "Therapy Progress Reports," in which clinicians electronically record patient information, including symptoms, history, diagnosis, activities of daily living, and plan of care.

202.    However, as used by Select collectively, these forms cause the fabrication of patient information because Select administrators are constantly micromanaging the therapists, forcing the person inputting the information to maximize the level of each discipline item. Off-site Select administrators are determined to work to ensure that the assessment information results in a high and/or the highest RUG level for each patient, and thus, warrant maximum reimbursement paid to Select.

203.    If a clinician enters information that could result in a low RUG rate or low reimbursement, off-site Select administrators are immediately on top of the issue. Perceiving it as an error that needs to be fixed, Select micromanages patient care and assigned treatment minutes and RUG rates, until the clinician increases the level of therapy assigned to patients. In other words, clinicians must exaggerate and fabricate his or her answers to clinical questions, authorizing for example, that the patient is in need of daily skilled care when instead, the patient is actually unable to tolerate the treatment, and thus, is not truly qualified as a skilled care patient.

204.    All of the therapists working for Select, predominantly at Anchorage and Snow

Hill, run in to this problem, in which they are forced to enhance medical needs, functionality, and

symptoms, in order to up-code patients to the highest RUG level possible.

205.    While this amounts to corporate fabrication, Select does not call it as such. By

default, Mr. Chesla and Mr. Schaffer routinely and expressly direct employees to up-code RUG

levels or assign RUG levels themselves, without ever examining the patients.

206.    The following text message is an example of a situation in which Mr. Chesla is

directing Relator Goebel to add a patient as "an Ultra [High] immediately":

To: Danny Chesla

Confirmed

Tue, Jun 9, 10:04 AM

Just ran rugs for today..
12..10..2..2...46%..we
need an ultra immed.
Thx

Pls call me

Important

207.    There is no mention of any patients in this directive. Mr. Chesla simply ran the

number of RUG level percentages for the day and decided that a patient must be added as an

Ultra-High to meet the corporate target threshold.

208.    This directive to add an Ultra-High patient is illustrative of those given on a daily

basis and implies that the clinicians are forced to fabricate a patient's assessment records in order

to add a high RUG level to the daily numbers, regardless of whether the therapy is reasonable or medically necessary for the patient, who is assigned the Ultra-High RUG level.

209.     In another example, on or about May 2016, Mr. Chesla, discussed with Relator Coleman the fact that the Ultra-High RUG rate for the entire facility should be 70-80% of its Medicare population. This goal is extremely high compared to the national average of 30-35% during the same quarter.

210.     In efforts to meet their targeted threshold, the Regional Managers at Select constantly place patients in the highest therapy reimbursement level possible, with their eyes fixed only on financial incentives. As a result, those fraudulent activities impose dangerous consequences for patients.

211.     Red flags are raised, just by looking at Anchorage's statistics.

212.     The service log matrices from February through April 2016 show that every single patient at Anchorage is either at an Ultra-High or Very-High. This is not only statistically impossible, but is not clinically appropriate, given the demographics of Anchorage's location and the makeup of the facility and its staffing. For example, Salisbury (where Anchorage is located) already has a 60-bed acute rehabilitation facility in the area, which should receive most of the patients who could truly qualify as Ultra-High. There is no reason for Anchorage to be striving to hit 70-80% of Ultra-High patients every month.

213.     Yet, as of May 2016, patient RUG levels at Anchorage were as follows: 82% Ultra-High, 14% Very-High, and 4% High.

214.     The fact that Anchorage had an Ultra-High RUG rate over 80% of its Medicare population suggest that most of its patients were receiving extremely high amounts of

rehabilitation on a daily basis, at least 720 minutes per week, which is a shocking anomaly given the national average percentage of Ultra High RUG rates.

215.     Upon information and belief, as of October 2016, the corporate mandate is currently 70% of Ultra High patients at Anchorage. Below is a RUG Utilization Report from January 2016 thru October 2016, showing an average of 68.7% of Ultra Highs at Anchorage:

## RUG Utilization Report

**Date Range:**   01/01/2016 - 10/11/2016
**Payers:**   ALL

| Site | | RU | RV | RH | RM | RL | R-Days | RPI |
|---|---|---|---|---|---|---|---|---|
| Anchorage Nursing & Rehab Center | Days | 4338 | 1594 | 283 | 101 | 0 | 6316 | 4.61 |
| | % | 68.7% | 25.2% | 4.5% | 1.6% | 0.0% | | |

216.     Even though the utilization report indicates high numbers, on or about October 26, 2016, Relator Goebel overheard Mr. Chesla interrogating Jared Votta, the Program Manager at Snow Hill, on every patient who was *not* assigned an Ultra-High. Mr. Votta still had to give a detailed reason as to why a patient was not an Ultra-High.

217.     Upon information and belief, from a clinical standpoint, the vast majority of patients at Anchorage should not be assigned to an Ultra-High RUG level. However, Select is determined to force its clinicians to do so, for the sole purpose of increasing revenue.

218.     In addition, as of June 2016, the corporate mandate is 66.67% of Ultra-High patients at Snow Hill. The RUG Utilization Report from January 2016 thru October 2016 at Snow Hill, shows an average of 60.9% of Ultra Highs, which is also highly improbable:

## RUG Utilization Report

**Date Range:** 01/01/2016 - 10/13/2016
**Payers:** ALL

| Site | | RU | RV | RH | RM | RL | R-Days | RPI |
|------|------|------|------|------|------|------|------|------|
| Harrison House of Snow Hill | Days | 1540 | 902 | 82 | 4 | 0 | 2528 | 4.57 |
| | % | 60.9% | 35.7% | 3.2% | 0.2% | 0.0% | | |

219.    These *RU* figures for both Anchorage and Snow Hill are very close to the corporate mandated figures. These numbers are not only twice the national average of Ultra-Highs, but are questionable and statistically impossible for a small city with a 60-bed acute rehabilitation facility.

220.    Supporting the fraudulent claim, Select also obtains a report that illustrates Select's clear intent to manipulate RUG levels for revenue purposes. As a part of the company's strategy to increase revenue through patient reimbursement, Select maintains a frequently updated master list of patients in its facilities. Blatantly entitled the "Specialty Program PPS Revenue Enhancement," the report displays RUG levels, treatment minutes and Medicare days in a concise one-page format for every Medicare Part A patient at Anchorage and Snow Hill. Below is the "Specialty Program PPS Revenue Enhancement" report for Anchorage from January 2016 to October 2016:

## Specialty Program PPS Revenue Enhancement

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 01/01/2016 - 10/14/2016
**Parameter(s):** Vendor: All; Specialty Program: All; Diagnostic Category: All; Payer Type: All

### Anchorage Nursing & Rehab Center

| Patient | Assessment | Minutes Program | Minutes Total | Effective | Thru | Excluding Program Minutes RUG | Excluding Program Minutes Rate | Including Program Minutes RUG | Including Program Minutes Rate | RUG Days | Revenue Enhancement |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 14-day-Change of Therapy OMRA | 15 | 325 | 5/10/2016 | 5/31/2016 | RM | $0.00 | RH | $0.00 | 22 | $0.00 |
| | 14-day | 45 | 730 | 1/1/2016 | 1/1/2016 | RV | $0.00 | RU | $0.00 | 1 | $0.00 |
| | 14-day | 45 | 730 | 1/3/2016 | 1/14/2016 | RV | $0.00 | RU | $0.00 | 12 | $0.00 |
| | 5-day | 30 | 720 | 5/28/2016 | 5/31/2016 | RV | $0.00 | RU | $0.00 | 4 | $0.00 |
| | 5-day | 30 | 720 | 6/1/2016 | 6/8/2016 | RV | $0.00 | RU | $0.00 | 8 | $0.00 |
| | 5-day | 15 | 730 | 6/15/2016 | 6/28/2016 | RU | $0.00 | RU | $0.00 | 14 | $0.00 |
| | 5-day | 24 | 720 | 8/31/2016 | 8/31/2016 | RV | $0.00 | RU | $0.00 | 1 | $0.00 |
| | 5-day | 24 | 720 | 9/1/2016 | 9/12/2016 | RV | $0.00 | RU | $0.00 | 12 | $0.00 |
| | 5-day | 36 | 720 | 8/2/2016 | 8/15/2016 | RV | $0.00 | RU | $0.00 | 14 | $0.00 |
| | 14-day | 32 | 720 | 8/16/2016 | 8/31/2016 | RV | $0.00 | RU | $0.00 | 16 | $0.00 |
| | 30-day | 32 | 720 | 9/1/2016 | 9/12/2016 | RV | $0.00 | RU | $0.00 | 12 | $0.00 |
| | 30-day | 32 | 720 | 9/14/2016 | 9/30/2016 | RV | $0.00 | RU | $0.00 | 17 | $0.00 |
| | 30-day | 32 | 720 | 10/1/2016 | 10/1/2016 | RV | $0.00 | RU | $0.00 | 1 | $0.00 |
| | 60-day | 16 | 720 | 10/2/2016 | 10/5/2016 | RV | $0.00 | RU | $0.00 | 4 | $0.00 |
| | PPS / OMRA-Change of Therapy OMRA | 16 | 500 | 10/6/2016 | 10/14/2016 | RH | $0.00 | RV | $0.00 | 9 | $0.00 |
| | 5-day | 30 | 725 | 4/15/2016 | 4/28/2016 | RV | $0.00 | RU | $0.00 | 14 | $0.00 |
| | 14-day | 30 | 720 | 4/29/2016 | 4/30/2016 | RV | $0.00 | RU | $0.00 | 2 | $0.00 |
| | 14-day | 30 | 720 | 5/1/2016 | 5/14/2016 | RV | $0.00 | RU | $0.00 | 14 | $0.00 |
| | 30-day | 45 | 720 | 5/15/2016 | 5/17/2016 | RV | $0.00 | RU | $0.00 | 3 | $0.00 |
| | PPS / OMRA-Change of Therapy OMRA | 15 | 720 | 8/24/2016 | 8/31/2016 | RV | $0.00 | RU | $0.00 | 8 | $0.00 |
| | PPS / OMRA-Change of Therapy OMRA | 15 | 720 | 9/1/2016 | 9/6/2016 | RV | $0.00 | RU | $0.00 | 6 | $0.00 |
| | PPS / OMRA-Change of Therapy OMRA | 8 | 500 | 9/7/2016 | 9/13/2016 | RH | $0.00 | RV | $0.00 | 7 | $0.00 |

## Specialty Program PPS Revenue Enhancement

**Site(s) of Service:** Anchorage Nursing & Rehab Center
**Date Range:** 01/01/2016 - 10/14/2016
**Parameter(s):** Vendor: All; Specialty Program: All; Diagnostic Category: All; Payer Type: All

### Anchorage Nursing & Rehab Center

| Patient | Assessment | Minutes Program | Minutes Total | Effective | Thru | Excluding Program Minutes RUG | Excluding Program Minutes Rate | Including Program Minutes RUG | Including Program Minutes Rate | RUG Days | Revenue Enhancement |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 5-day | 30 | 721 | 5/18/2016 | 5/31/2016 | RV | $0.00 | RU | $0.00 | 14 | $0.00 |
| | 14-day | 45 | 722 | 6/1/2016 | 6/16/2016 | RV | $0.00 | RU | $0.00 | 16 | $0.00 |
| | 30-day | 30 | 722 | 6/17/2015 | 6/30/2016 | RV | $0.00 | RU | $0.00 | 14 | $0.00 |
| | 30-day | 46 | 720 | 3/25/2016 | 3/31/2016 | RV | $0.00 | RU | $0.00 | 7 | $0.00 |
| | 60-day | 39 | 500 | 8/14/2016 | 8/23/2016 | RH | $0.00 | RV | $0.00 | 10 | $0.00 |
| | 5-day | 31 | 720 | 8/7/2016 | 8/20/2016 | RV | $0.00 | RU | $0.00 | 14 | $0.00 |
| | 14-day | 32 | 720 | 8/21/2016 | 8/31/2016 | RV | $0.00 | RU | $0.00 | 11 | $0.00 |
| | 14-day | 32 | 720 | 9/1/2016 | 9/5/2016 | RV | $0.00 | RU | $0.00 | 5 | $0.00 |
| | 30-day | 40 | 720 | 9/6/2016 | 9/30/2016 | RV | $0.00 | RU | $0.00 | 25 | $0.00 |
| | 30-day | 40 | 720 | 10/1/2016 | 10/5/2016 | RV | $0.00 | RU | $0.00 | 5 | $0.00 |
| | 5-day | 16 | 505 | 7/8/2016 | 7/21/2016 | RH | $0.00 | RV | $0.00 | 14 | $0.00 |
| | 14-day | 8 | 500 | 7/22/2016 | 7/31/2016 | RH | $0.00 | RV | $0.00 | 10 | $0.00 |
| | 14-day | 8 | 500 | 8/1/2016 | 8/6/2016 | RH | $0.00 | RV | $0.00 | 6 | $0.00 |
| | 30-day | 16 | 510 | 8/7/2016 | 8/25/2016 | RH | $0.00 | RV | $0.00 | 19 | $0.00 |
| | 30-day | 8 | 555 | 10/6/2016 | 10/14/2016 | RV | $0.00 | RV | $0.00 | 9 | $0.00 |
| | 5-day | 30 | 720 | 4/20/2016 | 4/30/2016 | RV | $0.00 | RU | $0.00 | 11 | $0.00 |
| | 5-day | 30 | 720 | 5/1/2016 | 5/3/2016 | RV | $0.00 | RU | $0.00 | 3 | $0.00 |
| **Total** | | **1,080** | **26,041** | | | | | | | | **$0.00** |

221.     In essence, the compilation of patient information has absolutely no information on patient medical necessities, including current medical symptoms, functionalities, show of improvement, goals, and clinical outcomes, which could be helpful in determining whether the patient needs therapy or continued skilled care. Select just uses the report to systematically decide when to add another Ultra-High patient, entirely for the purpose of maximizing Medicare reimbursement payments.

222.     According to CMS, a Medicare skilled-care adult patient must adhere to a standard assessment schedule that includes 5-day, 14-day, 30-day, 60-day, and 90-day scheduled assessments, each with a predetermined time period for setting the ARD for that assessment. It is critical that the SNF completes the assessments according to the following schedule to assure compliance with the SNF PPS requirements. So typically, the therapist assigned to a patient is reasonably the only clinician that should be aware of the patient's RUG levels for the patient.

223.     However, at Select, off-site Select administrators like Mr. Chesla and Mr. Schaffer *always* know exactly when patients are close to being discharged or are due for their assessment. Unlike therapists, who actually provide daily skilled care to patients, there is absolutely no medically necessary reason for such patient information to be compiled into a report entitled, "Specialty Program PPS Revenue Enhancement." Methods of reaching Select's revenue goals clearly have no clinical component.

224.     Such a report, which clearly shows Select's fraudulent intent and motive to maximize Medicare reimbursement and failure to comply with Federal regulations, results in countless false claims submitted to the Government and causes Medicare to deliver improper payments. Select is fully knowledgeable of this misconduct and rampant fraud.

225. In sum, by pressuring and forcing therapists at Anchorage to falsify patient symptoms, functional abilities, and medical necessity in the MDS report, Select systematically manipulates (up-codes) case mix data submitted to CMS and ensures that nearly every Ultra-High or Very-High patient will appear to satisfy the necessary medical pre-requisites for skilled care covered by Medicare. This inflates unnecessary therapy minutes to justify the high therapy reimbursement per episode.

*Patient H.W.*

226. By way of example, Medicare Part A patient H.W. (birth year 1935) began her Start of Care at Snow Hill on or about October 4, 2016. The patient was diagnosed with chronic atrial fibrillation and was assigned treatment focused on muscle weakness. On or about October 24, 2016, the physician ordered a patient status change, assigning only comfort care to the patient. Comfort care is typically assigned to patients who are in critical condition and the goal of the care is to provide relief from the symptoms and stress of the serious illness. This type of care is usually required after a dramatic drop in the patient's functional level. In other words, physicians literally assigned strictly "comfort" care to make the patient H.W. comfortable. She had low cognitive abilities and could not even sit up in bed, let alone participate in physical therapy.

227. The patient's change in status indicates that she is unable to tolerate and benefit from her assigned therapy minutes and should not receive further skilled care. In fact, the physician order expressly stated that Snow Hill discontinue therapy and discharge the patient:

**PHYSICIAN ORDER SHEET**

Patient Name: ▮▮▮▮▮▮▮▮▮

Facility Name: H.S.L. – SNOWHILL

Patient ID :_____

Physician:_____

Room #: _____



*(Change to [Do Not Resuscitate], comfort measures, discontinue labs, No Medical Test, [Discharge], Per Stephanie Howard, CRNP)*

228.    The physician order indicates that there is nothing further that the facility could do for the patient. It was the reason why the doctor ordered comfort care in the first place. In fact, medical records indicate that the patient desperately needed to be put in hospice.

229.    Disregarding doctor's orders, Mr. Chesla instructed Jared Votta, the Program Manager at Snow Hill, to continue patient H.W.'s therapy minutes for 75 minutes of physical therapy, 65 minutes of occupational therapy, and 45 minutes of speech therapy to maintain her Ultra-High RUG level. Mr. Chesla reasoned that it was the patient's last day before her Change of Therapy assessment and was extremely persistent in arguing that the patient's RUG level had to be maintained, regardless of the functional level of the patient.

230.    Medical records indicate that the patient was physically unable to participate in therapy. Upon information and belief, the patient was forced to complete therapy on some days. On other days, Select continued to bill for Ultra-High therapy minutes that never actually took place for this patient, because the patient was simply unable to participate.

231.    On or about November 1, 2016, patient H.W. was billed for a total of 50 minutes of physical therapy and 60 minutes of occupational therapy per day. On the last day before her Change of Therapy assessment, patient was up-coded and was billed for 90 minutes of physical

76

therapy. The patient's November 2016 Service Log Matrix for physical therapy and occupational

therapy indicates as such:

**Service Log Matrix (PT)**

| Site Of Service: Harrison House of Snow Hill | | | | | | | | | | | | | | | | Place Of Residence: | | Skilled Nursing Facility | | | | | | Service Dates: | | | | 11/01/2016 - 11/30/2016 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Name (Last, First) | | | | MRN No. | | | | | HICN / Policy No. | | | | Physician | | | | Med Dx Onset | | | | SOC | | | SOC Visits | | | | Status | | | | | |
| | | | | 1849 | | | | | 218301680A | | | | baral, sarad | | | | 9/30/2016 | | | | 10/4/2016 | | | 24 | | | | Active | | | | | |
| Primary Med. Dx & Onset: | M48.2 - 09/30/16 | | | Chronic atrial fanilation. Additional Diagnosis  [ I50.40, I25.119, E03.9, K21.9 ] | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Treatment Dx & Onset: | R27.8 - 10/04/16 | | | Other lack of coordination. Additional Diagnosis  [ R26.2, M62.81 ] | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Code | Svc. Description | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 97110 | Therapeutic exercises | | | 20 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| | Visit 1 | | | MK | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 97112 | Neuromuscular reeducation | | 20 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| | Visit 1 | | MK | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 97116 | Gait training therapy | 20 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| | Visit 1 | MK | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 97530 | Therapeutic activities | 55 | 30 | 10 | 50 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 165 |
| | Visit 1 | MK | MK | MK | MK | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 97530 | Therapeutic activities | 15 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 15 |
| | Visit 1 | JV | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Total Minutes: Visit 1 | 90 | 50 | 50 | 50 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 240 |

| Therapist Co-Signature | JV | JV | JV | JV | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PPS Day | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | | |
| RUG Level | RU | RU | RU | RU | RU | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | | |
| Evaluation Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-MDS Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Individual Treatment Minutes | 90 | 50 | 50 | 50 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 240 |
| Concurrent Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Group Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Time Based Minutes | 90 | 50 | 50 | 50 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 240 |
| Total Minutes | 90 | 50 | 50 | 50 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 240 |
| RUG Minutes (7 Days) | 335 | 315 | 315 | 310 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PPS Units | 6 | 3 | 3 | 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 15 |
| Visits | 1 | 1 | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| Payer Source | MCA | MCA | MCA | MCA | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**Service Log Matrix (OT)**

| Site Of Service: Harrison House of Snow Hill | | | | Place Of Residence: | | Skilled Nursing Facility | | Service Dates: | | 11/01/2016 - 11/30/2016 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Name (Last, First) | | | MRN No. | | HICN / Policy No. | | Physician | | Med Dx Onset | SOC | SOC Visits | Status |
| | | | 1849 | | 218301680A | | baral, sarad | | 10/3/2016 | 10/4/2016 | 25 | Active |
| Primary Med. Dx & Onset: | M48.2 - 10/03/16 | | Chronic atrial fanilation. Additional Diagnosis  [ I50.40, I25.119, E03.9, K21.9 ] | | | | | | | | | |
| Treatment Dx & Onset: | M62.81 - 10/04/16 | | Muscle weakness (generalized) | | | | | | | | | |

| RUG Level | RU | RU | RU | RU | RU | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | RV | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Evaluation Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-MDS Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Individual Treatment Minutes | 60 | 60 | 60 | 60 | | | | | | | | | | | | | | | | | | | | | | | | | 240 |
| Concurrent Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Group Treatment Minutes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Time Based Minutes | 60 | 60 | 60 | 60 | | | | | | | | | | | | | | | | | | | | | | | | | 240 |
| Total Minutes | 60 | 60 | 60 | 60 | | | | | | | | | | | | | | | | | | | | | | | | | 240 |
| RUG Minutes (7 Days) | 295 | 295 | 295 | 300 | | | | | | | | | | | | | | | | | | | | | | | | | |
| PPS Units | 4 | 4 | 4 | 4 | | | | | | | | | | | | | | | | | | | | | | | | | 16 |
| Visits | 1 | 1 | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| Payer Source | MCA | MCA | MCA | MCA | | | | | | | | | | | | | | | | | | | | | | | | | |

232. On or about November 2, 2016, Relator Goebel spoke to Stephanie Howard, the nurse practitioner who wrote the comfort care order for patient H.W., on behalf of the doctor. She was surprised to hear that the patient was being treated as an Ultra-High because the patient should not have received any aggressive therapy and said, "I figured you'd [Relator Goebel] just do a range of motion and discharge her to restorative nursing care." The nurse practitioner added, "I don't know how this is possible given [the patient's] low functional level and low probability of achieving any real functional goals."

233. Later that afternoon, after her conversation with Relator Goebel, Ms. Howard approached Mr. Votta, asking why patient H.W. was still receiving aggressive therapy when Ms. Howard submitted the doctor's orders almost two weeks ago, ordering only comfort care for the patient.

234. That same day, Relator Goebel overheard Mr. Votta discussing patient H.W. with Mr. Chesla, who strongly argued that the patient cannot be ramped down from Ultra-High until November 5, 2016. In effect, Mr. Votta should have told Mr. Chesla that the patient needed to be ramped down to a High and transfer her to a restorative nursing program. But he did not push back to Mr. Chesla, even though the patient was in no condition whatsoever to tolerate therapy.

235. The conversation shows that Mr. Chesla and Mr. Votta are in direct contravention to the doctor's orders and are doing so for pure revenue purposes.

236. Because of Mr. Chesla's improper up-coding of the patient to an Ultra-High RUG level and then continuing to keep her at that level despite even doctor's orders, even though the patient was absolutely in no condition to tolerate any more skilled care, Patient H.W. passed away on or about November 25, 2016.

237.    Not only were the patient's therapy progress reports falsified to justify for the highest RUG level possible, her service log matrices were documented with constant *RU*s, which were ultimately submitted to the government for skilled care reimbursement.

**Patient A.T.**

238.    As another representative sample, Medicare Part A patient A.T. (birth year 1932) begin her Start of Care at Anchorage on or about October 17, 2016. The patient was diagnosed with a neck fracture and was assigned treatment focused on improving muscle weakness. She was on caseload for 84 days and was assigned an Ultra-High RUG level for the vast bulk of her plan of care, despite negligible progress. On or about January 2, 2017, Relator Goebel and Mr. Votta, decided to ramp her down to a Very-High, which was an appropriate adjustment to her treatment minutes by on-site clinicians, who were providing daily skilled care to the patient.

239.    However, on or about January 3, 2017, patient A.T. was up-coded to an Ultra-High, courtesy of Mr. Chesla (working off-site), who once again overrode the clinician's decisions in favor of monetary revenue. Patient A.T.'s medical records indicate that she should not have been receiving 60 to 70 minutes of physical therapy, but the more appropriate 45 to 50 minutes of discipline.

240.    However, to satisfy Mr. Chesla's desire to maintain high RUG levels for every patient, regardless of reasonableness or medical necessity, patient A.T. was up-coded to an Ultra-High RUG level.

241.    On or about January 6, 2017, patient A.T. was discharged to the hospital for abdominal and/or rectal bleeding. Despite her dangerous condition, Select was *still* treating her at the Ultra-High level, at the time of her discharge. Upon information and belief, given the

patient's overall medical condition, the excessive therapy minutes clearly did not help and were not medically necessary.

242.    This patient example is another potent illustration of Select's intent to disregard patient symptoms and functionalities to instruct clinicians to manipulate (up-code) the case mix index or up-code patient RUG levels themselves without notifying the clinicians, to maximize dollars for the company.

*Medicare Part B*

243.    It is also common practice for the corporate office to instruct clinicians to engage in up-coding not only to Medicare Part A patients, but to Medicare Part B patients as well, by extending a patient's Length of Stay. As a part of its strategy to induce more Part B claims, Select maintains a frequently updated master list of Medicare Part B patients in its facilities, which includes information on whether the patient's status is active or inactive as well as the number of visits that remain per patient. This "SuperCap Report" gives year-to-date dollar figures that Select profits from its Medicare Part B patients.

244.    CMS proffers financial limits for covering outpatient physical and occupational therapy services. The therapy cap limits for 2016 were the following: 1) $1,960 for physical therapy and speech-language pathology services combined; and 2) $1,960 for occupational therapy services.

245.    Despite these hard caps, Select ran its patient service level up to a total of $12,000 in 2015 for both disciplines. To do so, Select used the "SuperCap Report" to track the number of Medicare Part B recipients in the facility and the total minutes of therapy services they received. Select generates the report on a daily basis, emailing the figures to notify all the program managers. Select uses the report to systemically increase the company's financial incentives not

just through Part A patients but also Part B patients. Below is a sample of Snow Hill's "Super Cap Report" created by Select's corporate office:

3700 Report

| Company | All Companies | Reg Manager | Danny Chesta, Clinical Manager |
|---|---|---|---|
| Corporate | 1. All Corporate Groups | Facility | Harrison House of Snow Hill |
| Vice President | Ed Lubenski | End Date | 08/08/2016 00:00:00 |

| Status | Full Name | Disc | Amount | $$$$/Visits Remain | Exception Status | Exception Auth # | Exc Visits Auth'd | Response |
|---|---|---|---|---|---|---|---|---|
| Over 3700 No Exception Actively Treating | | PT | 5,751 | 0 | | | | |
| Over 3700 No Exception Actively Treating | | OT | 8,985 | 0 | | | | |
| Over 3700 No Exception Actively Treating | | PT | 8,749 | 0 | | | | |
| Over 3700 No Exception Actively Treating | | ST | 5,057 | 0 | | | | |
| Over 3700 No Exception Actively Treating | | OT | 5,032 | 0 | | | | |
| Over 3700 No Exception Actively Treating | | OT | 6,275 | 0 | | | | |
| Above 2,700 less than 3,700 | | OT | 3,293 | 407 | | | | |
| Above 2,700 less than 3,700 | | OT | 3,400 | 300 | | | | |
| Active Med B Residents | | OT | 2,325 | 1,375 | | | | |
| Active Med B Residents | | PT | 2,454 | 1,246 | | | | |
| Active Med B Residents | | PT | 1,567 | 2,133 | | | | |
| Active Med B Residents | | PT | 1,634 | 2,066 | | | | |
| Active Med B Residents | | OT | 805 | 2,895 | | | | |
| Active Med B Residents | | PT | 976 | 2,724 | | | | |
| Active Med B Residents | | PT | 2,281 | 1,419 | | | | |
| Active Med B Residents | | OT | 2,103 | 1,597 | | | | |
| Inactive Residents | | OT | 3,178 | 522 | | | | |
| Inactive Residents | | PT | 4,107 | 0 | | | | |
| Inactive Residents | | ST | 4,107 | 0 | | | | |
| Inactive Residents | | OT | 3,184 | 516 | | | | |
| Inactive Residents | | PT | 3,376 | 324 | | | | |
| Inactive Residents | | PT | 1,700 | 2,000 | | | | |
| Inactive Residents | | OT | 4,818 | 0 | | | | |
| Inactive Residents | | PT | 4,401 | 0 | | | | |
| Inactive Residents | | ST | 4,401 | 0 | | | | |
| Inactive Residents | | OT | 5,697 | 0 | | | | |
| Inactive Residents | | OT | 140 | 3,560 | | | | |

| Status | Full Name | Disc | Amount | $$$$/Visits Remain | Exception Status | Exception Auth # | Exc Visits Auth'd | Response |
|---|---|---|---|---|---|---|---|---|
| Inactive Residents | | PT | 384 | 3,316 | | | | |
| Inactive Residents | | PT | 4,610 | 0 | | | | |
| Inactive Residents | | ST | 4,610 | 0 | | | | |
| Inactive Residents | | OT | 1,140 | 2,560 | | | | |
| Inactive Residents | | PT | 3,762 | 0 | | | | |
| Inactive Residents | | OT | 1,328 | 2,372 | | | | |
| Inactive Residents | | ST | 444 | 3,256 | | | | |
| Inactive Residents | | PT | 4,416 | 0 | | | | |
| Inactive Residents | | OT | 7,518 | 0 | | | | |
| Inactive Residents | | PT | 11,636 | 0 | | | | |
| Inactive Residents | | ST | 11,636 | 0 | | | | |
| Inactive Residents | | OT | 4,824 | 0 | | | | |
| Inactive Residents | | OT | 3,681 | 19 | | | | |
| Inactive Residents | | PT | 1,962 | 1,738 | | | | |
| Inactive Residents | | ST | 1,962 | 1,738 | | | | |
| Inactive Residents | | OT | 2,000 | 1,700 | | | | |
| Inactive Residents | | OT | 5,233 | 0 | | | | |
| Inactive Residents | | OT | 5,590 | 0 | | | | |
| Inactive Residents | | PT | 11,685 | 0 | | | | |
| Inactive Residents | | OT | 3,737 | 0 | | | | |
| Inactive Residents | | PT | 3,459 | 241 | | | | |
| Inactive Residents | | OT | 6,997 | 0 | | | | |
| Inactive Residents | | PT | 4,733 | 0 | | | | |
| Inactive Residents | | PT | 5,057 | 0 | | | | |
| Inactive Residents | | OT | 2,327 | 1,373 | | | | |
| Inactive Residents | | PT | 2,832 | 868 | | | | |
| Inactive Residents | | PT | 7,870 | 0 | | | | |

| Status | Full Name | Disc | Amount | $$$$/Visits Remain | Exception Status | Exception Auth # | Exc Visits Auth'd | Response |
|---|---|---|---|---|---|---|---|---|
| Inactive Residents | | OT | 192 | 3,508 | | | | |
| Inactive Residents | | PT | 161 | 3,539 | | | | |
| Inactive Residents | | OT | 4,348 | 0 | | | | |
| Inactive Residents | | PT | 1,608 | 2,092 | | | | |
| Inactive Residents | | OT | 808 | 2,892 | | | | |
| Inactive Residents | | OT | 3,053 | 647 | | | | |
| Inactive Residents | | PT | 692 | 3,008 | | | | |
| Inactive Residents | | PT | 10,613 | 0 | | | | |
| Inactive Residents | | PT | 6,572 | 0 | | | | |
| Inactive Residents | | PT | 5,213 | 0 | | | | |
| Inactive Residents | | ST | 5,213 | 0 | | | | |
| Inactive Residents | | OT | 5,700 | 0 | | | | |
| Inactive Residents | | PT | 6,198 | 0 | | | | |
| Inactive Residents | | PT | 1,697 | 2,003 | | | | |
| Inactive Residents | | ST | 2,281 | 1,419 | | | | |
| Inactive Residents | | ST | 711 | 2,989 | | | | |
| Inactive Residents | | OT | 4,814 | 0 | | | | |
| Inactive Residents | | PT | 4,847 | 0 | | | | |
| Inactive Residents | | ST | 4,847 | 0 | | | | |
| Inactive Residents | | OT | 524 | 3,176 | | | | |
| Inactive Residents | | OT | 574 | 3,126 | | | | |
| Inactive Residents | | PT | 935 | 2,765 | | | | |
| Inactive Residents | | OT | 3,910 | 0 | | | | |
| Inactive Residents | | OT | 5,472 | 0 | | | | |
| Inactive Residents | | PT | 10,309 | 0 | | | | |
| Inactive Residents | | OT | 2,840 | 860 | | | | |
| Inactive Residents | | PT | 9,195 | 0 | | | | |
| Status | Full Name | Disc | Amount | $$$$/Visits Remain | Exception Status | Exception Auth # | Exc Visits Auth'd | Response |
| Inactive Residents | | OT | 2,894 | 806 | | | | |
| Inactive Residents | | PT | 4,092 | 0 | | | | |
| Inactive Residents | | OT | 3,257 | 443 | | | | |

246.    Upon information and belief, this report comes from the headquarters of Select, created and exclusively managed by the corporate office.

247.    As indicated in the report, the majority of the patients are in excess of the CMS therapy cap limits and a number of patients are even at an excess of $10,000 for 2016. The report shows $$$$ signs but no indication of the patient's medical condition or functionality. There is obviously no clinical component to this tracking process.

248.    In fact, Relators heard other therapists at Snow Hill refer to the report as "[Snow Hill's] Bible for picking up patients and was based on dollars alone."

249.    In addition, Program Managers at Snow Hill for instance, are required to report their daily Part B patient projections to Select administrators, before a Part B patient is even admitted to the facility. By way of example, on or about April 16, 2015, Mr. Chesla told Relator

82

Goebel in a text message that "[they] need to be at a 100 plus," meaning that all therapists must deliver more than 100 Medicare Part B units per day:

> To: Danny Chesla
>
> ~~Did a give the staff the~~ new schedules?
>
> Apr 16, 2015, 7:55 AM
>
> What time will u be in?
> We need to tighten up schedule asap.
> Thx
>
> We need to be 100 plus today

250.    If Select administrators see a lower number of scheduled Part B patients than the projected numbers, Select interrogates the clinicians on why the number is low and pressures the therapist to provide both a detailed explanation and solution to increase the number of Part B patients. A response that a "patient was sick and could not do therapy," is not enough. The therapist is asked to follow up with detailed information on the patient's diagnosis and time frame for recovery. In other words, Select administrators want to know when the patient is likely to be back on their feet to participate in therapy, regardless of the patient's status.

251.    Therapists are under constant daily pressure to deliver "over the top" Part B units to contribute to the company's monetary revenue goals. Additional text messages from Mr. Chesla to Relator Goebel show the corporate office's intent to micromanage the tracking of its Part B patients and extensively burden its clinicians *not* to ensure that its patients are receiving quality care they need, but to make sure that Part B projection numbers are met.

252.    For example, on or about February 9, 2015, Mr. Chesla sent Relator Goebel a reminder text message to make-up low Part B projections. When Relator Goebel explains that he

83

only completed 60 Part B units due to staffing shortage, Mr. Chesla instructs him to make-up at least 45 Part B units over the weekend:

To: Danny Chesla

K

Feb 9, 2015, 9:24 AM

Pls don't forget to send projection after schedule modified.
Thx

60 today due to OT staffing shortage. Will make up on Saturday.

So at least 45 Saturday?

253.    The corporate office's urgency of maintaining projection numbers is obviously highlighted in the text message but there is nothing further about why 45 Part B units need to be made-up, relative to patient need.

254.    On or about March 9, 2015, Mr. Chesla sent Relator Goebel another text message, also reminding him of the Part B projections, highlighting the determinative demand of the corporate management to keep up with its Medicare Part B patients:

To: Danny Chesla

Mar 9, 2015, 9:31 AM

Ok.dont forget  projection

100 b's. what is correct ST
code for cog tx?

255.    Below are additional text messages, this time from Mr. Schaffer to Relator

Goebel, capturing internal conversations concerning the company's strategies and demands to

increase Medicare Part B patients:

To: Danny Chesla, Bobby Schaffer,

Bobby Schaffer

 **Be nice to Nichelle**

Mike,
I'm sure has spoken about
this to you in detail but the
month of July we must get
to 80/85 Bs per day and if
we have help from snow
hill even more
That is your goal to make
happen- if you want
overtime do it, get assts in
overtime, and get all PRN
in as much as you can

*(Mike, I'm sure [Danny] has spoken about this to you in detail but the month of July we must get to 80/85 B's per day and if we have help from Snow Hill, even more. That is your goal to make happen – if you want overtime, do it, get [assistants] in overtime, and get all PRN in as much as you can)*

To: Danny Chesla, Bobby Schaffer,

Bobby Schaffer

I spoke w Sarah and
starting this Friday she will
be at AC
Sarah will work 32/35 hrs
a week everyday at AC
Shannon will be working
20-25 hrs at Parsons then
a few days a week will
help out at AC in addition
to Sarah
This month we need to
increase Bs, but more
importantly make sure we
are not D/c ing residents

*(... This month we need to increase Bs, but more importantly make sure we are not discharging residents.)*

256.     Direct orders from Select administrators, demanding that Medicare Part B projections must be up to speed with the company's target goals, brazenly continue on a routine basis.

257.     In 2016, Select observed a decline in the number of long-term Medicare Part B residents at Anchorage. Select immediately hired more therapists for the sole purpose of sorting and tracking Part B patients triggered under the case-mix index. Instead of hiring clinicians to increase medical functional outcomes, Select required newly-hired clinicians to assist with the administrative management process of increasing revenue through Medicare Part B recipients. In fact, on or about July 2016, Mr. Schaffer complains to Relator in a text message "[that they] can't survive w[ith] 48 [Medicare Part B patients]" and therefore, attempting to justify Select's claim that more clinicians need be available to work:

Tue, Jul 7, 7:52 AM

Bobby Schaffer

Mike- meeting at Noon
today- you probably won't
speak that much- just
look pretty.....
Also we can't survive w
48 Bs- I know Karla is
back tomorrow and get
Cindy as much as she can
do

*(... Also we can't survive [with] 48 Bs...)*

258.   In summary, Select's corporate policy is to first hire more therapists and *then* build patient caseload to suit staffing, not the other way around as it should be.

259.   Extending the Length of Stay for Medicare Part B patients to bill Medicare for medical services designated under a payment code that is more expensive than what the patient actually need or is provided, is detrimental for a critical reason. The fraud not only improperly increases therapy minutes that are not reasonable or medically necessary, but wrongfully attempts to provide skilled care for unnecessary Part B services. As a result, too many patients are exhausted of benefits in that fraudulent process and are denied at other medical facilities when they truly need health care under Part A skilled care services.

260.   Medicare uses what is referred to as the benefit period to keep track of the SNF benefit days for each patient. A benefit period generally begins on the day inpatient hospital or SNF care starts and the patient can receive up to 100 days of SNF coverage in a benefit period. The benefit period ends when the patient has not been in a SNF or a hospital for at least 60 days in a row or if the patient is in the SNF but has not received skilled care for at least 60 days in a row.

261.    Select clearly knows that the patient's Length of Stay has a direct financial impact on the company. As such, its reasons for sustaining the patient's Length of Stay numbers are rarely correlated with the clinical component of the patient's care. On or about August 12, 2016, Mr. Schaffer instructs Relator Goebel to "get another resident to be 75% at least," in a text message:

> To: Bobby Schaffer
>
> Wed, Aug 12, 9:05 AM
>
> Give Miranda the 25 min pt from Karlas schedule and then let her know she needs to be out in 8 hrs Also you need to bump your Bs to 70 and get another resident to be 75% at least

262.    Similar to the "SuperCap Report," which tracks Part B patients in the facility and the total minutes of therapy services they received, Select also has another detailed report that keeps track of the Length of Stays that each patient at the facility has either leftover or has exhausted. The report includes information about the patient's discharge reasons and discharge destination. Upon information and belief, the report provides Select administrators with a sufficient tracking list to assign and manipulate the number of Part B units for each clinician, simultaneously ensuring that the clinicians meet the daily projection levels in "order [for the facility] to survive." An exemplar of a portion of the "ALOS [Length of Stay] Details Report" for Anchorage follows:

**ALOS Details Report**

Site: Anchorage Nursing & Rehab Center
Date Range: 01/01/2016 - 10/19/2016
ALOS Calculated By: Patient Count

Payer Types: ALL Payer Types
Payer Plans: ALL Payers
Gap Days Allowed: 0

| Patient | MRN | SOC | Treatment Sessions | | | | EOC | LOS | Physician | Discharge Destination | Discharge Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | PT | OT | ST | Total | | | | | |
| | 94731 | 09/30/2015 | 3 | 1 | | 4 | 10/03/2016 | 4 | Das, Babulal | Unknown | Refused Therapy Services |
| | 94292 | 09/21/2016 | | | 1 | 1 | 09/21/2016 | 1 | Natesan, Usha | SNF - Same | Other |
| | 99128 | 04/15/2016 | 11 | 11 | | 22 | 04/29/2016 | 15 | Das, Babulal | Acute Hospital | Hospitalization |
| | 93285 | 06/02/2015 | 161 | | | 161 | 02/12/2016 | 256 | Moondra, Mahesh | Long Term Care | Highest Practical Level Achieved |
| | 93285 | 04/04/2016 | 38 | 40 | | 78 | 06/09/2016 | 67 | Moondra, Mahesh | SNF - Same | Highest Practical Level Achieved |
| | | 12/14/2015 | 67 | 30 | | 97 | 03/25/2016 | 103 | Shaik, Sameer | SNF - Same | Highest Practical Level Achieved |
| | 99048 | 01/19/2016 | 47 | 28 | 9 | 84 | 03/25/2016 | 67 | Shaik, Sameer | SNF - Same | Highest Practical Level Achieved |

263.    Select's unyielding efforts to increase revenue through Medicare Part B patients present detrimental results for too many patients at its facilities.

***Patient J.J.***

264.    As a representative example, Medicare Part B patient J.J. (birth year 1957) began his Start of Care at Anchorage on or about April 7, 2016 for a wrist contracture. According to the plan of care administered by the therapist, the reasonable and necessary medical treatment for his condition was a splint with regular follow-up visits. The patient's occupational therapy should have been completed in just four or five visits. Instead, patient J.J. was admitted for 70 days, assigned therapy five times a week, and treated as a skilled care patient.

265.    Not only does the patient's prolonged admittance defraud Medicare, but it risks the patient's future beneficiary status and reimbursement. When a Part B patient is treated as a skilled patient like patient J.J., it maxes out the amount of coverage he can receive as a Part A recipient at a different hospital. For example, if patient J.J. were to experience a more serious medical condition than a wrist contracture, such as a stroke, he faces the risk of being kicked out without coverage benefits at a different hospital.

266.    Select's fraud caused patient J.J. to unknowingly use the maximum amount of his skilled care coverage at Anchorage, just to fix a simple contracture in the wrist. This is a typical scenario of many patients at Select facilities.

***Patient G.W.***

267.    In another patient example, Relator Goebel was the treating therapist for Medicare Part B patient G.W. (birth year 1938). His Start of Care at Snow Hill began on or about January 5, 2016. The patient was diagnosed with complicated medical conditions related to Parkinson's disease. Despite Relator's recommendations against it, Select instructed that the Part B patient be treated five times a week. However, the patient should have only received treatment three times a week, not only from a clinical standpoint but because it would bar the patient and the facility from being reimbursed under Part A. The purpose of Medicare Part B is to replace outpatient services and the beneficiary should only be receiving therapy three times a week under Part B. However, patient G.W. was intentionally being treated for five days a week, two extra unnecessary days, on purpose so that he would exhaust his Part B benefits for the year. Furthermore, because he was being treated five times a week he is unable to receive his Part A benefits. As a result, upon return from a 3-day hospital stay, which normally provides Medicare Part A coverage for up to 100 days after a 3-day inpatient stay, patient G.W. was unable to receive his Part A skilled care benefits.

268.    On or about November 23, 2016, Relator Goebel overheard a conversation between Mr. Votta and Mr. Chesla concerning patient G.W. When Mr. Votta brought up the fact that patient was not eligible for skilled care benefits because he had been continuously treated five times a week, Mr. Chesla became silent and changed the subject.

269.     As a result of the fraud, Patient G.W. accrued Part B totals of $11,311.21 for physical therapy and $5,303.39 for occupational therapy in the year 2016. Medicare therapy cap limits for 2016 totaled: 1) $1,960 for physical therapy and speech-language pathology services combined; and 2) $1,960 for occupational therapy services. Patient G.W. is so far over the therapy cap figures that he is barred from being reimbursed under Part A.

**Patient V.C.**

270.     Medicare Part B patient V.C. (birth year 1936) began her Start of Care on or about January 26, 2016 at Snow Hill. Patient V.C. is diagnosed with Type 2 diabetes, which typically can be controlled with oral medications. However, the patient was on caseload for nine months, despite her medical records, which indicate that she reasonably should have been discharged three months prior.

271.     Upon information and belief, there should not be a single Part B patient in a long-term facility that is on caseload for more than six months continuously. In fact, Ms. McDaniel, therapy assistant at Anchorage noted: "If [patient V.C.] is ever gone for three days, she will not be covered under Part A because she has been receiving services under her Part B coverage."

272.     Thus, the patient is likely to be denied her 100 days of skilled services at another hospital, which she should normally be provided under her Part A coverage.

273.     Patient V.C. still continues to remain on Part B services, five times per week for physical therapy – none of which is reasonable or medically necessary. Select knows that the patient has the money to stay, likes that she is fairly personable with all the nurses and therapists at facility, so it continues to keep her at the facility for as long as possible.

274.     In summary, Select's systematic and strategic methods to maneuver its Part B patients show that Select's process of admitting and treating Part B patients are only intended to

fraudulently fulfill their financial incentives. The high number of Part B patients at both Anchorage and Snow Hill, receiving an average of 550 treatment minutes, five days per week, far exceeds the average in similar facilities.

*Select Intentionally Ramps Up and Down Therapy Minutes During Assessment Reference Periods, Strategically Scheming to Maximize Medicare Reimbursement Levels*

275.    In order to continue its fraudulent practices undetected, especially with up-coding RUG levels for patients, Select accomplishes the particular billing scheme by ramping up and down treatment minutes around the assessment reference dates ("ARD"). "Classic ramping" is the practice of setting treatment minutes at an Ultra-High level right before the assessment reference date and right before the assessment cycle ends, only ramping down the treatment minutes when the new assessment cycle begins.

276.    CMS requires SNFs to submit assessments according to an assessment schedule, generally on the 5th, 14th, 30th, 60th, and 90th days of post-hospital SNF care, to account for changes in patient care needs.

277.    In light of the assessment schedule, foremost, Select's Regional Managers ramp up treatment minutes as high as possible, usually starting off the patient at an Ultra-High level, maintaining the high RUG level, and only attempting to ramp down when the new assessment cycle begins. In addition, Select routinely disregards physician orders, even those that expressly state: "No physical therapy for a few days per doctor," and keeps the patient's RUG levels ramped up.

278.    On or about May 29, 2015, Mr. Chesla sent Relator Goebel a text message indicating Select's financial goals in ramping down a patient at a later date, when clinically speaking, it was not appropriate for the patient to even be assigned an Ultra-High level:

May 29, 2015, 10:38 AM

# We cannot ramp down for 30 days now and goal is 5 day ultra

279.     On or about January 13, 2017, Relator Goebel overheard Mr. Chesla chastise Mr.

Votta for a missed assessment day. Mr. Chesla stated: "If you had taken the 14-day assessment

date, two days earlier, that would have meant more money for us."

280.     The "classic ramping" method, influenced by the assessment schedule, is clearly

used to maximize reimbursement without regard for patient need and benefit.

281.     Second, Select also ensures that the fraud affects new, entering patients. Select

automatically up-codes new, entering patients, *prior to examination*, usually as presumptive

Ultra-Highs, and then may ramp down therapy minutes only after the assessment reference date

or not ramp down at all.

282.     On or about July 2016, Mr. Chesla told Relator Coleman that all of the new

Medicare Part A patients must be at the Ultra-High level for at least the five-day assessment

reference period, reasoning that, "it is better to ramp [the patients] down than it is to ramp [the

patients] up."

283.     At Select, such a reasoning is not medically justifiable. Upon information and

belief, it is simply financially beneficial to ramp down RUG levels than to ramp them up. From a

clinical perspective, the patient may not even be able to tolerate or benefit from the Ultra-High

treatment minutes at all.

93

284.    Furthermore, in order to maintain the fraud, Select administrators are extremely careful, so as not to raise unnecessary red flags with the government.

285.    For example, Select administrators instruct therapists at Anchorage to schedule therapy minutes in increments like the following - 72, 73, 77, and 76 minutes – instead of the traditional round numbers of 75 minutes for physical therapy and 70 minutes for occupational therapy. The theory for using round numbers is that, if every patient is at an Ultra-High level, landing right at 720 minutes for each assessment reference period, it increases the probability of raising red flags with the government.

286.    Instead, therapists are instructed to schedule between 72-73 minutes, with the minutes only at one to three minutes apart, expressly meant to avoid government inquiry, audit and detection.

287.    In another example, on or about July 2016, Mr. Chesla told Relator Coleman that Anchorage needed to ramp down a few of the patients to Very-High, after noticing that the facility was running at 100% Ultra-Highs. Mr. Chesla stated: "We need to be careful and stay off the radar." This example shows clear intent that Select knowingly engages in the fraud, completely disregarding the facilities' responsibilities to deliver appropriate patient skilled care and for reasons unrelated to patient necessity. Upon information and belief, even if two of the Ultra-High patients were ramped down, Anchorage would still have been at an unjustifiable 75% of Ultra-Highs at the time.

*Patient B.M.*

288.    In a representative example showing "classing ramping," on or about March 15, 2016, Medicare Part A patient B.M. (birth year 1926), diagnosed with extreme heart failure, including a 30 percent ejection fraction (an ejection fraction is an important measurement in

94

determining how well the heart is pumping out blood and a normal ejection fraction ranges from 55-70 percent), was admitted to Snow Hill. On or about May 2016, during therapy, the patient's heel started to bleed. As a result, the doctor put a temporary hold on her treatment. Relator Coleman noted the doctor's orders and added that the patient cannot tolerate any more therapy.

289.    Later that day, Mr. Chesla personally called Relator Coleman four times to discuss the patient. When Relator Coleman explained that the patient really needed to decrease her therapy minutes, Mr. Chesla stated that they cannot decrease her minutes because "[the patient's] ARD was May 18, 2016 and if they ramp her down, [Select] will lose payments." Mr. Chesla added that they were willing to go against doctor's orders to continue therapy minutes until they can "safely lower [the patient's] RUG level without risking money."

290.    Deliberately disregarding doctor's orders, Select assigned the patient an increase of therapy minutes – 90 minutes of physical therapy and 75 minutes of occupational therapy per day - to which the patient expressly continued to complain that she could not tolerate.

291.    In other words, Select ramped up the patient's RUG levels and refused to ramp down the levels, until it was financially safe for the company to do so. The 90-year-old patient was assigned an Ultra-High RUG level, the entire time she was admitted, regardless of her condition, medical needs and doctor's orders.

292.    The patient's medical records show that over 50 minutes per discipline per day was neither reasonable nor necessary for her condition. Upon information and belief, as a result, patient B.M. is at risk of getting worse and facing fatal health complications.

293.    The next day, Mr. Chesla personally called Relator Goebel to ask about the billing for patient B.M., which was documented as 15 minutes short of her assigned therapy minutes. The patient had complained of fatigue and refused to continue treatment and Relator Goebel had

documented as such. Upon information and belief, Mr. Chesla was making the call because the personal phone call is actually code for "Can you bill an extra 15 minutes for this patient, regardless of what was really provided?"

294.    In reference to Mr. Chesla's request to bill an extra 15 minutes for services not actually rendered, Relator Goebel explained to Mr. Chesla that his billing was correct and again raised concerns about the patient's clinical condition as an Ultra-High, stating that she was "just getting too much treatment for a 90-year-old." Ultimately, Relator Goebel refused to make the changes himself.

295.    This patient is not only an example of who was wrongfully and irresponsibly up-coded and was prevented from being ramped down before the ARD, but also an example of a patient, in which Select knowingly intended to bill Medicare for services that were not rendered by the Relator. Select tried to pressure and force Relator to bypass CMS-regulated billing procedures and cause improper Medicare payments.

***Patient N.L.***

296.    On or about July 2016, Relator Goebel noticed another Medicare Part A patient at Snow Hill, who was subject to "classic ramping." Patient N.L. (birth year 1939) is non-ambulatory, in which she cannot get out of bed and has an extremely low activity tolerance.

297.    Yet, Mr. Chesla, who is off-site and has never even seen the patient, set her RUG level at Ultra-High and assigned 145 minutes of treatment per day of both physical therapy and occupational therapy.

298.    Although her medical records indicate that a lower RUG level is clinically appropriate for the patient, Mr. Chesla strongly refuses to ramp down her minutes until the next assessment cycle.

299.    These Medicare patients are only a small representative sampling of the fraud that occurs at Select. "Classic ramping" at Select, usually against doctor's orders, imposes serious medical setbacks on patients. Though it appears that the clinicians at Anchorage and Snow Hill are accurately assigning minutes and agreeing to RUG levels submitted to Medicare, this is rarely the case. Instead, the corporate office's proactive engagement in strategically ramping up and down RUG levels at points of ARD occur on a daily basis and therapists who raise concerns with the seriousness of the resulting condition of the patient, fall on deaf ears.

300.    Directives with regards to "classic ramping" have also been made in writing. On or about July 2016, Mr. Chesla, sent an email to Snow Hill staffers including "helpful hints" on how to schedule Medicare A patients during assessment reference periods, aligned with Select's fraudulent intent:

### Helpful Hints for Medicare A Scheduling

1. *Don't ramp down immediately after a regularly scheduled assessment reference date. Basically you will not realize RUG you met for the assessment reference date and the therapist will look back seven days and cover up these days.  Maintain the same RUG as the regular assessment reference date.*

2. *Begin ramping down approximately day 21, depending on where you set your 14 day. This way you can block the Change of Therapy that starts on approximately day 21 or 22 with the 30 day on day 27.*

3. *If you know a discipline is getting out at a regularly scheduled assessment reference date, start ramping down then to the RUG you can maintain on the following Change of Therapy. Refer to number 1.*

4. *If a patient is being discharged off of Medicare A to Long Term Care in facility, try to discharge on the last day of the Change of Therapy and ramp down during that period. Long Term Care day #6, then discharge on day #7.*

5. *Likewise, if a patient is being discharged at home, make sure they are being discharged on or before the 7th day of the Charge of Therapy period. If they are, begin ramping minutes down.*

301.    This written directive instructing medical providers on *when* to discharge and

*when* to ramp down RUG rates is completely devoid of any mention of the medical needs of the

patient. It unambiguously shows clear intent at the management level to skew RUG rates and

defraud payers.

302.    In another email blast sent to all Snow Hill staffers, Mr. Luberski explicitly

instructs therapists "to make up minutes to maintain the RV" to ensure that a patient is receiving

more therapy minutes, for the purpose of maintaining their high RUG level until it is safe to

ramp down:

> From: Ed Luberski
> Sent: Monday, August 8, 2016 9:47 PM
> To: Harrison House of Snow Hill
> Subject: checking in
>
> just a few things:
>
> 1. ▇▇▇ needs to make up minutes to maintain the RV
>
> 2. Looks like ▇▇ and ▇ were not seen by PT Monday, can you let me know what happened/
>
> Ed
>
> Edward T Luberski MSPT
> Regional Vice President
> Select Rehabilitation

303.    In light of the reimbursement percentage factor, Select continues to engage in

"classic ramping" to maximize reimbursements from Medicare and ensure that the continuous

fraud is concealed and undetected. Accordingly, such conduct causes therapists to over-

document more than what actually occurs during a disciplinary session, and therefore causes

fraudulent up-coding that correlates to reimbursement levels that are outrageously high.

Ultimately, the Government faces high monetary damages and the patients receiving skilled care

are subject to a high probability of medical risk and harm.

*Select Enforces Corporate Directives, Encouraging its Therapists to Commit Fraud to Meet Irrational Productivity Levels*

304.     Select demonstrates fraudulent corporate intent through a variety of strategic

methods, instructing its therapists to follow corporate policies that direct and require fraud to

meet irrational productivity levels.

305.     The fraud committed at Anchorage and Snow Hill are corporate directives from

Select, exercised through both verbal and written instructions to maintain high RUG levels and

the development of a strict billing system to measure and set target productivity levels exclusive

to Select employees, all in efforts to ensure that everyone working at the facilities is committed

to increasing Part A and Part B patient admissions, RUG levels, therapy utilizations, and

productivity levels.

306.     Corporate policies and procedures at Select are neither a reflection of what is

medically necessary or reasonable for the patients nor is it in the best interest of the patients.

Despite the company's obligation under Federal and State regulations to provide medically

necessary and reasonable, patient-focused therapy to SNF beneficiaries, Select exercises control

over its therapists through its fraudulent initiative to receive maximum reimbursement from the

Government.

307.     Revealing fraudulent intent and that these practices are indeed conducted on a

company-wide scale, corporate policy is constantly reinforced at Select through both verbal and

written instructions.

99

308.    At Snow Hill, for example, the Mr. Chesla requires all of its therapists to submit

"numbers" for the facility. Each day Mr. Chesla reviews the number of Part A and Part B

patients and their total treatment minutes performed by therapists, the number of Ultra-Highs and

Very-Highs, and projection numbers. The email chain below shows Mr. Chesla's request on or

about July 5, 2016, for the daily "numbers" from Snow Hill staffers and Snow Hill's response.

From: Danny Chesla
Sent: Tuesday, July 5, 2016 6:43:38 AM
To: Ginger Cove - riley-kremer@gingercove.com (riley-kremer@gingercove.com); Harrison
House of Snow Hill; John B. Parsons; Sanctuary at Holy Cross, Maryland
Subject: This AM

Good am all

I have a meeting at 8:30 this AM. Please email me normal numbers and
carefully go thru As, Bs and quarterlys. And include any other items.

I will call you when out of meeting.
Thank you,

Daniel Chesla PT, DPT
Clinical Manager
Select Rehabilitation, Inc.

From: Harrison House of Snow Hill
Sent: Tuesday, July 5, 2016 8:04 AM
To: Danny Chesla
Subject: Re: This AM


Good morning,

  Total hours 27.65   benefit time 3.5 hours

  Med A RUG 2 RU, 3 RV

   Units per visit 72

  Projected Med B Units are 68

309.    Through constant communication, Select's corporate office relies on the Regional Managers to ensure that specific corporate instructions, fraudulently tailored to lead to submitting false reimbursement claims to Medicare, are directly passed on to the therapists.

310.    Should clinicians lack "numbers," including percentages of Ultra-High RUG levels, Part B numbers, billed therapy minutes, and other overall productivity levels, Regional Managers, on behalf of Select, circulate demanding corporate directives, via emails, text messages, and direct phone calls to therapists, pressuring licensed, health care professionals to focus on "replenishing the caseload" because of "unexpected discharges," noting that "the percentages are lacking," rather than directing the focus to the type and quality of treatment provided to each patient. By way of example, Mr. Chesla circulated an email instructing Snow Hill staffers to "build the caseload ASAP":

**From:** Danny Chesla
**Sent:** Tuesday, June 28, 2016 7:25 AM
**To:** Harrison House of Snow Hill
**Cc:** Ed Luberski
**Subject:** 6/27

Good am Bill

We need to tighten up on the schedule, the % were lacking. You were at 46%, we need to get to 75% . Mike at 79%, Cindy at 81%.

I understand we had some DCs last week, some unexpected. We need to replenish caseload ASAP.

PT side:
Recently, we were able to keep Norman, Jared and you pretty busy. Now we are having trouble just keeping you and Jared busy.

OT side:
I know we spoke about Mike and Cindy yesterday being a little low in the AM.. However, I know for sure Cindy has had her fair share of otime in the past, and having a short day once in a blue moon may happen and she needs to understand especially with the recent otime she has been offered. If Mike needs to leave early for appts etc, then we can give more to Cindy or vice versa.

They still need to remain productive. We need to build the caseload ASAP. I believe we spoke of 3 evals today.

Thank you,
Danny

Daniel Chesla PT, DPT
Clinical Manager
Select Rehabilitation, Inc.

311.    Similar to the email, on or about March 12, 2015, Mr. Chesla directly text messaged Relator Goebel, reminding Relator of the upcoming discharge patients. Corporate intent is shown in this text: "We have to do what we can to get [length of stay] better and higher RUGs [rates]":

Mar 12, 2015, 9:33 AM

(1/2) There r a lot of med
A dcs coming up.
We have to do what we
can to get LOS better and
higher rugs.

312.    The text message highlights "better LOS" and "higher RUGs" but nowhere does it mention patient need or whether the practice is medically necessary for any of its patients.

313.    Corporate directives are handed down by Select through the chain of command, in the form of both written and verbal instructions, to actively micromanage and pressure therapists to meet the company's quota of 60-70% of Ultra-High patients and targeted number of Part B unit projections.

314.    Corporate intent is also demonstrated in the company's frequent involvement with abusing the billing system. In essence, corporative directives regarding the productivity level of its therapists working at Anchorage and Snow Hill, also play a role in incentivizing health care

102

clinicians and employees to commit fraud. The current productivity levels that Select requires at Anchorage and Snow Hill are as follows:

| Required Productivity Level (%) | | |
|---|---|---|
| | Anchorage | Snow Hill |
| Treating Assistants | 94% | 92% |
| Treating Therapists | 92% | 90% |
| Program Managers | 75% | 75% |

315.    Regional Managers, including Mr. Chesla and Mr. Schaffer, require therapists to submit daily emails detailing their "numbers." Upon review, Select administrators address points of low productivity, coercing therapists and nurses to maintain a high level of productivity by for instance, assigning more patients into the Ultra-High category. If the therapist fails to complete the projected amount of Part B units or fails to hit a targeted percentage of high RUG levels, they are required to work weekends to make up for the missing "numbers."

316.    Such productivity levels lead to constant,unnecessary pressure at the facilities and incentivizes fraud because none of the corporate directives concerning the billing system are related to patient medical needs.

317.    Without prioritizing patient needs or benefits noted in doctor's orders, service log matrices, and therapy progress notes, the corporate office forces therapists to bill at an unrealistically high productivity level, instead of allowing medical practitioners to do what they are licensed to do, including accurately and truthfully billing for therapy that is medically necessary and reasonable for every patient.

318.    At Anchorage for example, in order to hit a certain percentage beneficial to their financial interest, Select ignores the fact that reimbursement is only to cover the total number of *actual* labor hours billed by the clinician. In other words, if a patient cancels a scheduled treatment or if a therapist goes to lunch, clinicians are supposed to clock out accordingly.

319.    But Select administrators freely instruct therapists at Anchorage to bill for care not actually provided. Upon information and belief, there is no way the facility can meet scheduling demands which includes such high RUG distributions of 720 treatment minutes, while taking a full-hour for lunch.

320.    Anchorage may be documenting patients at an Ultra-High and billing Medicare as such, but its therapists are definitely not delivering all the minutes that they claim to have provided to its patients.

321.    The productivity levels at both Anchorage and Snow Hill are impossible to truthfully maintain when taking into account that providers have breaks, have to eat lunch, have to complete work that is not billable (like completing charts), and sometimes meet patients who cannot tolerate or refuse treatment. The only way to maintain these productivity levels is to fabricate records and bills.

322.    In order to maintain the fraudulent billing practice, Select also uses its "efficiency calculator," created exclusively by the corporate office to track hours submitted by the facilities, RUG levels, and Part B units. The "efficiency calculator" provides a big-picture outlook of how the facility is doing in terms of "numbers. The "efficiency calculator" does *not* track information on how each patient is doing in terms of functionality or whether they are meeting their health improvement goals.

323.    In reference to the productivity levels, other clinicians that work with Relators are also highly concerned with Select's dishonest policies. On or about August 2016, Ms. Wood, a COTA who has been employed at Anchorage for one year, complained to Relator Goebel that she is resigning because the productivity level requirement for the facility is 94% and she refuses to work under those conditions. She said, "[Therapist] take an hour for lunch every day. How can they ever be at 94 percent? This is fraud. I refuse to be a part of it." On or about September 2016, a month after her conversation with Relator Goebel, Ms. Wood resigned from Anchorage.

324.    On another occasion, an occupational therapist named Ms. Kaputsos informed Relator Goebel that Anchorage is requiring 15/75 treatment minutes for the evaluation and treatment distribution. She said, "I guess I'm supposed to bill 90 minutes for this evaluation, but I don't know how I'm going to do it. This is impossible." In other words, Anchorage is assigning more and more patients into the Ultra-High level and billing Medicare accordingly but are not actually delivering all the minutes. At the same time, Select is habitually forcing therapists to bill extra therapy minutes if it seems unsatisfactory to meeting their productivity level.

325.    In fact, on or about May 27, 2016, Relator Goebel directly overheard Ms. McDaniel, the therapy assistant, instructing a COTA to bill extra therapy minutes for a patient. Rachel Betz was a COTA at Anchorage who reported to Ms. McDaniel that patient N.B. refused therapy on four different occasions that day. When Ms. Betz asked Ms. McDaniel, "how many minutes should [she] bill," Ms. McDaniel said: Either 50 or 55 minutes, I'm not sure. [The patient] is a Medicare A so we have to get the minutes." Ms. Betz billed the patient, who refused therapy, for 50 minutes of therapy that was never even provided.

326.    In summary, all of these various methods to systematically induce its fraudulent scheme, intent, and conduct per the corporate office, also serve to continue the fraud and have served to keep detection at bay, until now.

327.    As a result of the continuous fraud occurring at Anchorage and Snow Hill, under Select operation, the federal Medicare and state Medicaid programs has already made numerous overpayments for falsely submitted claims and continues to be wrongly responsible for an unreasonable amount of reimbursement that correlate to the patients and the total duration of skilled care provided.

328.    Upon information and belief, the amount charged to the federal Government, per patient, per RUG level assigned is actually much higher. The corporate office, through its off-site Regional Managers, is pressuring all patient cases to make medical decisions on patients they have never seen. Furthermore, the corporate office communicates daily with the therapists to review the numbers in all the following areas of fraud, including patient eligibility; falsification of medical records to up-code RUG levels; ramping up and down of RUG levels; and requiring irrational productivity levels. With the corporate office having a hand in each case and circumventing clinician assessments and patient need, fraud is evident in close to 100% of patients.

### COUNT I
### FALSE CLAIMS ACT VIOLATION
(False Claims 31 U.S.C.  §3729(a)(1)(A))

329.    Plaintiffs-Relators adopt and incorporate by reference all paragraphs herein.

330.    This is a claim brought by Plaintiffs-Relators and the United States to recover treble damage, civil penalties, and the cost of this action, under the Federal False Claims Act, 31

U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising

from the Defendant Select's violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq.*

331.    The FCA, 31 U.S.C. § 3729(a)(1)(A), provides that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval … is liable to the United
> States Government for any civil penalty of not less than $5,000 and
> not more than $10,000 … plus 3 times the amount of damages
> which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

332.    Defendant Select knowingly presented and/or caused to be presented false or

fraudulent claims for payment or approval of services for payment, and upon information and

belief, continues to submit and/or cause the submission of false or fraudulent claims for payment

or approval of services for payment, to the United States Government through the entities

administering government funds pursuant to the Medicare programs, all in violation of 31 U.S.C.

§ 3729(a)(1)(A).

333.    By engaging in the submission of claims for patients who are wrongfully provided

skilled care, Defendant Select knowingly presents and/or causes to be presented false or

fraudulent claims for payment to the Medicare program. Defendant improperly provides skilled

care for patients who do not meet the eligibility assessment standards to receive skilled care

benefits. By excessive and over-certification of Medicare patients in the process of assessing

treatment benefits and assigning therapy minutes, Defendant Select knowingly caused the

Medicare program to be charged and present payment for patients who were not eligible for

skilled care.

334.    Moreover, Defendant Select knowingly presents and/or causes to be presented

false or fraudulent claims for payment to the Medicare program by up-coding RUG levels

corresponding to therapy services to grossly inflate the Medicare reimbursement paid for skilled care. This fraud leads to assigning the highest RUG level that were not reasonable and medically necessary for patients, submitting misrepresented RUG levels that were exceeding the level of services that patients expressly refuse, and are unable to tolerate and/or benefit from.

335.    Defendant Select failed to follow CMS standards for identifying and reporting RUG levels scores and instead, knowingly overbilled the Medicare program, resulting in overpayments that were not refunded but were kept to yield high financial revenues for the company.

336.    The corporate office specifically knew about the fraud described above, acted to encourage, facilitate, require, and actively pressure it through the corporate emphasis on therapy and revenues over compliance and patient welfare, and acted to conceal the fraudulent conduct.

337.    Defendant Select knew and intended to violate CMS regulations and governing laws, to deceive the Medicare program, and to violate the FCA. As described herein, by improperly assigning skilled care therapy to Medicare patients who are not eligible for skilled care therapy and up-coding and misrepresenting RUG levels, Defendant knowingly submitted and continue to submit false or fraudulent claims to the Medicare program, causing the government to pay for patients ineligible for skilled care and fraudulent and improper billing and payment coding corresponding to therapy services that were not medically necessary and unreasonable for the patient and that were exceeding the level of services actually provided or needed.

338.    As a result of Defendant Select's wrongdoing and improper conduct, the Federal Medicare program made and continues to make Medicare payments to Defendants based upon false and fraudulent claims and suffered and continues to suffer damages. The United States

Government is entitled to full recovery of the amount paid by the Medicare program for the false or fraudulent claims submitted by Defendant Select.

339.    Defendant knew that given its conduct, if the government had been aware of the false or fraudulent conduct and false and/or fraudulent claims, it would be entitled to refuse payment.

340.    As set forth in the preceding paragraphs in this Complaint, Defendant knowingly violated 31 U.S.C. § 3729(a)(1)(A) and damaged the United States by their action in an amount to be determined at trial.

**COUNT II**
**FALSE CLAIMS ACT VIOLATION**
(False Statements of 31 U.S.C. §3729(a)(1)(B)).

341.    Plaintiffs-Relators adopt and incorporate by reference all paragraphs herein.

342.    This is a claim brought by Plaintiffs-Relators and the United States to recover treble damage, civil penalties, and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendant's violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq.*

343.    The FCA, 31 U.S.C. § 3729(a)(1)(B), provides that any person who:

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim… is liable to the United States Government for any civil penalty of not less than $5,000 and not more than $10,000 … plus 3 times the amount of damages which the Government sustains because of the act of that person.

U.S.C. § 3729.

344.    Defendant knowingly made, used, or caused to be made or used, and upon information and belief, still makes and uses, false records or statements material to a false or fraudulent claim to the United States Government through the entities administering government funds pursuant to the Medicare program.

345.    By falsifying medical records and patient assessment forms submitted to CMS or its fiscal intermediary, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment to the Medicare program.

346.    At Select, therapy progress reports, patient evaluations, and plan of treatment forms, all documenting patient symptoms, functioning and needs, do not accurately and truthfully reflect honest clinical assessments made in the field, do not accurately and truthfully report patient symptoms, needs and functioning, and are not completed to accurately and truthfully report the best interests and medical needs of the patients.

347.    Most importantly, the purpose of the MDS report is to capture an accurate and true diagnosis and progress of the patient, including the identification of the patient's continuing need for skilled care, in order to meet his or her medical, nursing, rehabilitative, social, and discharge planning needs. Equally important, the MDS report, as a part of the RAI, serves as an assessment tool required by Medicare to determine how much therapy the patient truly needs and what types of skilled care treatments are reasonable and necessary, therefore, determining the level of reimbursement that is ultimately paid by the Medicare program to Defendant Select. As such, the government expects patients' medical needs to be thoroughly satisfied at the assessment level and that it is submitted to the government with accurate reflection of the patient's plan of care. In sum, patient-related forms are supposed to be completed and documented with honest clinical contribution and consent, prior to submitting to the government.

348.    But as described in the Complaint, therapists are asked daily to fabricate and exaggerate the information recorded in the assessments in order to up-code RUG levels and improperly increase therapy, with the sole purpose of increasing reimbursement payment and justifying unreasonable and medically unnecessary skilled care to its patients.

349.    The corporate office specifically knew about the fraud described above, acted to encourage, facilitate, require, and actively pressure it through the corporate emphasis on therapy and revenues over compliance and patient welfare, and acted to conceal the fraudulent conduct. Corporate demand showed intent to violate CMS regulations, deceive the Medicare program, and violate the FCA.

350.    As a result of Defendant Select's fraudulent course of conduct, with actual knowledge of falsity and/or in deliberate ignorance or reckless disregard that such statements and claims were false, Defendant made, used, or caused to made or used, false records or statement material to a false or fraudulent claim to the government for the Medicare program. The federal Medicare program made and continues to make Medicare payments to Defendant based upon false and fraudulent claims and suffered and continues to suffer damages. The United States Government is entitled to full recovery of the amount paid by the Medicare program for the false or fraudulent claims submitted by Defendant.

351.    The government would not have made payments to Defendant but for their fraudulent claims and submissions. Specifically, the government would not have paid Defendant for the following, including but not limited to: wrongfully provided assigned therapy that did not meet the eligibility criteria, up-coded RUG levels, misrepresented and falsified medical records and patient assessment forms, therapy services that were not reasonable and medically necessary for the patient, excessive treatments, and skilled care that were not supported or required by patients' medical records or physicians' orders.

352.    The government, through its proxies under the Medicare program, made payments to Defendant based upon false and fraudulent claims and suffered damages. The United States Government is entitled to full recovery of the amount paid by the Medicare program for the false or fraudulent claims.

353.    Defendant knew that given its conduct, if the government had been aware of the false or fraudulent conduct and false and/or fraudulent claims, it would be entitled to refuse payment.

354.    As stated in preceding paragraphs, Defendant Select knowingly violated 31 U.S.C. § 37299(a)(1)(B) and damages the United States by its actions in an amount to be determined at trial and totaling many millions of dollars.

**COUNT III**
**FALSE CLAIMS ACT VIOLATION**
(Violation of 31 U.S.C.  §3729(a)(1)(G)).

355.    Plaintiffs-Relators adopt and incorporate herein by reference all paragraphs herein.

356.    This is a claim brought by Plaintiffs-Relators and the United States to recover treble damage, civil penalties, and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendant's violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq.*

357.    The FCA, 31 U.S.C. § 3729(a)(1)(G), provides that any person who:

> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government … is liable to the United States Government for any civil penalty of not less than $5,000 and not more than $10,000 … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31  U.S.C. § 3729.

358.    By virtue of the fraud described in the Complaint, Defendant Select knowingly made, used, or caused to be made or used false records or statements and knowingly concealed or avoided obligation to pay (repay) money to the government, and continues to do so, in violation of 31 U.S.C. § 3729(a)(1)(G). Defendant knowingly committed fraud by enforcing corporate directives, exercised through both verbal and written instructions to maintain high RUG levels and the development of a strict billing system to measure and set target productivity levels exclusive to Select employees, all in efforts to ensure that everyone working at the facilities is committed to increasing Part A and Part B patient admissions, RUG levels, therapy utilizations, and productivity levels.

359.    Corporate policies and procedures at Select are neither a reflection of what is medically necessary or reasonable for the patients nor is it in the best interest of the patients. Despite the company's obligation under Federal regulations to provide medically necessary and

reasonable, patient-focused therapy to SNF beneficiaries, Select exercised control over its therapists through its fraudulent initiative to receive maximum reimbursement from the Government. Defendant clearly knew it was being overpaid by Medicare.

360. Yet Defendant Select did not take the required and appropriate steps to cease the fraudulent conduct, satisfy the obligation owed to the United States, refund or return such overpayments, or inform Medicare of the overbilling, and it instead continued to retain the same corporate directives and commit fraud to overbill the Medicare program.

361. Moreover, in order to continue its fraudulent practices undetected, especially with up-coding RUG levels for patients, Defendant accomplished their particular billing scheme by ramping up and down treatment minutes around the assessment reference dates ("ARD"). Defendant intentionally engaged in "classic ramping" to set treatment minutes at an Ultra-High level right before the assessment reference date and right before the assessment cycle ends, only ramping down the treatment minutes when the new assessment cycle began.

362. Defendant Select knew that given its conduct, if the government had been aware of the false or fraudulent conduct and false and/or fraudulent claims, it would be entitled to refuse payment.

363. As a result of Defendant's violations of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered substantial losses in an amount that exceeds tens of millions of dollars, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial and totaling many millions of dollars.

**COUNT IV**
**FALSE CLAIMS ACT VIOLATION**
(Violation of 31 U.S.C. § 3729(a)(1)(C)).

364. Plaintiff-Relators adopt and incorporate herein by reference all paragraphs herein.

365. This is a claim brought by Plaintiffs-Relators and the United States to recover treble damage, civil penalties, and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants Select, Communicare and White Oaks' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq.*

366. The FCA, 31 U.S.C. § 3729(a)(1)(C), provides that any person who:

> (a)(1)(C) conspires to commit a violation of [false claims 31 U.S.C. §3729(a)(1)(A); false statements 31 U.S.C. §3729(a)(1)(B); and 31 U.S.C. §3729(a)(1)(G)] … is liable to the United States Government for any civil penalty of not less than $5,000 and not more than $10,000 … plus 3 times the amount of damages which the Government sustains because of the act of that person.

32 U.S.C. § 3729.

367. Defendants conspired with one another to participate in a fraudulent scheme to defraud the United States and the State of Maryland by submitting, causing to submit or aiding and participating and benefiting in the submission of false or fraudulent claims Medicare and Medicaid claims in violation of 31 U.S.C. § 3929(a)(1)(C).

368. First, Defendant Select conspired with Defendants CommuniCare and White Oak at relevant times to knowingly present and/or caused to be present false or fraudulent claims for payment or approval of services for payment, and upon information and belief, continues to submit and/or cause the submission of false or fraudulent claims for payment or approval of services for payment, to the United States Government through the entities administering government funds pursuant to the Medicare programs and to the State of Maryland, all in violation of 31 U.S.C. § 3729(a)(1)(A).

369. Select's corporate office works closely with CommuniCare's corporate office to operate and manage Anchorage on the therapy side of the business, including setting therapy

minutes, monitoring therapists, assigning services to Medicare patients, managing productivity levels, and enforcing corporate directives. Communicare has knowledge of Select's fraud detailed herein and willingly participates therein and profits therefrom.

370.    Prior to CommuniCare's acquisition of Anchorage in January 2016, Anchorage was formerly owned and operated by White Oak, which managed Anchorage similarly to how CommuniCare manages Anchorage now. Select's corporate office worked closely with White Oak's corporate office to operate and manage Anchorage on the therapy side of the business, , including setting therapy minutes, monitoring therapists, assigning services to Medicare patients, managing productivity levels, and enforcing corporate directives. White Oak had knowledge of Select's fraud detailed herein and willingly participated therein and profited therefrom. As such, Plaintiffs-Relators also bring claims against White Oak for all the relevant frauds that occurred prior to the date of CommuniCare's acquisition of Anchorage. White Oak acquired Anchorage in June 2007.

371.    Second, Defendants were also engaged in a conspiracy to knowingly make, use, or caused to be made or used, and upon information and belief, in the case of Select and Communicare, still makes and uses, false records or statements material to a false or fraudulent claim to the United States Government through the entities administering government funds pursuant to the Medicare program and State of Maryland, all in violation of all in violation of 31 U.S.C. § 3729(a)(1)(B).

372.    Select's corporate office is in charge of the billing system for the therapy services provided at Anchorage and Snow Hill. CommuniCare essentially handles the billing for the nursing care provided at Anchorage and Snow Hill. Upon information and belief, CommuniCare knows about Select's fraudulent process in billing the Government for therapy services provided

to Medicare patients at its facilities, but does nothing to report or stop the fraud because CommuniCare also earns a percentage of the profit that Select collects from the fraudulently submitted reimbursements, paid for by the Government. Communicare has and White Oak had an obligation to return the fraudulently obtained profit, but do not. At all times relevant, White Oak also knew about Select's fraudulent billing scheme.

373.    Third, by virtue of the fraud described in the Complaint, Defendants also engaged in conspiracy to knowingly make, use, or cause to be made or use false records or statements and knowingly concealed or avoided obligation to pay (repay) money to the Government, and continues to do so, in violation of 31 U.S.C. § 3729(a)(1)(G).

374.    CommuniCare knowingly permits, participates and benefit from the fraud. It is in constant communication with Select and either encourages or, with deliberate indifference to the truth, turns a blind eye to Select's fraudulent activity. Anchorage also plays a key role in contributing to the fraud by carrying out the corporate directives that directly lead to patient harm and government fraud. This combined effort directly causes the fraudulent acts that intentionally divest the government of funds, maximizing Medicare reimbursement for the personal, financial benefit of all the Defendants involved.

375.    The United States and the State of Maryland were unaware of the fraud and fraudulent schemes detailed herein, and but for this complaint, would not have discovered it and its true breadth and scope.

376.    In reliance on the false and fraudulent records presented or caused to be presented by the Defendants, the United States authorized payments to be made which greatly enriched Defendants and which damaged the United States Government.

117

377.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(C), the United States and the State of Maryland have suffered substantial losses in an amount that exceeds tens of millions of dollars, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial and totaling many millions of dollars.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs-Relators prays, on behalf of the United States and themselves, that on final trial of this case, judgment be entered in favor of the United States and against Defendant Select Rehabilitation, Inc. as follows:

A.  On the First Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

B.  On the Second Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but limited to, statutory penalties for each violation, attorney's fees and costs;

C.  On the Third Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but limited to, statutory penalties for each violation, attorney's fees and costs; and

D.  For the costs of this action, prejudgment interest, interest on the judgment, attorney's fees and for any other and further relief to which Plaintiffs-Relators and the United States may be justly entitled.

And against Defendants Select Rehabilitation, Inc., Anchorage SNF, LLC, CommuniCare Health Services, Inc., and White Oak Healthcare, LLC:

A.  On the Fourth Cause of Action under the False Claims Act, for the amount of the United States' damages, multiplied as required by law and for such civil penalties as are allowed by law, including, but limited to, statutory penalties for each violation, attorney's fees and costs; and

B.  For the costs of this action, prejudgment interest, interest on the judgment, attorney's fees and for any other and further relief to which Plaintiffs-Relators and the United States may be justly entitled.

**COUNT V**
**Maryland False Claims Act Against State Health Plans and State Health Programs Act**
(Violation of Md. Code Ann., Health-Gen. § 2-601 *et seq.*)

378.     Plaintiffs-Relators adopt and incorporate herein by reference all paragraphs.

379.     This is a *qui tam* action brought by Plaintiffs-Relators on behalf of the State of

Maryland to recover treble damages and civil penalties under the Maryland False Claims Act

Against State Health Plans and State Health Programs Act, Md. Code Ann., Health-Gen. § 2-601

*et seq.*

380.     Section 2-602 provides, in part, liability for anyone who:

> (1) Knowingly present or cause to be presented a false or fraudulent claim
> for payment or approval;
> (2) Knowingly make, use, or cause to be made or used a false record or
> statement material to a false or fraudulent claim;
> (3) Conspire to commit a violation under this subtitle;
> ... or
> (7) Knowingly made, use, or cause to be made or used, a false record of
> statement material to an obligation to pay or transmit money or other
> property to the State; or
> (8) Knowingly conceal, or knowingly and improperly avoid or decrease,
> an obligation to pay or transmit money or other property to the State.

Md. Code Ann., Health-Gen § 2-602 (West).

381.     As alleged above and in Count I, Defendant Select Rehabilitation violated and

continues to violate Section 2-602(1) by knowingly presenting or causing to be presented false or

fraudulent claims for payment or approval to the State of Maryland.

382.     As alleged above and in Count II, Defendant Select Rehabilitation violated and

continues to violate Section 2-602(2) by knowingly making, using or causing to be made or used

false records or statements material to false or fraudulent claims to the State of Maryland.

383.     As alleged above and in Count III, Defendant Select Rehabilitation violated and

continues to violate Section 2-602(7),(8) by knowingly making, using, or causing to be made or

119

used, false records or statements to the State that are material to an obligation to pay and by knowingly concealing, or knowingly and improperly avoiding or decreasing, an obligation to pay or transmit money to the State.

384.   As alleged above and in Count IV, Defendants Select Rehabilitation, Inc., Anchorage SNF, LLC, CommuniCare Health Services, Inc., and White Oak Healthcare, LLC violated and (other than White Oak) continue to violate Section 2-602(3) by conspiring to commit a violation under this subtitle, including to violate Sections 2-602(1), (2), (7) and (8).

385.   The State of Maryland, by and through the Maryland Medicaid Program and unaware of Defendants' conduct, paid the claims submitted or caused to be submitted by Defendants through healthcare providers and third party payers in connection therewith – a result intended by the Defendants.

386.   Compliance with applicable Medicare and Medicaid laws, rules, regulations and coverage determinations was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' conduct.

387.   In order to be eligible to participate in and receive reimbursement as a provider, compliance with applicable Maryland statues and regulations is mandatory.

388.   Additionally, Maryland requires all Medicaid providers to agree to the following among other items:

> That all claims submitted under his, her or its provider number shall be for medically necessary services that were actually provided as described in the claim. The Provider acknowledges that the submission of false or fraudulent claims could result in criminal prosecution and civil and administrative sanctions.

(Maryland Medical Assistance Program – Provider Agreement).

389.    Had the State of Maryland known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

390.    As a result of Defendants' violations of Md. HEALTH-GENERAL Code Ann. § 2-601 *et seq.*, the State of Maryland has been damaged in an amount in excess of millions of dollars, exclusive of interest.

391.    Plaintiffs-Relators are both private citizens with direct and independent knowledge of the allegations of this Complaint, who brought this action pursuant to Md. HEALTH-GENEAL Code Ann. § 2-601 *et seq.* on behalf of themselves and the State of Maryland.

392.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims and merely asserts separate damage to the State of Maryland in the operation of its Medicaid (Medical Assistance) program.

WHEREFORE, Plaintiffs-Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

**To the State of Maryland:**

(1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' conduct;

(2) A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Plaintiffs-Relators:**

(1) The maximum amount allowed pursuant to Md. HEALTH-GENERAL Code Ann. § 2-601 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Plaintiffs-Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## JURY DEMAND

Plaintiffs-Relators hereby demand a jury trial as to all issues so triable.

Veronica Nannis

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

Veronica Nannis; vnannis@jgllaw.com
Jay P. Holland; jholland@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
(301) 220-2200
*Counsel for Plaintiffs-Relators:*
*Michael Goebel and William Coleman*