## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHAEL GOEBEL, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-17-00722 |
| ANCHORAGE SNF, LLC, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM

Pending before the Court is Defendants Anchorage SNF, LLC, CommuniCare Health Services, Inc., and White Oak Healthcare, LLC's Motion to Dismiss Amended Complaint. (ECF No. 92.) The Motion is fully briefed, and no hearing is required. *See* Local Rule 105.6. For the reasons that follow, the Motion will be granted.

### I.   BACKGROUND

#### A. Statutory Framework

This case arises under the False Claims Act, 31 U.S.C §§ 3729–3733 ("FCA"). The FCA contains several provisions prescribing liability for those who defraud the United States government by submitting false claims for payment. In relevant part, the FCA ascribes liability to any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> . . .

> (G) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to an obligation to pay or transmit
> money or property to the Government, or knowingly conceals or
> knowingly and improperly avoids or decreases an obligation to pay
> or transmit money or property to the Government[.]

31 U.S.C. § 3729(a)(1). The FCA also contains a conspiracy provision which holds liable any

person who "conspires to commit a violation of subparagraph (A), (B), . . . or (G)." *Id.* §

3729(a)(1)(C).

As the government is the victim of the fraud, the Department of Justice may bring a civil

action under the FCA against anyone who has violated § 3729. *Id.* § 3730(a). However, that is

not the FCA's sole enforcement mechanism. In addition, "[a] person may bring a civil action for

a violation of section 3729 for the person and for the United States Government . . . brought in the

name of the Government." *Id.* § 3730(b)(1). This is known as a *qui tam* action. *Id.* § 3730(c).

The person bringing the action is known as a relator. When a relator brings a *qui tam* action, the

relator must file the complaint under seal. *Id.* § 3730(b)(2). The government is notified of the

complaint and is given time to investigate the allegations itself. *Id.* The government must then

either proceed with the action or "notify the court that it declines to take over the action, in which

case the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4).

The FCA contains several provisions limiting the power of relators in *qui tam* suits. One

of those provisions is at issue in this case. This provision is known as the "first-to-file" bar. The

first-to-file bar states:

> When a person brings an action under this subsection, no person
> other than the Government may intervene or bring a related action
> based on the facts underlying the pending action.

*Id.* § 3730(b)(5). As explained below, the meaning of this sentence determines the outcome of this

action.

### B. Statement of Facts

This case concerns allegations of fraud occurring at Anchorage SNF, LLC ("Anchorage"), a skilled nursing facility ("SNF"). Anchorage provides both short and long-term rehabilitation and senior healthcare services, including both nursing and therapy care. (ECF No. 86 ¶ 4.) From June 2007 until January 2016, Anchorage was owned by White Oak Healthcare LLC ("White Oak"). (*Id.* ¶ 6.) White Oak "is a mid-sized healthcare and senior services company" registered in Maryland. It operates SNFs and other similar rehabilitation facilities. (*Id.*) Since January 2016, Anchorage has been owned by CommuniCare Health Services, Inc ("CommuniCare"). (*Id.* ¶ 5.) CommuniCare "is a national provider of post-acute care." (*Id.*) It operates 51 facilities across five states, including Maryland. (*Id.*) Collectively, Anchorage, White Oak, and CommuniCare are the defendants ("Defendants").

Defendants contract with a company called Select Rehabilitation, LLC ("Select") to provide staff for Medicare patients at Anchorage. (*Id.* ¶ 36.) Based in Illinois, Select is a national therapy service provider which staffs SNFs nationwide with therapists and other medical professionals. (*Id.* ¶ 35.)

There are three plaintiffs. The United States is the real plaintiff in interest because it is the party that allegedly was defrauded. *See* 31 U.S.C. § 3730(b)(1). The second plaintiff is Michael Goebel. Goebel is a Maryland resident and a certified occupational therapy assistant. (*Id.* ¶ 33.) Goebel began working at Select in September 2010. (*Id.*) He served as the program manager at Anchorage for five years. (*Id.*) Goebel still works for Select but is now assigned to another SNF called Snow Hill. (*Id.*) Snow Hill is not affiliated with Defendants. (*Id.* ¶ 7.) The final plaintiff is Bill Coleman. Coleman is a Maryland resident and a physical therapist. (*Id.* ¶ 34.) He joined Select in July 2015. (*Id.*) He worked at both Snow Hill and Anchorage. (*Id.*) Coleman resigned

from Select in September 2016. (*Id.*) Goebel and Coleman will be referred to as "Relators."

Relators allege that Select and Defendants engaged in a multi-part scheme to defraud the government, which included fraudulent billing practices and mistreating patients. However, Relators were not the first parties to allege wrongdoing by Select. Rather, before Relators brought this action, a different relator, Patrick Carson, brought a separate suit against Select and several SNFs in Pennsylvania as well as their owners. (*See United States ex rel. Carson v. Select Rehab., Inc.*, No. 15-CV-05708 (E.D. Pa. Oct. 20, 2015) (hereinafter *Carson* Dkt.), ECF No. 1.)[1] Because of the FCA's first-to-file bar, if Relators' claims are related to the claims in this first lawsuit brought by Carson, then Relators' claims must be dismissed. Thus, to properly frame its legal analysis, the Court must first describe the facts underlying the *Carson* lawsuit before laying out the facts of Relators' case.

### 1. *Carson* Complaint

Carson was a Pennsylvania resident and physical therapist assistant. (*Carson* Dkt., ECF No. 1 ¶ 24.) He worked for Select from October 2011 through March 2015. (*Id.*) Carson's complaint stated that Select "partners with 500 communities across 31 states and employs over 6000 therapists." (*Id.* ¶ 13.) While working for Select, Carson was assigned to five different SNFs in Pennsylvania. (*Id.* ¶ 24.) He sued Select, the five SNFs, and three companies which owned the SNFs. (*See id.* ¶¶ 13–23.) Carson alleged that "[t]o obtain the highest reimbursement possible for skilled nursing facility stays and the therapy administered during those stays," these entities "utilize[d] improper billing practices and methodologies" to present false claims for payment to

---

[1] The Court references three different dockets in this Memorandum: its own docket, the docket of this case while transferred to the Eastern District of Pennsylvania, and the *Carson* docket. When switching between dockets, the Court will note that it is citing to a different docket than in the previous citation. Additionally, some of the relevant documents from the Eastern District of Pennsylvania have been placed onto this Court's docket in the District of Maryland. Where that has occurred, the Court will cite to its own docket. Where the documents do not appear on this Court's docket, the Court will cite to the docket in the Eastern District of Pennsylvania.

4

the government. (*Id.* ¶ 4.)

Carson alleged approximately six categories of fraud. First, he alleged that Select and the SNFs overbilled for therapy services. (*Id.* ¶¶ 67–81.) For instance, before holidays, therapists were told to increase therapy minutes "to ensure that weekly totals would not be diminished because of the holiday" even though this treatment was not provided in full. (*Id.* ¶ 74.) Second, Carson detailed how "Management" repeatedly instructed therapists to bill for services that were never provided. (*Id.* ¶¶ 82–101.) The companies also "systematically" billed for future treatments even though "no further such treatment was ever rendered to the patient and management knew of this fact." (*Id.* ¶ 99.) Third, Carson stated that the companies billed non-skilled activities as skilled therapy. (*Id.* ¶¶ 102–107.) Fourth, Carson alleged that Select and the SNFs billed for unreasonable, harmful, and medically unnecessary therapy. (*Id.* ¶¶ 108–126.) In particular, Carson explained that certain "modalities" such as ultrasound were "consistently over utilized [sic] and administered to inappropriate patients." (*Id.* ¶ 117.) Carson stated that according to one individual, "many employees (across the country)" complained about the widespread use of these modalities. (*Id.* ¶ 118.) According to Carson, this individual also "knew that these improper treatments were done on a nation-wide basis." (*Id.* ¶ 119.) Fifth, Carson asserted that the companies improperly billed for inferior medical products. (*Id.* ¶¶ 127–130.) Finally, Carson alleged that Select and the SNFs had company policies of postponing the discharge of patients longer than medically appropriate so that they could seek additional reimbursement from the government. (*Id.* ¶¶ 131–140.)

Based on these allegations, Carson sued Select, the SNFs, and their owners on October 16, 2015. The complaint included both substantive FCA allegations, including under 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G), as well as an allegation of conspiracy to violate the FCA under §

5

3729(a)(1)(C). (*Id.* ¶¶ 151–159, 169–171.) Carson also alleged violations under fifteen state false claims laws. (*Id.* ¶¶ 174–311.) These states included the domiciles of the various defendants—Illinois and Maryland[2]—but also thirteen other states' laws.

### 2. Relators' Amended Complaint

On March 16, 2017, Relators filed their original complaint in this action. (*See United States ex rel. Goebel v. Anchorage SNF, LLC*, No. 17-CV-00722 (D. Md. Mar. 16, 2017) (hereinafter *Goebel* D. Md. Dkt.), ECF No. 1.) In this complaint, they sued Select for violations of §§ 3729(a)(1)(A), (B), and (G), as well as an FCA conspiracy violation under § 3729(a)(1)(C) and a violation of Maryland's false claims law. (*Id.* at 329–392.) The original complaint also named Anchorage, CommuniCare, and White Oak but only in the FCA conspiracy count and the Maryland state law count. (*Id.* at 364–392.) On February 5, 2025, Relators filed an amended complaint (ECF No. 86 ("Amended Complaint")), which does not name Select as a defendant and no longer contains a Maryland state law count. It also names Anchorage, CommuniCare, and White Oak in the substantive counts. Thus, there are now four counts at issue, which are violations of §§ 3729(a)(1)(A), (B), (C), and (G). Anchorage, CommuniCare, and White Oak are the only defendants, and they are alleged to have violated each of these FCA provisions. (*Id.* ¶¶ 327–375.) Despite these differences with the original complaint, the Amended Complaint contains no new factual allegations against Defendants. (ECF No. 92–2 at 4.)

Like Carson, Relators allege a scheme of improper billing and patient mistreatment involving Select. Relators explain that "[o]ne location in which the fraud occurs is at Anchorage." (ECF No. 86 ¶ 9.) According to the Amended Complaint, Anchorage contracts with Select to provide therapy services to Medicare patients. (*Id.* ¶ 4.) Relators describe a scheme in which

---

[2] While the alleged fraud occurred in Pennsylvania and several defendants were domiciled there, Pennsylvania does not have its own false claims law.

Select's "corporate office" orchestrates the fraud. (*Id.* ¶ 9.) Relators explain that as part "of its corporate strategy to perpetuate fraudulent practices," Select hires individuals to manage its branches. (*Id.* ¶ 121.) However, they are "off-site administrators who never see patients." (*Id.*) Yet, it is these administrators who make medical decisions and determine what reimbursement rate should be billed to the government. (*Id.*) Then, "CommuniCare joins in the fraud by receiving a portion of the billed services that Select fraudulently bills." (*Id.* ¶ 9.) Thus, "CommuniCare knowingly permits, participates [sic] and benefits from the fraud." (*Id.*) When White Oak owned Anchorage, it also engaged in similar fraudulent activities. (*See id.* ¶¶ 9, 123.) Finally, Anchorage "plays a key role in contributing to the fraud by carrying out the corporate directives that directly lead to patient harm and government fraud." (*Id.* ¶ 9.)

Relators allege four primary components of this fraudulent scheme. First, they assert that Select wrongfully provides skilled care to patients who are not eligible for SNF benefits. (*Id.* ¶¶ 135–184.) This results in patients receiving therapy "despite there being no reasonable and medically necessary reason to treat." (*Id.* ¶ 136.) Relators provide financial figures and describe in detail the experiences of several patients to illustrate this component of the scheme. For instance, Relators explain that one patient at Anchorage steadfastly refused therapy but was nevertheless given three-and-a-half hours of therapy per day, which was then fraudulently billed to Medicare. (*Id.* ¶ 161.) Relators also describe similar experiences of patients at Snow Hill. (*See, e.g., id.* ¶¶ 167-173.) Overall, Relators assert that the Anchorage patient samples "illustrate Select's and Defendants' scheme to bill for SNF care benefits despite the patient's ineligibility for coverage." (*Id.* ¶ 183.)

Second, Relators argue that Select knowingly falsifies medical records so that it can improperly increase therapy and up-code Resource Utilization Group (RUG) levels. (*Id.* ¶¶ 185–

272.)  Each patient is categorized into a RUG level, and the RUG level determines the reimbursement rate that Medicare pays for the patient.  (*Id.* ¶ 108.)  RUG rates are supposed to be assigned after a patient's medical needs are evaluated.  (*Id.* ¶ 191.)  But, according to Relators, "[a]t Select, the opposite occurs."  (*Id.* ¶ 192.)  Relators allege that "Select automatically sets RUG rates" prior to medical evaluations and then "requires its and Defendants' therapists to document the patient's condition, the duration of therapy minutes, and disciplines according to the RUG rates predetermined by the corporate office."  (*Id.* ¶ 193.)  The purpose of this is to get "each patient to stay at Anchorage and Snow Hill for as long as possible, with the highest RUG level that could be assigned."  (*Id.* ¶ 194.)

Third, Relators assert that Select engages in strategic methods to maximize Medicare reimbursements.  (*Id.* ¶¶ 273–301.)  In particular, Select and Defendants ramp up and down treatment minutes depending on the date, as this affects reimbursement from Medicare.  (*Id.* ¶¶ 91, 273.)  This ramping occurs even though it is not medically appropriate.  (*Id.* ¶ 275.)

Fourth, Relators allege that Select and Defendants have broad corporate policies which encourage therapists to commit fraud.  (*Id.* ¶¶ 302–326.)  Relators describe corporate directives "exercised through both verbal and written instructions" to ensure that everyone working at Snow Hill and Anchorage is committed to increasing Medicare patient admissions, RUG levels, therapy treatment, and productivity.  (*Id.* ¶ 303.)  Furthermore, Relators assert that "these practices are indeed conducted on a company-wide scale" at Select and Defendants.  (*Id.* ¶ 305.)

## C. Procedural History

The procedural history of this case is long and somewhat complicated.  Carson filed his complaint in the Eastern District of Pennsylvania on October 16, 2015.  (*Carson* Dkt., ECF No. 1.)  While that complaint was under seal as the United States investigated, Relators filed their

original complaint under seal in the District of Maryland on March 16, 2017. (*Goebel* D. Md.
Dkt., ECF No. 1.) As noted above, Select was named in three substantive FCA counts, one FCA
conspiracy count, and one Maryland state law count. Anchorage, CommuniCare, and White Oak
were only named in the FCA conspiracy count and Maryland state law count. In July 2019, the
United States moved to transfer Relators' case to the Eastern District of Pennsylvania. (ECF No.
16.) This Court granted the transfer, and the case was transferred to Judge Timothy Savage in the
Eastern District of Pennsylvania. (ECF No. 17.) On July 5, 2022, the United States and the State
of Maryland declined to intervene in this action. (ECF No. 39.) By statute, the Maryland state
law claim was then dismissed. (ECF No. 44.)

Relators' original complaint was then unsealed on July 7, 2022. (*United States ex rel.
Goebel v. Select Rehab. Inc.*, 19-CV-03277 (E.D. Pa. July 7, 2022) (hereinafter *Goebel* E.D. Pa.
Dkt.), ECF No. 43.) Select moved to dismiss the claims against it based on the first-to-file bar.
(*See Goebel* E.D. Pa. Dkt., ECF No. 72 at 9.) Relators consented to dismissal of all claims against
Select, and Judge Savage granted the dismissal on December 28, 2022. (*Goebel* E.D. Pa. Dkt.,
ECF No. 88.) Thus, the only remaining claim at that point was the FCA conspiracy count against
Anchorage, CommuniCare, and White Oak.

On January 20, 2023, the three defendants moved to dismiss that claim. (*Goebel* E.D. Pa.
Dkt., ECF No. 93.) As here, they argued that the first-to-file bar precluded the claim, and even if
it did not, they asserted that the complaint failed to state a claim under Rule 12(b)(6). They did
not raise any constitutional challenges to the FCA at that time.

On September 29, 2023, Judge Savage denied Defendants' motion to dismiss. (*Goebel* D.
Md. Dkt., ECF No. 45.) He explained that the issue facing the court was whether the first-to-file
bar precluded Relators' suit even though it now named entirely different defendants than Carson's

9

complaint. (*Id.* at 1.) Judge Savage held that the first-to-file bar did not apply. (*Id.*) He explained that there was no binding Third Circuit precedent on point. (*Id.* at 14.) Thus, he surveyed the caselaw from other circuits and ultimately relied on cases out of the Fifth and Tenth Circuits to "hold that an action naming unrelated defendants not named in the first action, which does not sufficiently allege a nationwide fraudulent scheme, is not barred by the first-to-file rule." (*Id.* at 1, 18.) Defendants moved for leave to certify his order for interlocutory appeal, but Judge Savage denied leave on February 13, 2024. (ECF No. 50.)

Upon joint motion, the case was transferred back to this Court on February 27, 2024. (ECF No. 19.) On February 5, 2025, Relators filed their Amended Complaint. (ECF No. 86.) As Defendants note, the Amended Complaint did not add any new factual allegations to the original complaint. (ECF No. 92–2 at 4.) Rather, it re-alleged the substantive FCA counts under 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) but this time against Anchorage, CommuniCare, and White Oak instead of Select. (ECF No. 86 ¶¶ 327–361.) The Amended Complaint also retained the FCA conspiracy count under § 3729(a)(1)(C), dismissal of which Judge Savage previously denied. (*Id.* ¶¶ 362–375.) Defendants moved to dismiss the Amended Complaint on March 14, 2025. (ECF No. 92.)

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may seek to dismiss a complaint based on a lack of subject matter jurisdiction. "Where, as here, a defendant urges dismissal on the grounds that the complaint's allegations are insufficient to confer jurisdiction," the Court analyzes the motion under the same standard as one brought under Rule 12(b)(6). *Ministry of Def. of State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir. 2024). Under that standard, the Court accepts the veracity of all factual allegations in the complaint. *Id.* If the Court

finds that these facts are insufficient to create subject matter jurisdiction, then it must grant the motion to dismiss. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

## III.   DISCUSSION

Defendants make three arguments in support of their motion to dismiss. First, they allege that this Court lacks subject matter jurisdiction because the False Claim Act's first-to-file bar applies to Relators' claims. (ECF No. 92–2 at 7–16.) Notably, as Defendants point out, in the Fourth Circuit the first-to-file bar is jurisdictional, while in the Third Circuit it is not. (*Id.* at 8.) Second, Defendants argue that even if the first-to-file bar does not apply, Relators fail to state a claim under Rules 8 and 9 of the Federal Rules of Civil Procedure. (*Id.* at 23–44.) Third, Defendants assert that even if Relators' claims are otherwise meritorious, they must be dismissed because the *qui tam* provisions of the FCA are unconstitutional. (*Id.* at 16–23.) Relators rejoin that these first two arguments were already decided and dispensed with by Judge Savage. (ECF No. 94 at 1.) As a result, the law-of-the-case doctrine applies and precludes the Court from revisiting these issues. (*Id.*) And they characterize the constitutional argument as a "Hail Mary" which should similarly be disregarded. (*Id.* at 2.)

For the reasons that follow, the Court exercises its discretion not to apply the law-of-the-case doctrine. Reviewing Defendants' arguments *de novo*, the Court agrees with Defendants that recent Fourth Circuit precedent requires dismissal of the Amended Complaint because of the first-to-file bar. The Court, therefore, need not address Defendants' remaining arguments about pleading standards and the constitutionality of the FCA's *qui tam* provisions.

### A.  Law of the Case

The law-of-the-case doctrine provides "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pepper*

11

*v. United States*, 562 U.S. 476, 507 (2011) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). The doctrine applies both to a court's own prior rulings, *see, e.g., TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009), and, after a case has been transferred, to the rulings of the transferor court, *see Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 210 n.5 (4th Cir. 2011). Ordinarily, courts should be "loathe" to revisit their prior decisions or those of a coordinate court and should only do so under "extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Nevertheless, courts always have the authority to do so because the law-of-the-case doctrine only "directs a court's discretion, it does not limit the tribunal's power." *Pepper*, 562 U.S. at 507 (quoting *Arizona*, 460 U.S. at 618). As the Fourth Circuit has explained, law-of-the-case is a "malleable doctrine meant to balance the interests of correctness and finality." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003).

Relators argue that Judge Savage's opinion upholding their conspiracy claim should remain the law of the case because no extraordinary circumstances are present. However, Relators skip a threshold question. Before the Court can determine if extraordinary circumstances justify an exception to the law-of-the-case rule, it must first conclude that law-of-the-case is applicable in the first place. That is because Judge Savage's opinion concerned a motion to dismiss Relators' *original* complaint. But now before the Court is Relators' *Amended* Complaint. Therefore, the Court must decide whether it remains bound by Judge Savage's decision even though the underlying pleading has been amended. The Court concludes that it is not bound.

In recent years, several judges in this District have addressed whether the law-of-the-case doctrine applies to motions to dismiss amended complaints. Three of them concluded that law-of-the-case was inapplicable while one judge concluded that it was applicable. *Compare Chase v. Dep't of Pub. Safety & Corr. Servs.*, Civ. No. ELH-18-2182, 2020 WL 1914811 (D. Md. Apr. 20,

2020); *Canty v. Corcoran*, Civ. No. GLR-18-1404, 2022 WL 899278 (D. Md. Mar. 28, 2022); *Layani v. Ouazana*, Civ. No. SAG-20-420, 2022 WL 11949038 (D. Md. Oct. 20, 2022), *with Noel v. Paccar Fin. Corp.*, 568 F. Supp. 3d. 558 (D. Md. 2021). While these judges reached different conclusions, all agreed on the proper analysis. They reasoned that law-of-the-case can only apply to an amended complaint if it does not include any new factual allegations and is subject to the same pleading standards as the original complaint. *Layani*, 2022 WL 11949038, at *4. As Judge Hollander explained in *Chase*, "'a properly filed amended complaint supersedes the original one,' thereby becoming the operative filing." *Chase*, 2020 WL 1914811, at *13 (quoting *Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451, 455 (4th Cir. 2017)). Thus, "when a defendant moves for dismissal of an amended complaint, the analysis wholly concerns the adequacy of the allegations contained in that filing." *Id.* But as Judge Simms recognized in *Noel*, if the amended complaint includes no new factual allegations and is subject to the same pleading standards, then, for the purposes of ruling on a motion to dismiss, the amended complaint is substantively no different from the original complaint. *Noel*, 568 F. Supp. 3d at 567. In such a situation, the law-of-the-case doctrine would apply.

The Court agrees that these two criteria are relevant for determining whether the law-of-the-case doctrine applies to a motion to dismiss an amended complaint, and the Court now considers how they apply here.

First, Defendants do not dispute that the amended complaint contains no new factual allegations. (ECF No. 92–2 at 4.) This factor leans toward application of law-of-the-case.

Second, Defendants assert that the amended complaint is subject to a new pleading standard because the substantive law about the first-to-file defense is different in the Fourth Circuit than in the Third Circuit. (ECF No. 99 at 2.) There are multiple problems with this argument.

13

Initially, this argument may not even be cognizable because federal law is presumed to be uniform. *See Bell v. CSX Transp., Inc.*, Civ. No. JKB-18-00744, 2024 WL 4570851, at *1 n.2 (D. Md. Oct. 24, 2024). Even if the Court can consider this, the Court disagrees that new "pleading standards" are now at play. An examination of *Canty* and *Chase* illustrates why. In those cases, the original complaints were brought *pro se* while the amended complaints were brought with the assistance of counsel. *Canty*, 2022 WL 899278, at *4; *Chase*, 2020 WL 1914811, at *1. Thus, the original complaints received deferential review under the more liberal standards afforded to *pro se* litigants. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In *Canty*, for instance, the plaintiff alleged a First Amendment violation. *Canty*, 2022 WL 899278, at *8. Judge Russell partially denied the motion to dismiss the original complaint, made *pro se*, under the more deferential pleading standard. *Id.* at *7. But when the plaintiff amended his complaint and the defendants again moved to dismiss, Judge Russell reconsidered the First Amendment issues but through the narrower pleading standard given to counseled litigants. *Id.* at *8. While the pleading standard changed, the underlying substantive First Amendment principles did not.

But Defendants' argument here is that a different substantive rule of law applies. A substantive rule of law is distinct from a pleading standard. In the section of their Reply brief dealing with this issue, Defendants only address the substantive change in law on the first-to-file issue.[3] (*See* ECF No. 99 at 2.) That is not the relevant inquiry.

This is underscored by Judge Hollander's analysis in *Chase*. Judge Hollander explained that "the Fourth Circuit has cautioned against applying the law of the case doctrine where the

---

[3] It is possible that a different pleading standard is raised here because Defendants' motion is now not just a motion to dismiss for failure to state a claim but also for lack of subject matter jurisdiction. However, in the section of their Reply brief addressing the applicability of law-of-the-case, Defendants do not raise this issue. They therefore forfeit it. *See United States v. Smith*, 75 F.4th 459, 468 (4th Cir. 2023). Even had Defendants properly raised this issue, the Court would likely find that no new pleading standard was at play because, as noted above, this 12(b)(1) motion is judged according to the same standard as a 12(b)(6) motion. And that was the same standard that Judge Savage previously employed when denying Defendants' motion to dismiss the original complaint.

14

previously litigated issue arises in a different procedural posture." *Chase*, 2020 WL 1914811, at

*13 (citing *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019)). The reason why law-of-the-case

usually does not apply in a different procedural posture is because the facts known to the court are

different. And these "different facts will lead to a different legal analysis to which the doctrine

cannot apply." *Graves*, 930 F.3d at 318. Similarly, where the procedural posture is the same but

the pleading standards are different (whether due to the presence of a *pro se* litigant or some other

reason), the court must view the facts in a different light, and that leads to a different legal analysis.

But here, the Court has no more facts available to it than Judge Savage did. (*See* ECF No. 92–2

at 4.) As a result, the pleading standard has not changed in any relevant sense.

Overall, these two factors—both considered by other judges in this District—lean toward

application of the law-of-the-case doctrine. However, this case presents a unique issue not faced

previously. Specifically, Relators ask the Court to apply law-of-the-case to a jurisdictional rule.

This factor counsels heavily against application of law-of-the-case. Thus, mindful that law-of-the-

case is a "malleable" doctrine that does not affect the court's power to rule, *see Am. Canoe Ass'n*,

326 F.3d at 515, the Court concludes that law-of-the-case is inapplicable here.

Relators argue that the Court should apply law-of-the-case to the first-to-file bar, which at

least in this Circuit, is a jurisdictional rule. *See United States ex rel. Rosales v. Amedisys N.C.,*

*L.L.C.*, 128 F.4th 548, 561 (4th Cir. 2025). However, the Fourth Circuit has held that the law-of-

the-case doctrine is significantly weaker when it comes to subject matter jurisdiction issues. *Am.*

*Canoe Ass'n*, 326 F.3d at 515. In *American Canoe*, the district court issued an initial opinion

finding that the plaintiffs had standing to sue. *Id.* at 510. Later, after more facts came to light, the

defendants moved for reconsideration of that decision. *Id.* at 511. The district court denied the

motion after finding that law-of-the-case applied. *Id.* at 512. The Fourth Circuit reversed. *Id.* at

15

516.

The Fourth Circuit based its decision on two primary rationales. First, it noted the paramount importance of being correct on the issue of subject matter jurisdiction. *Id.* at 515. The court emphasized that nowhere is the responsibility to be correct "greater and more unflagging than in the context of subject matter jurisdiction issues." *Id.* To illustrate this, the Fourth Circuit highlighted various rules that change when subject matter jurisdiction is at stake. *Id.* Accordingly, the Fourth Circuit concluded that a district court has much less discretion to abide by prior interlocutory orders when Article III subject matter jurisdiction is at issue. *Id.*; *accord Owens v. Stirling*, 967 F.3d 396, 425 (4th Cir. 2020) ("[T]he substantiality standard implicates our very jurisdiction to consider Owens's appeal, an issue that circuit courts have tended to view as immune from the law of the case doctrine in light of our duty to dismiss whenever it becomes apparent that we lack jurisdiction.") (cleaned up); *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116–19 (3d Cir. 1997).

Second, the Fourth Circuit noted the unique factual issues posed by the question of standing. The court explained that the original decision on standing was made early in the case before significant factual development or discovery. *Am. Canoe Ass'n*, 326 F.3d at 516. The court continued that while the earlier standing ruling could have served beneficial purposes, it should not have been given the "preclusive effect of a decision rendered after full trial, or even a decision rendered after full discovery." *Id.* Because "the defendants presented evidence going to the standing issue that had not been previously considered by the district court," the district court had a duty to reconsider its prior opinion. *Id.* That was so even though "the issue [was] close," which is evidenced by the fact that the Fourth Circuit ultimately found that the district court's original standing decision was correct. *Id.* at 516–17.

16

*American Canoe* is highly relevant to the instant case. Because the first-to-file bar is a jurisdictional rule, this Court has an "unflagging" obligation to determine if the bar applies because if it does, then this Court is divested of jurisdiction. *Am. Canoe Ass'n*, 326 F.3d at 515. The question then is how the first-to-file issue here differs from the standing issue in *American Canoe*. In *American Canoe*, the Fourth Circuit explained that because standing is a fact-intensive inquiry, the district court abused its discretion in not reconsidering additional facts. *Id.* at 516. But here, as already noted, this Court confronts the same facts as Judge Savage. The difference here is the law. In the Fourth Circuit, first-to-file is a jurisdictional rule, *Rosales*, 128 F.4th at 561, while in the Third Circuit, it is not, *In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 974 F.3d 228, 232 (3d Cir. 2020). The Court thus must confront the issue of whether it can consider the "new" law just as the Fourth Circuit said new facts must be confronted.

This Court has previously noted that a difference in law because of a circuit split may not be cognizable because federal law is presumed to be uniform. *See Bell v. CSX Transp., Inc.*, Civ. No. JKB-18-00744, 2024 WL 4570851, at *1 n.2 (D. Md. Oct. 24, 2024). Indeed, the Court has already made this observation in this Memorandum. (*See supra* at 14.) However, in this instance, the Court concludes that it must consider the Fourth Circuit caselaw because the Court has a "duty to dismiss whenever it becomes apparent that [it] lack[s] jurisdiction." *Owens v. Stirling*, 967 F.3d 396, 425 (4th Cir. 2020) (internal quotations and alterations omitted). And, as explained below, the Court determines that under recent Fourth Circuit precedent, the first-to-file rule bars Relators' claims, stripping this Court of jurisdiction. However, when Judge Savage ruled on this issue, he did not view the first-to-file rule as jurisdictional. But this "distinction sometimes matters." *Plavix*, 974 F.3d at 231. For instance, in the Third Circuit, "the plaintiff bears the burden of persuasion on jurisdiction, while the burden of showing that a complaint fails to state a claim falls

17

on the defendant." *Id.* Thus, had Judge Savage viewed first-to-file as a jurisdictional rule, his ruling may have been different.

After acknowledging that it is stripped of jurisdiction, the Court cannot then put on blinders and ignore this conclusion out of deference to Judge Savage's ruling on what was actually a different issue. *Cf. Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 698 (D.C. Cir. 2022) (Jackson, J.) ("Wye Oak's argument that the Fourth Circuit's ruling qualifies as law of the case falters at the threshold, because . . . this court and the Fourth Circuit panel are actually addressing *different* questions."). On the contrary, law-of-the-case is a "malleable" doctrine that is ultimately "discretionary rather than mandatory." *Owens*, 967 F.3d at 425 (internal quotations omitted). This Court must heed the Fourth Circuit's command that its "ultimate responsibility . . . to reach the correct judgment under law" is nowhere "greater and more unflagging than in the context of subject matter jurisdiction issues." *Am. Canoe. Ass'n*, 326 F.3d at 515. As detailed below, the Court concludes that it lacks subject matter jurisdiction to hear the merits of this dispute because the first-to-file bar applies. Accordingly, the law-of-the-case doctrine does not mandate that the Court abide by Judge Savage's ruling. [4]

### B. First-to-File Bar

The Court now explains why the first-to-file bar applies. When Judge Savage addressed this issue, he concluded that "naming unrelated defendants not named in *Carson*" means the first-

---

[4] In dicta in *Rosales*, the Fourth Circuit noted that it falls within "a rapidly shrinking minority of circuits" finding that first-to-file is a jurisdictional rule. *Rosales*, 128 F.4th at 561. The court also pointed to recent Supreme Court precedent suggesting that first-to-file is not jurisdictional. *Id.* at 561–62. However, the *Rosales* court ultimately decided not to revisit the issue. *Id.* at 562. Had the Fourth Circuit determined that first-to-file was not jurisdictional, then this Court would have been more amenable to applying law-of-the-case to Judge Savage's well-reasoned opinion. The Court also may have found that, despite *Rosales'* substantive analysis of the first-to-file rule, no "extraordinary circumstances" were present to create an exception to law-of-the-case because "[t]here is no authority for the proposition that a circuit split qualifies as a change in controlling law." *U.S. ex rel. Staley v. Columbia/HCA Healthcare Corp.*, 587 F. Supp. 2d 757, 762 (W.D. Va. 2008). But because first-to-file remains a jurisdictional rule in this Circuit, the Court is bound by *American Canoe* to reconsider Defendants' first-to-file arguments.

to-file rule does not apply. (ECF No. 45 at 22.) The Court finds Judge Savage's decision to be well-reasoned and persuasive. And if this Court were in his position, it may have ruled the same way. But after Judge Savage rendered his decision, the Fourth Circuit ruled that the first-to-file bar can still apply even if the second action names unrelated defendants. *Rosales*, 128 F.4th at 560. This Court is bound by that precedent. Accordingly, the Court holds that, under *Rosales*, the first-to-file bar precludes Relators' action in its entirety.

### 1. Background Law

The FCA authorizes *qui tam* suits to "encourage[e] citizens to act as whistleblowers" who root out fraud. *United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013), *aff'd in part, rev'd in part on other grounds sub nom. Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650 (2015). However, the first-to-file bar also requires that "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). The bar serves "[t]o reconcile [the FCA's] conflicting goals" of stamping out fraud while also "prevent[ing] parasitic lawsuits based on previously disclosed fraud." *Carter*, 710 F.3d at 181.

To determine if a later action is "related" to the original action, the Fourth Circuit applies the "same material elements" test. *Id.* at 182. Under this test, "a later suit is barred if it is based upon the same material elements of fraud as the earlier suit, even though the subsequent suit may incorporate somewhat different details." *Id.* (internal quotations omitted). "[D]ifferences in specifics—such as geographic location or added facts—will not save a subsequent case." *Id.* at 181. The purpose of this test is to determine if the original action put the government on notice of the fraud described in the later action. *See United States ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 302–03 (4th Cir. 2017) ("A belated relator who merely adds details to a previously

19

exposed fraud does not help reduce fraud or return funds to the federal fisc, because once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds) (internal quotations omitted); *accord Grynberg v. Koch Gateway Pipeline, Co.* 390 F.3d 1276, 1279 (10th Cir. 2004) ("Once the government is put on notice of its potential fraud claim, the purpose behind allowing *qui tam* litigation is satisfied." (citation modified)).

## 2. The *Rosales* Decision

Despite the seeming similarities of the two schemes, Relators contend that the first-to-file bar cannot apply because their action names entirely different defendants than Carson's action. Judge Savage addressed the same issue. He first noted the lack of Third Circuit caselaw assessing how to adjudicate a first-to-file argument when new defendants are involved. (ECF No. 45 at 14.) He then surveyed the caselaw of other circuits and concluded that "adding unrelated defendants in a later-filed FCA action does not bar the action under the first-to-file rule . . . where the second action asserts a new claim based upon a separate injury caused by another unrelated party." (*Id.* at 22.) Because these prerequisites were all met in this case, Judge Savage concluded that the first-to-file rule did not bar Relators' action against the SNFs.

Without the benefit of binding caselaw, this Court would have acted similarly to Judge Savage and may have come to the same conclusion as he did. However, this Court now has the benefit of binding caselaw. Earlier this year, the Fourth Circuit decided *Rosales*. That case controls here and requires a different result.

*Rosales* concerned a set of schemes similar to the ones at issue here. It involved alleged fraudulent practices at various hospice facilities all owned by Amedisys Holding, LLC ("Amedisys"). *Rosales*, 128 F.4th at 552–54. In August 2015, nurse Jackie Byers filed a *qui tam* complaint bringing FCA claims against Amedisys and its South Carolina subsidiary ("Amedisys

SC"). *Id.* at 553. While that case was under seal, in June 2020, home hospice case manager Ganesa Rosales filed her own sealed FCA complaint against Amedisys and its North Carolina subsidiary ("Amedisys NC"). *Id.* In October 2021, just after the *Byers* complaint was unsealed, Rosales amended her complaint to add as defendants to the existing counts Amedisys NC's medical director and his medical practice.[5] *Id.* at 554.

As relevant here, the Fourth Circuit held that the claims against the medical director and his practice were barred by the first-to-file rule. *Id.* at 560. The court began by explaining that the "first-to-file rule must be applied claim-by-claim and defendant-by-defendant." *Id.* at 555. However, the "first-to-file rule does not create a bright-line distinction based on the identities of the defendants." *Id.* at 558. Thus, even if the claims against Amedisys were barred, that did not automatically mean that the claims against the medical director were as well. But, by the same logic, the claims against the medical director were also not automatically immune from the first-to-file rule. "The emphasis is on the facts at play and whether the earlier-filed lawsuit was sufficient to promptly alert the government to the essential facts of a fraudulent scheme, not necessarily the identities of the defendants named in the complaints." *Id.* at 558 (internal quotations omitted).

In this instance, based on the "facts at play," the Fourth Circuit found that the claims against the medical director and his practice were barred because the government was sufficiently on notice of the fraudulent scheme alleged by Rosales. The court made two key determinations to reach this conclusion. First, the court explained that the *Byers* complaint—filed five years before the *Rosales* complaint—included two specific allegations against medical directors. *Id.* at 560. Second, the court found that in the *Byers* complaint, these allegations against the medical directors

---

[5] Rosales also lodged an additional count against all the defendants under the Anti-Kickback Statute, but that is not relevant here.

were described as "systematic" and "wide-spread" at Amedisys facilities. *Id.* When these facts were considered together, the Fourth Circuit concluded that the *Byers* complaint put the government on notice that medical directors at other Amedisys facilities—including Amedisys NC—must be committing fraud. *Id.* Thus, Rosales' later claims against the Amedisys NC medical director and his practice were barred by the first-to-file rule. *Id.*

### a) Substantive FCA Violations[6]

The same logic from *Rosales* applies to the substantive FCA counts in this case. Here, (1) Select is analogous to Amedisys, (2) Defendants are analogous to the Amedisys NC medical director and his practice, and (3) SNFs and their owners, generally, are analogous to medical directors and their practices, generally. The first question then is if the *Carson* complaint contained allegations against SNFs and their owners. The answer here is even clearer than in *Rosales* because the *Carson* complaint specifically named SNFs and their owners as defendants.

The Court now proceeds to the second question—whether the allegations against SNFs in *Carson* were characterized as nationwide such that the government was put on notice that other SNFs contracting with Select were also violating the FCA. Judge Savage addressed this same question and found that the allegations in the *Carson* complaint were not alleged to be nationwide. (ECF No. 45 at 21). But again, Judge Savage was not bound by *Rosales*. This Court is. And in *Rosales*, the Fourth Circuit pointed to only two allegations in the *Byers* complaint that were made on a nationwide basis. But those were still enough.

Here, although it is a close call, the Court concludes that the *Carson* complaint's allegations

---

[6] *Rosales* directs district courts to analyze the first-to-file bar claim-by-claim. *Id.* at 557. Here, Relators bring four counts. Three are for substantive violations of the FCA while one is for conspiracy to violate the FCA. Rosales' complaint alleged the exact same substantive violations of the FCA. But in *Rosales*, the Fourth Circuit did not address each count separately. Rather, likely because they were all based on the same underlying fraudulent scheme, the Fourth Circuit addressed them collectively. Likewise, the Court determines that all three substantive counts in Relators' complaint arise from the same underlying scheme, so the Court analyzes them collectively as the Fourth Circuit did. It then analyzes the conspiracy count separately.

surpass *Rosales*' low bar.   For instance, the *Carson* complaint states: "[T]he Defendants *systematically* engaged in a practice of billing for treatments that were to be delivered in the future." (*Carson* Dkt., ECF No. 1 ¶ 99 (emphasis added).)   And sometimes, "no further such treatment was ever rendered to the patient and management knew of this fact." *Id.*  It also described an individual who "knew that . . . improper treatments were done on a *nation-wide* basis because of where he had worked." (*Id.* ¶ 119 (emphasis added).)   Several paragraphs of the complaint also discussed Select and the SNFs' corporate-wide policies that called for delaying discharge of patients in order to bill the government for more treatment hours. (*Id.* ¶¶ 131–140.)   Finally, the Court is most persuaded by the fact that Carson made claims under not just the federal FCA but under fifteen state false claims laws. (*Id.* ¶¶ 174–311.)   Meanwhile, Select, the SNFs, and their owners were domiciled only in Illinois, Pennsylvania, and Maryland. (*Id.* ¶¶ 13–22.)   After reviewing the complaint, the government's most likely conclusion would have to be that the alleged conduct was also taking place in these other states.

Relators' Amended Complaint makes similar allegations, which are sufficient to show that the two actions assert the same material elements of fraud.   Relators allege that Defendants routinely engaged in improper billing and falsification of records.   For instance, Relators assert that Defendants engaged in "fraudulent and improper billing and payment coding corresponding to specific services that are unreasonable or not medically necessary." (*Goebel* D. Md. Dkt., ECF No. 86 ¶ 136.)   Relators then detail several examples of medically unnecessary treatment that Defendants performed so that they could bill the government for more money. (*See, e.g., id.* ¶¶ 160, 173.)   Relators also contend that Select and Defendants have broad corporate-wide policies which "require fraud to meet irrational productivity levels" rather than act "in the best interest of the patients." (*Id.* ¶¶ 302, 304.)   As Judge Savage concluded, "[t]here is no substantial difference

23

between the fraudulent schemes alleged in *Carson* and *Goebel*." (ECF No. 45 at 10.) But where the Court differs from Judge Savage is in its finding that the addition of new defendants does not change the conclusion. As guided by *Rosales*, the Court finds that "the earlier-filed lawsuit was sufficient to promptly alert the government to the essential facts of a fraudulent scheme." *Rosales*, 128 F.4th at 558 (internal quotations omitted). Even though the *Carson* complaint did not name Defendants, "the False Claims Act's first-to-file rule does not create a bright-line distinction based on the identities of the defendants." *See id.* Accordingly, the first-to-file bar precludes Relators' claims against Defendants.

Although the reasoning in *Rosales* controls this case, the Court notes one key difference. In *Rosales*, the Fourth Circuit's underlying assumption was that because the *Byers* complaint alleged systematic fraud by Amedisys medical directors, the government could essentially pick any Amedisys facility and find fraud by the medical directors. Thus, it was irrelevant that the *Byers* complaint did not refer directly to the Amedisys NC facility sued by Rosales.

But in the instant case, the facts are different. According to the Amended Complaint, Snow Hill—another SNF staffed by Select—was not aware of the fraudulent behavior that Select was perpetrating at Snow Hill. (ECF No. 86 ¶ 7.) Thus, even if the *Carson* complaint would put the government on notice that Select was executing a nationwide scheme, including at both Anchorage and Snow Hill, it would not provide the government with enough information to determine that *the SNFs and their owners themselves* were involved in such a scheme. In his opinion, Judge Savage also keyed onto this distinction when he noted that the facts laid out in the *Carson* complaint do not "provide the government with enough information from which it could discern a company-wide fraudulent scheme between Select and the 495 other SNFs it supplied therapy services, including the Maryland SNF named in this action." (ECF No. 45 at 21.)

24

However, under the logic of *Rosales*, the *Carson* complaint *did* put the government on notice that fraud was occurring at every SNF where Select operated. Even if the government did not know the identity of every wrongdoer, it knew where to find all the fraud. Given that the "first-to-file rule does not create a bright-line distinction based on the identities of the defendants," this is enough to satisfy the first-to-file bar. *See Rosales*, 128 F.4th at 558.

### b) FCA Conspiracy

The conspiracy count poses an even closer question, but the Court ultimately concludes that the analysis is no different. By definition, a conspiracy requires an agreement between two or more parties. *See Conspiracy, Black's Law Dictionary* (12th ed. 2024). Meanwhile, as explained above, the *Carson* complaint only put the government on notice of fraudulent behavior by a single party, Select, but not SNFs or their owners. Thus, there is a plausible argument that the government could not have discovered the conspiracy based off the *Carson* complaint even if it could have discovered the substantive FCA violations. However, the Court concludes that this argument is unavailing because *Rosales* is clear that the first-to-file inquiry is broad. *Rosales*, 128 F.4th at 558. Even if the government was not put on notice specifically of a conspiracy, it was put on notice that there was fraud occurring at every Select-operated facility. And that is enough for the government to go investigate and then find the conspiracy. *See United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 380 (5th Cir. 2009) (quoting *United States ex rel. LaCorte v. SmithKline Beecham Clinical Lab'ys, Inc.*, 149 F.3d 227, 234 (3d Cir. 1998)) ("[O]nce the government knows the essential facts of the fraudulent scheme, it has enough information to discover related fraud."). Thus, the FCA conspiracy count is also barred by the first-to-file rule.

25

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 92) will be granted, and this case will be closed. A separate order will issue.

DATED this ___ day of October 2025.

BY THE COURT:

James K. Bredar
United States District Judge

26